UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
SAN ANGELO DIVISION

ROBERT SCHELSKE, et al.,

      Plaintiffs,

v.

                                              No. 6:22-CV-049-H

LLOYD J. AUSTIN, III, in his official
capacity as United States Secretary of
Defense, et al.,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

The Army has a valid interest in vaccinating its soldiers, and it has made the COVID-19 vaccine mandatory. But its soldiers have a right to religious freedom, which in this case includes a sincere religious objection to the COVID-19 vaccine. Which side must yield? The answer lies in the Religious Freedom Restoration Act, which applies to the military: The Army must accommodate religious freedom unless it can prove that the vaccine mandate furthers a compelling interest in the least restrictive means. The Army attempts to meet that burden by pointing to the need for military readiness and the health of its force. But the law, including Fifth Circuit precedent, makes clear that these generalized interests are insufficient. Rather, the Army must justify denying these particular plaintiffs' religious exemptions under current conditions. Here, with 97% of active forces vaccinated and operating successfully in a post-pandemic world, the Army falls short of its burden. It admitted no evidence at the hearing, and its assertion that allowing the ten named plaintiffs to remain exempt would prevent the Army from satisfying its mission defies logic and is undermined by the record. Thus, the Court grants the plaintiffs' motion for a preliminary injunction; all disciplinary and separation procedures against the plaintiffs must cease.

The Court begins with what is not in dispute.  First, the Army concedes that the plaintiffs' sincerely held religious beliefs prevent them from receiving the COVID-19 vaccine.  Second, the Army recognizes that its vaccine mandate substantially burdens those beliefs.  Third, the Army agrees that it is subject to the Religious Freedom Restoration Act, which prevents it from substantially burdening religious beliefs unless it can prove that the burden furthers a compelling interest through the least restrictive means possible.  Fourth, 97% of active-duty soldiers are vaccinated against COVID-19, and thousands of soldiers have operated unvaccinated for the past year or so based on temporary, non-religious exemptions.  Fifth, Army policy permits it to grant religious exemptions but later rescind them if circumstances change.  And finally, despite these realities, nearly 2,000 Army soldiers have lost their jobs—and the opportunity to continue serving their country—for refusing to be vaccinated.

The parties' dispute centers on whether the Army can prove that application of the vaccine mandate to these plaintiffs furthers a compelling government interest through the least restrictive means possible.  At every turn, however, the evidence before the Court weighs against the Army and in favor of the plaintiffs.  For example:

- The Army has continued to operate successfully despite thousands of secular exemptions being granted and despite booster shots not being required for those that were previously vaccinated;

- The plaintiffs have fulfilled their job duties and not caused a single mission failure while unvaccinated;

- Seven plaintiffs received the support of their immediate commanding officers in seeking a religious exemption;

- The defendants' asserted interest in the plaintiffs' ability to quickly deploy is undermined by the fact that seven of the ten plaintiffs serve in non-deployable roles;

- The Army's high vaccination rate—coupled with the plaintiffs' compliance with safety protocols and low health risk—lessens the asserted, generalized interest in the Army's health and safety;

- The generic, nearly identical letters denying religious exemptions—which include errors, inaccuracies, and, in one instance, the wrong name—make clear that the Army did not conduct the necessary individualized analysis;

- The Army based its 2021 mandate on CDC data and guidance, but circumstances have changed, including the Army's near-perfect vaccination rate, the weakening strain of the virus, and the decline in COVID-19-related casualties; and

- Less restrictive means, including temporary exemptions and safety protocols, have been employed successfully for an extended period of time, but the Army provides no evidence why the more restrictive burden—vaccination—is required.

Thus, the record makes clear that, at nearly 100% vaccination, the Army has met its mission, with few exceptions, to vaccinate its force from COVID-19.  But the law requires the Army to make a tactical withdrawal from this small field of sincere religious objectors who, despite being unvaccinated, will not undermine its mission.  To the contrary, they have served with valor and distinction even as the Army tried to discard them.

Finally, the Court recognizes that much of this litigation may soon be moot. Congress recently passed the National Defense Authorization Act for Fiscal Year 2023 (NDAA).  If signed by the President into law, the NDAA would require the Secretary of Defense to "rescind the mandate that members of the Armed Forces be vaccinated against COVID-19" within 30 days of enactment.  National Defense Authorization Act for Fiscal Year 2023, H.R. 7776, 117th Cong. § 525 (2022).  Despite these developments, the Army has refused to commit to halting separation proceedings against the plaintiffs by way of any agreement that this Court can enforce.  And there is no real indication that separations will cease.  To the contrary, the Army recently delivered to one West Point cadet recoupment documents that detail his obligation to reimburse the Army for over $150,000 in educational

costs upon his disenrollment.  Therefore, despite the Court's frustration with the Army's litigation position, it has no choice but to resolve the dispute before it.

1.      **Factual and Procedural Background**

The plaintiffs include a First Lieutenant, a 35S Signals Collector/Analyst Instructor, a Senior Construction Equipment Repairer, an Apprentice Signals Collection Instructor, a 19D Cavalry Scout, and five cadets in different stages of their training at the U.S. Military Academy at West Point.  *See* Dkt. No. 14.  Collectively, they bring suit against the defendants—each a federally appointed Department of Defense official—for violating their statutorily and constitutionally protected religious rights.

A.      **The Army's Vaccine Mandate**

The Department of Defense (DoD) promotes a general policy of "medical readiness," requiring its service members to, "as a condition of continued participation in military service, . . . maintain their health and fitness, meet [immediate medical readiness requirements], and report medical issues . . . that may affect their readiness to deploy, ability to perform their assigned mission, or fitness for retention in military service."  Dep't of Def. Instruction 6025.19 ¶ 1.2(b), Individual Medical Readiness Program (July 13, 2022).[1]  In order to "maximize the lethality and readiness of the joint force," the DoD expects "all [s]ervice members . . . to be deployable."  Dep't of Def. Instruction 1332.45 ¶ 1.2(a), Retention Determinations for Non-Deployable Service Members (July 30, 2018).[2]  As part of its ongoing efforts to achieve readiness and deployability amongst its members, the DoD has sought to "[m]aintain[] a fully immunized force."  Dkt. No. 39-1 at 263.

---

[1] Available at: https://www.esd.whs.mil/portals/54/documents/dd/issuances/dodi/602519p.pdf.

[2] Available at: https://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodi/133245p
.pdf?ver=2018-08-01-143025-053.

In August 2021, the military issued its COVID-19 vaccine mandate.  Specifically, the DoD issued a directive entitled "Mandatory Coronavirus Disease 2019 Vaccination of Department of Defense Service Members."  Dkt. No. 14 at 6.  As its title suggests, it directs each military branch to pursue "full vaccination" of its service members against COVID-19 with a stated goal of achieving a "healthy and ready force."  *Id.*  A service member is considered "fully vaccinated" two weeks after receiving the final dose of any FDA-approved vaccine.  *Id.*  Additionally, "[s]ervice members voluntarily immunized with a COVID-19 vaccine under FDA Emergency Use Authorization or World Health Organization Emergency Use Listing . . . are considered fully vaccinated."  *Id.*  However, "[t]hose with previous COVID-19 infection are not considered fully vaccinated."  *Id.*  The directive orders each branch to "promulgate appropriate guidance" and "impose ambitious timelines" for implementation of this mandate.  *Id.* at 6–7.

Taking heed of this mandate, in September 2021, the Army issued Fragmentary Order 5 (FRAGO 5) to Headquarters Department of the Army (HQDA) Execution Order (EXORD) 225-21, "COVID-19 Steady State Operations."[3]  Dkt. No. 39-1 at 264.  FRAGO 5 states that the Army "will achieve" a minimum 90% vaccination rate among active-duty soldiers by December 1, 2021.  FRAGO 5 to HQDA EXORD 225-21 COVID-19 Steady State Operations (hereinafter "FRAGO 5"), ¶ 3.B.3.  A soldier is considered fully vaccinated two weeks after receiving the final dose of an authorized vaccine.  *Id.* ¶ 3.D.8. Any soldier who refuses to take the vaccine without an approved exemption must be

---

[3] Available at: https://armyreup.s3.amazonaws.com/site/wp-content/uploads/2021/09 /14205311/FRAGO-225-21.pdf.

The Army has since published FRAGOs 6–34, which include various additions and modifications to FRAGO 5.  Those changes are covered below as necessary as detailed by the declaration of Colonel Kevin J. Mahoney.  *See* Dkt. No. 39-1 at 261–81.

"legally ordered to do so." *Id.* ¶ 3.D.8.B.2. "[F]ailure to obey th[at] order may result in adverse administrative or punitive action." *Id.*

Next, the Army informed soldiers that dire consequences awaited those who refused to get vaccinated. The Secretary of the Army issued a directive setting forth "procedures for flagging [s]oldiers who refuse the COVID-19 vaccination." Dkt. No. 14 at 13. The "effective date of the flag" is when a soldier "makes a final declination of immunization." *Id.* The soldier must remain flagged until "[he] [is] fully vaccinated, receive[s] an approved medical or administrative exemption, or [is] separated from the Army." *Id.* Though flagged soldiers may remain eligible for "retirement, unqualified resignation, and separation upon expiration of term of service," they are not eligible for "[f]avorable personnel actions," including, but not limited to, "reenlistment, reassignment, promotion, appearance before a semi-centralized promotion board, issuance of awards and decorations, attendance at military and civilian schools, application for or use of tuition assistance, payment of enlistment bonus or selective reenlistment bonus, or assumption of command." *Id.* at 13–14. The directive authorizes commanders to "impose bars to continued service . . . for all [s]oldiers who refuse the mandatory vaccination order without an approved exemption or a pending exemption request." *Id.* at 14.

About two months later, the Secretary of the Army issued another directive instructing commanders to "initiate involuntary [] separation proceedings" against soldiers who refuse the vaccine after "final action is taken to deny" their requests for exemption— and to do so quickly. *Id.* at 18. The basis for any such separation is, with respect to enlisted personnel, the "Commission of a Serious Offense"; with respect to officers, "Misconduct, Moral or Professional Dereliction"; and with respect to cadets, "Misconduct." *Id.* at 18–19,

– 6 –

21.  Barring any "additional misconduct," personnel separated on this basis "will be issued either an Honorable or General (under honorable conditions) characterization of service." *Id.* at 18.  They "will not be eligible for involuntary separation pay" and "may be required to repay" portions of "unearned" advancements.  *Id.* at 20.

The directive carves out exceptions to involuntary separation for those soldiers who initiated voluntary separation or retirement before July 2022, whose term of service expired before July 2022, or who otherwise retire within 120 days after receiving a final denial of an exemption.  *Id.* at 18–20.  Otherwise, commanders must process separation actions, from initiation to discharge, "as expeditiously as possible."  *Id.* at 18.

### i.   Exemptions to the Vaccine Mandate

The Army's vaccine mandate allows for two types of exemptions: medical and administrative.  FRAGO 5, ¶ 3.D.8.B.5.  Medical exemptions "may be temporary (up to 365 days) or permanent."  *Id.* ¶ 3.D.8.B.5.A.  Administrative exemptions include religious exemptions, as well as those provided for in the Army's existing policies, including exemptions for soldiers within 180 days of separation or retirement or those with 30 days or fewer of service remaining.  *Id.* ¶ 3.D.8.B.5*; see also* Army Regulation 40-562 ¶ 2-6(b), Immunizations and Chemoprophylaxis for the Prevention of Infectious Diseases (October 7, 2013)*.  A religious exemption "may be revoked under imminent risk conditions." FRAGO 5, ¶ 3.D.8.B.5.B.1.  Soldiers with a pending exemption request "are temporarily deferred from immunization, pending the outcome of their request or any appeal of a denied request."  *Id.* ¶ 3.D.8.B.5.B.3.

Several reasons could justify a medical exemption: (1) underlying health conditions, including, for example, pregnancy or a previous adverse response to immunization;

(2) medical evidence demonstrating immunity (notably, however, "the Army does not consider previous infections or positive serology a basis for exemption from the COVID-19 vaccine"); or (3) the lack of a "readily definable" clinical case.  Dkt. No. 39-1 at 266–67.  The applicant's healthcare provider may unilaterally approve a temporary medical exemption (i.e., one for 365 days or less).  *Id.* at 267.  And a permanent medical exemption simply requires approval from the Regional Health Command-Commanding General (RHC-CG) where the applicant is assigned.  *Id.* at 267–68.  A soldier can appeal a denial of a permanent medical exemption to the Surgeon General.  *Id.* at 268.

In contrast, with respect to religious exemptions, an applicant "who believe[s] [his] religious practices conflict with immunization requirements" must submit an exemption request in memorandum format, along with optional supplemental documentation like a letter from a religious leader.  *Id.* at 268–69.  The request must include the "[s]oldier's name, rank, military occupational specialty, and a description of the religious tenet or belief that is contrary to the immunization."  *Id.* at 269.  The applicant has the burden of showing "a sincerely held religious belief" and that the vaccine mandate "substantially burdens [his] religious exercise."  *Id.* at 271.

Then, the applicant must partake in a meeting with his assigned chaplain, who must "provide a memorandum that summarizes the interview and addresses the religious basis and sincerity of the [s]oldier's request."  *Id.* at 269.  Additionally, a licensed healthcare provider must counsel the soldier to "ensure that he . . . is making an informed decision." *Id.*  The healthcare provider should address specific information about COVID-19, the benefits of vaccination, and the risk of infection for unvaccinated individuals.  *Id.*  Lastly, the applicant's immediate commander must also counsel him regarding the consequences of

his noncompliance with the vaccine mandate, specifically with respect to "deployability, assignment, and domestic or international travel." *Id.* at 269–70.

The applicant's religious-exemption request must be processed through his "battalion, brigade, division, and General Court-Martial Convening Authority (typically a General Officer) Commanders." *Id.* at 268. Each commander up the applicant's chain of command must review his request and make a recommendation of approval or denial, but, ultimately, the Surgeon General makes the final determination. *Id.* at 269–70.

If the Surgeon General denies the request, the applicant may appeal to the Assistant Secretary of the Army (Manpower and Reserve Affairs) (ASA (M&RA)). Dkt. No. 71 at 10. As with the initial request, an appeal must go through the soldier's entire chain of command, who must provide updated recommendations. *Id.* Additionally, a new chaplain and medical provider must conduct supplementary review of the record on appeal. *Id.* at 11. The ASA (M&RA) will then make the final decision on appeal "after a privileged conversation with her legal advisor." *Id.*

FRAGO 5 states that the review process must comply with the Army's existing policies regarding religious exemptions to immunization. FRAGO 5, ¶ 3.D.8.B.5.B. Those policies specifically implicate RFRA, directing the reviewing authority to grant a religious exemption—so long as the applicant has demonstrated a sincere religious belief that has been substantially burdened by the vaccine mandate—unless the Army has demonstrated (1) "a compelling governmental interest" for denial; and (2) that denying the request "is the least restrictive means of furthering that compelling governmental interest." Dep't of Def.

Instruction 1300.17 ¶ 3.2(d), Religious Liberty in the Military Services (September 1, 2020).[4]

Army policy further requires that all requests "be assessed on a case-by-case basis," meaning that "[e]ach request must be considered based on its unique facts; the nature of the requested religious accommodation; the effect of approval or denial on the [s]oldier's exercise of religion; and the effect of approval or denial on military necessity." Army Regulation 600-20 ¶ 5-6(a)(4), Army Command Policy (July 24, 2020).[5]

As with any religious exemption to immunization, a religious exemption to the COVID-19 vaccine mandate "may be revoked in the case of an imminent risk of exposure to a disease for which an immunization is available." *Id.* ¶ P-2(b)(8). If a soldier's General Court-Martial Convening Authority (GCMCA) "identifies a specific and concrete threat to health and safety" based on the exemption, he may initiate proceedings to suspend it. *Id.* ¶ 5-6(f)(3)(a). In "exigent circumstances involving an imminent threat to health and safety," the GCMCA may expedite those proceedings, and "in urgent circumstances," he may require immediate suspension. *Id.* ¶ 5-6(f)(3)(b). The GCMCA will only "reinstate the suspended accommodation when the specific and concrete threat to health and safety as a result of the accommodation no longer exists." *Id.* ¶ 5-6(f)(3)(c).

Despite these detailed policies, the military struggled to comply with the standards applicable to religious-exemption requests. On June 2, 2022, the Acting Inspector General for the DoD issued a memorandum regarding "potential noncompliance with standards for reviewing and documenting the denial of religious accommodation requests of [s]ervice

---

[4] Available at: https://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodi /130017p.pdf.

[5] Available at: https://www.armyresilience.army.mil/ard/images/pdf/Policy/600-20%20Army %20Command%20Policy.pdf.

members."  Dkt. No. 14 at 26.  In particular, the memorandum notes a "trend of generalized assessments rather than the individualized assessment that is required by [f]ederal law and DoD and Military Service policies."  *Id.*  It also highlights the alarming "volume and rate" at which denials are processed—approximately 50 denials per day over the 90-day review period, leaving an average of 12 minutes to consider each package.  *Id.* at 27.

### ii.    Enforcement of the Vaccine Mandate

In accordance with FRAGO 5, the disciplinary process for a soldier whose exemption is denied begins when a commander requests issuance of a General Officer Memorandum of Reprimand (GOMOR).  Dkt. No. 39-1 at 274.  The soldier must receive an opportunity to respond, and the General Officer will decide whether to store the GOMOR in the soldier's permanent file.  *Id.* at 275.

In addition to the issuance of the GOMOR, a commander must initiate separation proceedings against a noncompliant soldier.  *Id.*  Soldiers with more than six years of total service are entitled to have their separation adjudicated by an administrative board.  *Id.* at 276.  The Deputy Assistant Secretary of the Army (Review Boards) (DASA (RB)) directs retention or discharge of officers.  *Id.* at 278.  Any separation action of a soldier with more than 18 years of service "must be forwarded through the Commander of U.S. Army Human Resources Command to the Secretary of the Army, or [her] designee."  *Id.* at 277.

Cadets receive different process.  A cadet is entitled to a formal misconduct hearing, and the board will submit a recommendation to the Commandant of Cadets.  *Id.* at 338–39, 341.  The Commandant will then make a recommendation to the Superintendent of the Academy.  *Id.*  The Superintendent may initiate separation for any cadets who have not

commenced the first term of their second-class year. *Id.* In all other cases, the ASA (M&RA) retains final approval authority. *Id.* at 342.

As of December 8, 2022, 97% of the Army's active-duty soldiers have received the COVID-19 vaccine. Dkt. No. 71 at 8. A total of 1,851 soldiers have been separated so far for refusing to take the vaccine. *Id.* A total of 65 soldiers have received a permanent medical exemption, while 1,100 have been denied. *Id.* Further, 13,044 soldiers have received temporary exemptions—whether a temporary medical exemption, an administrative exemption, or an exemption while awaiting final determination of a request for a religious or permanent medical exemption. *Id.* No more than 9,068 of the temporary exemptions relate to pending requests for religious exemption.[6] Tr. at 12. Regardless of the reason, there are thousands of soldiers who have received a temporary exemption to the vaccine mandate and have continued serving over the past year.

As shown in the table below, a total of 1,913 religious-exemption requests have been denied, while 123 have been approved. Dkt. No. 71 at 8. The defendants concede that 21% of those soldiers (approximately 26 of them) had a planned separation date within a year at the time of approval. *Id.* at 5. With respect to the other 97 soldiers, the defendants have provided no context—except for a conjecture during the hearing that perhaps those soldiers were not deployable. Tr. at 21. They have otherwise refused the plaintiffs' requests to produce documentation concerning those soldiers' religious-exemption requests and the reasons for approval. *Id.* at 244.

---

[6] At the preliminary injunction hearing, the defendants stated that the total number of religious-exemption requests (9,068) was equivalent to the current number of temporary exemptions related to a pending request for religious exemption. Tr. at 12. However, 2,036 of those requests have already been decided. *See* Dkt. No. 71 at 8. Therefore, it would seem that only 7,032 temporary exemptions could relate to pending requests for religious exemptions, while the other 6,012 do not.

| U.S. Army COVID-19 Exemption Data[7] | | | |
|---|---|---|---|
| **Temporary** | **Approved:** *(includes requests for permanent exemptions)* | | |
| Active Army | 2,336 | | |
| Army National Guard | 6,578 | | |
| Army Reserve | 4,130 | | |
| **Permanent Medical** | **Approved:** | **Disapproved:** | **Requested:** |
| Active Army | 30 | 722 | 783 |
| Army National Guard | 14 | 62 | 79 |
| Army Reserve | 21 | 316 | 361 |
| **Permanent Religious** | **Approved:** | **Disapproved:** | **Requested:** |
| Active Army | 119 | 1,797 | 4,440 |
| Army National Guard | 1 | 65 | 2,265 |
| Army Reserve | 3 | 51 | 2,363 |

### B.    The Plaintiffs

Each plaintiff has requested an exemption to the Army's vaccine mandate due to religious opposition to the use of fetal cell lines in developing the COVID-19 vaccine.  Dkt. No. 14 at 37, 64, 99, 122, 149, 184, 225, 261, 281, 319.  For example, Lieutenant Bakich states in his request that, as a practicing Catholic, he is "obligated" to "consciously object to . . . any vaccine which uses aborted fetal tissue in any part of the vaccine process."  *Id.* at 35.  Sergeant Schelske provides that "[his] convictions on the matter of abortion," as an active member of the Protestant Church, counsel against "any vaccination that has used human fetal cell tissue" in development or production.  *Id.* at 281.  Cadet Mell asserts that he has a "moral duty" to refuse vaccines that "are produced using human cell[] lines derived

---

[7] U.S. Army Public Affairs, *Department of the Army Updates Total Army COVID-19 Vaccination Statistics* (Dec. 12, 2022), https://www.army.mil/article/262681/department_of_the_army_updates _total_army_covid_19_vaccination_statistics.

from direct abortions." *Id.* at 185.  Cadet Bufkin tells the personal story of the pressure his own mother—at the time a student pilot in the Air Force—faced to receive an abortion and how her "personal relationship with Jesus Christ compelled her to stand up for life."  Dkt. No. 39 at 42.  The plaintiffs' assigned chaplains have confirmed the sincerity of their beliefs.  Dkt. Nos. 14 at 43, 80, 101, 123, 152, 232, 259, 284, 321; 39 at 246.

At the preliminary injunction hearing, three plaintiffs further testified on the significance of their religious convictions.  Sergeant Schelske said that he attended church "three times a week" throughout his childhood.  Tr. at 44.  In his words, his faith is "everything."  *Id.* at 45.  It "is the lens in which [he] [] look[s] through" in "every decision that [he] make[s]."  *Id.*  Similarly, Cadet Mell was raised in the church and now leads a Bible study for eighth graders.  *Id.* at 138–39.  He testified that he "ha[s] done everything [he] can to be a great follower of Jesus."  *Id.* at 139.  Though he chose to attend the U.S. Military Academy due to its biblically based principles, he refuses to "give up [his] faith [in] God for [his] Army."  *Id.* at 163.  Likewise, Sergeant Costroff testified that he "made the decision to not get the shots because [his] convictions are more important."  *Id.* at 202.

Seven plaintiffs received support from their immediate commanders in favor of a religious exemption.  Dkt. Nos. 39 at 21, 88, 130, 132, 247; 39-1 at 60, 103, 105, 156.  For instance, Cadet Conklin and Sabella's regimental tactical officer recommended approval of their exemption requests based on the high vaccination rate and current compliance with safety protocols amongst cadets at the U.S. Military Academy.  Dkt. Nos. 39 at 88; 39-1 at 60.  Sergeant Costroff and Schelske's company and battalion commanders also recommended approval.  They did so based on the "minimal impact" an exemption would have on their units—since they currently serve in non-deployable positions and cannot work

– 14 –

out of the office—and the fact that "less than 1%" of their units remain unvaccinated and service members in similar roles have "for the last 18 months [] been able to perform their duty with instruction to all students."  Dkt. Nos. 39 at 130, 132; 39-1 at 103, 105.

Commanders who did not recommend approval of the plaintiffs' religious-exemption requests relied on pre-made templates to convey that message.  Many of their recommendations contain no personalization other than a reference to the plaintiff's name and title.  *See, e.g.*, Dkt. Nos. 39 at 58, 94, 253; 39-1 at 20, 66.  In several cases, they merely checked a box or circled a term to denote their recommendation for disapproval.  Dkt. Nos. 39 at 19, 20, 22, 201, 207; 39-1 at 157, 158, 241.  In other cases, they gave a nod to the respective plaintiff's religious beliefs or referenced his unit, duties, or other involvements but, in every case, found exemption to be inappropriate based on the Army's "compelling" interests in health and readiness.  *See, e.g.*, Dkt. Nos. 39 at 53, 89, 134–35, 137, 248; 39-1 at 13, 61, 107–08, 110.  In particular, those commanders focused on the plaintiffs' contact with others—no matter how minimal—concluding that any contact with an unvaccinated soldier threatens the force's health and ability to achieve its mission.  *See id.*

But even the recommendations for disapproval contain conflicting evidence.  For example, one of Lieutenant Bakich's commanders stated that granting a religious exemption "would not significantly impact unit training requirements" because Bakich "mainly participates in training and exercise support roles without additional travel requirements."  Dkt. No. 39 at 26.  That commander also found a "low" public health risk due to the high vaccination rate amongst both Lieutenant Bakich and Sergeant Testa's unit and the general population where they are stationed.  *Id.*; Dkt. No. 39-1 at 162.  Nevertheless, the commander recommended against an exemption in each case.

– 15 –

All of the plaintiffs have contracted and recovered from COVID-19. Dkt. No. 30 at 10. And, as acknowledged by the defendants, the plaintiffs have not caused a single mission failure due to their unvaccinated status. Tr. at 262. To the contrary, they have performed exceptionally during the pandemic. For example, Lieutenant Bakich has taken command of the Scout Platoon and redeployed his platoon from Korea. Dkt. No. 14 at 33. Cadet Conklin has completed his classes, trainings, and testing with "above average" performance. *Id.* at 97. Cadet Sabella has never received any academic, physical, or military flags alerting him of deficiencies in his cadet report. *Id.* at 259.

The Court also learned more about the plaintiffs at the evidentiary hearing. First, Cadet Mell testified that he has served in various leadership roles, participated in extracurricular activities, and graduated from Air Assault School during the pandemic. Tr. at 152–55. He testified that he has contracted COVID-19 twice already—and that, each time, he believes he caught it from his vaccinated roommates. *Id.* at 146. Mell experienced only minor symptoms and "recovered fine." *Id.* Mell has always complied with the rigorous safety protocols imposed at West Point, including twice-weekly testing, masking, and quarantining when returning from breaks from school. *Id.* at 149. He testified that only five cadets out of approximately 4,000 remain unvaccinated, and he has successfully fulfilled his duties despite his close contact with many others. *Id.* at 152–55. Mell's tactical officer—who had regular interaction with him and observed him perform his duties— recommended approval of his exemption request, but he told Mell that he changed his recommendation on appeal due to "orders" from his chain of command. *Id.* at 176–78.

Second, Sergeant Schelske testified that he was selected to serve as the Non-Commissioned Officer in Charge of the Apprentice Signals Collection Course at

Goodfellow Air Force Base.  *Id.* at 101–02.  When he began this role in November 2020, he taught remotely in accordance with the Army's protocols at the time.  Tr. at 88.  Since then, he has instructed approximately 1,500 hours—the majority of those hours in person.  *See* Dkt. No. 14 at 280.  Schelske testified that he generally practices social distancing from his students and has complied with twice-weekly testing requirements.  Tr. at 41, 68.  Though he did contract COVID-19 in January 2021, he quarantined for about a week and then returned to work.  *Id.* at 42–43.  He was not hospitalized, did not cause an outbreak, has not contracted COVID-19 since, and has not cancelled any classes.  *Id.* at 42–43, 80.  Schelske further testified that he does not teach the Apprentice Signals Collection Couse by himself, so, even if he did pose a threat to students' health through in-person contact with them, other instructors can fill in as necessary while he works remotely.  *Id.* at 123.

Two of Schelske's commanders recommended approval of his religious-exemption request so that he could "continue his record of high performance" and his unit could "continue its very complex and specialized mission."  Dkt. No. 39-1 at 103.  In fact, they provided that Schelske's separation would hurt the force because Schelske "holds a critical role as an instructor in a critically short [Military Occupation Specialty]."  *Id.* at 106. Although the two commanders most removed from Schelske—neither of whom are located at Goodfellow Air Force Base, have interacted with him, or have witnessed him perform his duties—recommended disapproval, Schelske testified that his two most immediate commanders were able to best assess his request given their regular, personal interaction with him and their command of far fewer service members.  Tr. at 63–70.

Finally, Sergeant Costroff testified that he serves as a 35S Signals Collector/Analyst Instructor at Goodfellow Air Force Base, where he has trained nearly 500 soldiers since the

start of the pandemic. *Id.* at 186; Dkt. No. 14 at 119–21. He has also developed a

Graphical User Interface and personally trained a team of signal soldiers on equipment

familiarization and signals theory. Dkt. No. 14 at 121. Costroff testified that he contracted

COVID-19 earlier this year, had mild symptoms for about a day, and ultimately returned to

work. Tr. at 203, 206. He has not cancelled any classes due to COVID-19 and has not

otherwise witnessed any impact to operations at his level. *Id.* at 205. Costroff testified that

his course is "hands on," but other instructors can help out as needed. *Id.* at 204. He has

also complied with twice-weekly testing requirements and practices social distancing. *Id.* at

204–05. Further, all of his students are vaccinated. *Id.* at 196. In Costroff's view, the Army

has in fact "accommodated" him for 15 months without issue. *Id.* at 207.

     Costroff's most immediate commanders recommended that he receive an exemption

so that he can "continue his record of high performance" and "handl[e] sensitive material"

without any religious burden. Dkt. No. 39 at 130. They noted that Costroff's separation

would "create a delay in the training pipeline for the 35S MOS[,] a strategic intelligence

asset for national level leadership and policy makers." *Id.* at 133. Costroff testified that

these commanders were located at Goodfellow Air Force Base and periodically interacted

with him and checked on the "health and welfare" of the instructors, unlike the

commanders who recommended disapproval of his request. Tr. at 196–97.

     Nonetheless, the Surgeon General denied each plaintiff's request for a religious

exemption. Every cadet-plaintiff received a nearly identical letter of denial, stating that,

after consideration of the cadet's "specific" case, given his "current duties and role as a

cadet and future Army officer," his "shared" living and working environment, and the

"local transmission rates [and] risk of exposure and transmission," vaccination was deemed

"the least restrictive means to further the Department of the Army's compelling governmental interests," including "protecting [the cadet's] health, the health of the force, and ensuring mission accomplishment." Dkt. Nos. 14 at 193, 233, 263; 39 at 59, 95.

The other plaintiffs have also received strikingly similar denial letters from the Surgeon General. Each letter contains no more than five paragraphs. Four of those paragraphs contain the same boilerplate language, and only one contains any sort of personal references. *See* Dkt. No. 14 at 46, 124, 161, 287, 327. Even then, that paragraph does no more than list the plaintiff's job title and briefly mention his role—and only so far as necessary to show that his role requires interaction with others. *See id.* For instance, the denial issued to Lieutenant Bakich states that because he "serve[s] as both an Armor Officer[] and [] a platoon leader," he "must routinely be in close contact with other [s]oldiers." *Id.* at 46. Sergeant Costroff's denial letter similarly provides that his duties as a 35S AIT Instructor "do not allow sufficient space for social distancing." *Id.* at 124. And the letter to Sergeant Galloway asserts that "as a Construction Equipment Repairer, [he] would be required to work . . . alongside other members of [his] platoon." *Id.* at 161. Each letter notes the "grave risk" of COVID-19 and concludes that "vaccination is the least restrictive means to further the Department of the Army's compelling governmental interests," including "protecting [the soldier's] health, the health of the force, and ensuring mission accomplishment." *See id.* at 46, 124, 161, 287, 327.

Each plaintiff has appealed, and, in all but two cases, the ASA (M&RA) has affirmed the denial of his religious-exemption request. Those denials, too, follow a uniform template. The letters issued to each cadet-plaintiff provide identical reasons for denial, reiterating that because the cadet must "attend in-person classes that do not offer a virtual

alternative," "[is] exposed daily to [c]adets and [f]aculty," and in the future will need to "deploy in support of worldwide contingency operations," vaccination "is the least restrictive means to further the Army's compelling governmental interests of protecting the health of the force[] [and] ensuring [s]ervicemembers are medically fit and ready to deploy worldwide." *Id.* at 91, 113, 205, 253, 273.

Likewise, the denials issued so far on appeal to the officer-plaintiffs invoke identical, boilerplate language in four out of five paragraphs, while the remaining paragraph merely references the plaintiff's job title and states that his role requires in-person contact with others. *Id.* at 137, 292; Dkt. No. 37-2 at 2. Each letter concludes that vaccination "is the least restrictive means to further the Army's compelling governmental interests of protecting the health of the force[] [and] ensuring [s]ervicemembers are medically fit and ready to deploy worldwide." *Id.* at 137, 292; Dkt. No. 37-2 at 2.

Errors contained in the documentation submitted by Army officials throughout the process further demonstrate a lack of meaningful, individualized review. For example, an exhibit admitted during the hearing shows that the Brigadier General recommended denial of Cadet Mell's appeal due to a "lack of new or additional information," even though Mell included references to various studies in his appeal that he did not include in his original request. *See* PX 39 at 1–11, 14. Mell also received a notice for a formal misconduct hearing that mentioned "Cadet Rose" rather than him. PX 42 at 2. And Sergeant Costroff testified that the counseling forms submitted by his commander contained the "wrong names" and that he "d[id] [not] think anything on [the form] [wa]s accurate." Tr. at 194.

Since submitting their requests for religious exemption, the plaintiffs have received adverse treatment by the Army. They collectively complain of having been passed over for

leadership roles (Dkt. No. 14 at 182), barred from attending career-advancing courses and trainings (*id.* at 33, 120, 279– 80, 314–15), restricted from transferring to different posts (*id.* at 315), precluded from participating in events, trips, internships, and athletics (*id.* at 97, 182, 223, 260), and harassed and alienated by leadership (*id.* at 62, 223).  At least one plaintiff—Sergeant Galloway—was even ordered to complete all "separation prerequisites," including a "command-directed behavioral health appointment," before he had even received a final denial of his exemption request on appeal.  *Id.* at 146.

Further, at least one plaintiff—Sergeant Schelske—has attempted to receive a vaccine that (at the time) he believed to conform with his convictions.  In particular, Schelske applied to a trial of the COVAXIN trial but "was not accepted."  Dkt. No. 46-1 at 2.  He then requested time to coordinate travel to India to receive the NOVAVAX vaccine, but that request was denied at the direction of the Army's counsel.  *Id.* at 2–3.  Each plaintiff who testified at the preliminary injunction hearing stated that he would be willing to take a vaccine that complies with his religious beliefs.  Tr. at 81–82, 141–42, 199.

Nearly every plaintiff has been issued a GOMOR from his commander, formally denoting the Army's initiation of separation proceedings against him for his refusal to obey the "lawful order" that he take the COVID-19 vaccine.  Dkt. Nos. 14 at 207; 39-1 at 364, 366–67; 47-1 at 2, 4, 6; 56-1 at 2.  Though the plaintiffs remain at different stages of the separation process, at least one—Cadet Mell—has been recommended for separation by the board and issued recoupment paperwork.  *See* Dkt. Nos. 55; 55-1; 55-2.  His Regimental Executive Officer informed him that he will be separated "any day now."  Tr. at 180.

### C.    This Suit

The plaintiffs allege that the defendants have violated their rights under the Religious

Freedom Restoration Act and the First Amendment by substantially burdening their

sincerely held religious beliefs without a compelling interest or narrow tailoring to achieve

that interest.  Dkt. No. 1 ¶¶ 54–71.  The plaintiffs seek relief in the form of: (1) a declaration

that the challenged actions are unconstitutional and illegal; (2) class certification of those

similarly situated to the plaintiffs; (3) a preliminary injunction enjoining the defendants from

taking punitive action against the plaintiffs and those similarly situated to the plaintiffs due

to their requests for religious exemption to the vaccine mandate; and (4) a permanent

injunction (i) enjoining the defendants from retaliating, discriminating, or taking punitive

measures against those who participate in this litigation or request a religious exemption

and (ii) directing the defendants to reprocess religious-exemption requests without

discrimination and provide restorative relief as necessary.  *Id.* at 22–23.

Shortly after filing suit, the plaintiffs moved for a preliminary injunction "to enjoin

the [d]efendants from taking further punitive actions—including but not limited to

separation actions—against all [named] [p]laintiffs . . . for failure to take a COVID-19

vaccination in violation of their sincerely held religious beliefs."  Dkt. No. 29 at 1.  The

defendants responded in opposition (Dkt. No. 38), and the plaintiffs replied (Dkt. No. 46).

The parties presented argument to the Court in a six-hour evidentiary hearing held on

December 16, 2022.  Dkt. No. 77.  Three witnesses—Sergeant Schelske, Cadet Mell, and

Sergeant Costroff—testified, and the Court finds their testimony credible.  *See id.*  The

plaintiffs also admitted exhibits 1–60 without objection.  *Id.*  The defendants admitted no

evidence.  At this time, the plaintiffs' Motion for Preliminary Injunction (Dkt. No. 29) is ripe for review.[8]

## 2.      The Preliminary Injunction Standard

Federal Rule of Civil Procedure 65(a) authorizes federal courts to issue preliminary injunctions.  "A preliminary injunction is an extraordinary remedy," requiring a "clear showing" that plaintiffs are entitled to such relief.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 24 (2008).  The purpose of a preliminary injunction is to preserve the status quo and prevent irreparable injury until the court renders a decision on the merits.  *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974).  "In order to obtain a preliminary injunction, a movant must demonstrate (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction does not issue; (3) that the threatened injury outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction is in the public interest."  *Moore v. Brown*, 868 F.3d 398, 402–03 (5th Cir. 2017) (citing *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009)).  The Court takes each question in turn, but in the final analysis, "[l]ikelihood of success and irreparable injury to the movant are the most significant factors."  *Louisiana v. Becerra*, 20 F.4th 260, 262 (5th Cir. 2021) (citing *Veasey v. Perry*, 769 F.3d 890, 892 (5th Cir. 2014)). But, as always, the Court first turns to the question of its power to hear this case.

---

[8] The plaintiffs have since moved for class certification (Dkt. No. 48) and preliminary injunctive relief for the entire class (Dkt. No. 50).  That briefing is not yet ripe.  For now, the Court contains its discussion to the motion for preliminary injunction related to the named plaintiffs (Dkt. No. 29).

3.      **Justiciability**

Before addressing the merits, the Court must ensure that this is a justiciable case or controversy under Article III of the Constitution.  *See Holder v. Humanitarian L. Project*, 561 U.S. 1, 15 (2010).  Notably, in a case involving similar facts and issues, the Fifth Circuit held that the lawfulness of the military's vaccine mandate under RFRA and the First Amendment was justiciable.  *U.S. Navy Seals 1-26 v. Biden*, 27 F.4th 336, 349 (5th Cir. 2022).  That precedent controls here; therefore, the same outcome is warranted.

A.      **RFRA applies to the military and invites judicial review.**

The Court recognizes that "[g]enerally, courts refrain from reviewing internal military affairs.  The rationale is simple: '[J]udges are not given the task of running the Army.'"  *U.S. Navy SEALs 1-26 v. Biden*, 578 F. Supp. 3d 822, 829 (N.D. Tex. 2022) (quoting *Orloff v. Willoughby*, 345 U.S. 83, 93 (1953)).  The Fifth Circuit, however, has held that RFRA, "which applies to every 'branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States,'" expressly renders the plaintiffs' claims "justiciable."  *U.S. Navy Seals 1-26*, 27 F.4th at 345–46 (quoting 42 U.S.C. § 2000bb-2(1)).  Because RFRA "undoubtedly 'applies in the military context,' . . . [f]ederal courts are [] empowered to adjudicate RFRA's application to these [p]laintiffs."  *Id.* at 346 (quoting *United States v. Sterling*, 75 M.J. 407, 410 (C.A.A.F. 2016)).  Therefore, "it is likely that, following RFRA's enactment, [judicial abstention] is no longer permissible."  *Id.*

In fact, the Supreme Court has never adopted a general abstention test grounded in judicial policy that applies to all claims against the military.  *Doster v. Kendall*, 54 F.4th 398, 411 (6th Cir. Nov. 29, 2022).  To the contrary, when resolving statutory questions, the Supreme Court has refrained from intruding into military affairs only when the statute is

– 24 –

ambiguous as to whether intrusion is permissible.  *Id.*  But "[j]ust because 'congressionally uninvited intrusion into military affairs by the judiciary is inappropriate,' . . . does not mean that courts may 'decline' an invitation that Congress has sent."  *Id.* (quoting *United States v. Stanley*, 483 U.S. 669, 683 (1987)).  Here, RFRA expressly reaches the Army's officers—"officials" of the United States.  *See* 42 U.S.C. § 2000bb-2(1).  And it "applies to all [f]ederal law, and the implementation of that law, whether statutory or otherwise."  42 U.S.C. § 2000bb-3(a).  It thus applies to the Army's vaccine mandate, which implements federal law.  *See* Dep't of Def. Instruction 6205.02, Dep't of Def. Immunization Program (July 23, 2019).[9]  Congress has therefore invited judicial review here through RFRA, and this Court cannot decline that invitation.

Nonetheless, taking the Fifth Circuit's lead and "[i]n an abundance of caution," the Court will consider the judicial-abstention doctrine set forth in *Mindes v. Seaman*, 453 F.2d 197 (5th Cir. 1971).  *See U.S. Navy Seals 1-26*, 27 F.4th at 346.  *Mindes* provides that "a court should not review internal military affairs" unless the plaintiff (1) "alleg[es] . . . the deprivation of a constitutional right"; and (2) has "exhaust[ed] . . . available intraservice corrective measures."  453 F.2d at 201.  "If the plaintiff satisfies both criteria, then the [C]ourt considers a series of factors, 'including' (1) '[t]he nature and strength of the plaintiff's challenge to the military determination[;]' (2) '[t]he potential injury to the plaintiff if review is refused[;]' (3) '[t]he type and degree of anticipated interference with the military function[;]' and (4) '[t]he extent to which the exercise of military expertise or discretion is involved.'"  *U.S. Navy Seals 1-26*, 27 F.4th at 346–47 (quoting *id.* at 201–02).

---

[9] Available at: https://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodi/620502p—.pdf?ver=2019-07-23-085404-617.

**B.**    **In any event, the plaintiffs satisfy the two-part threshold *Mindes* inquiry.**

As a preliminary matter, the Court finds that the plaintiffs satisfy the two-part

threshold *Mindes* inquiry.  The plaintiffs satisfy the first *Mindes* requirement because "they

allege constitutional violations of the First Amendment and RFRA, which 'secures

Congress' view of the right to free exercise under the First Amendment.'"  *U.S. Navy Seals 1-*

*26*, 27 F.4th at 347 (quoting *Tanzin v. Tanvir*, 141 S. Ct. 486, 489 (2020)).

The second *Mindes* requirement—that the plaintiffs exhaust administrative

remedies—is meant to preclude "courts from interfering with the administrative process"

and allow the military "to fully exercise its own expertise and discretion" prior to judicial

review.  *Von Hoffburg v. Alexander*, 615 F.2d 633, 637–38 (5th Cir. 1980).  The Fifth Circuit

addressed this requirement in the context of the Navy's vaccine mandate, holding that the

plaintiffs had exhausted their administrative remedies when their "appeals [of the denials of

their religious-exemption requests] ha[d] been finally adjudicated."  *U.S. Navy Seals 1-26*, 27

F.4th at 347 n.10.

Here, eight plaintiffs have similarly received a "final" decision on appeal to the ASA

(M&RA).  Dkt. Nos. 14 at 91, 113, 137, 205, 253, 273, 292; 37-2 at 2.  Thus, contrary to the

defendants' claim that the plaintiffs must complete all "separation [and] post-separation

processes" (Dkt. No. 38 at 27), the plaintiffs have exhausted the Army's administrative

remedies as required by *Mindes*.  *See Air Force Officer v. Austin*, 588 F. Supp. 3d 1338, 1350

(M.D. Ga. 2022) (finding that "exhaustion [was not] even a speedbump" when the plaintiff

had "submitted her religious accommodation request and [the] [d]efendant ultimately

denied her final appeal").

With respect to the only two plaintiffs—Bakich and Testa—who have not yet received a final decision on appeal, the Fifth Circuit has identified at least four exceptions to the exhaustion requirement. Those include "futility, inadequacy of administrative remedies, irreparable injury, and a substantial constitutional question." *U.S. Navy SEALs 1-26*, 578 F. Supp. 3d at 830 (citing *Von Hoffburg*, 615 F.2d at 638). The Court finds that the plaintiffs have satisfied each exception, discussed in turn below.

First, the futility exception to the exhaustion requirement applies in this case. Although a plaintiff must generally exhaust administrative remedies, this rule encompasses "only those remedies which provide a real opportunity for adequate relief." *Hodges v. Callaway*, 499 F.2d 417, 420 (5th Cir. 1974). In other words, a plaintiff need not exhaust administrative remedies if such "would be futile." *Id.* The administrative process is futile if it provides no viable opportunity to correct an alleged wrong. *M.L. v. Frisco Indep. Sch. Dist.*, 451 F. App'x 424, 428 (5th Cir. 2011). The unlikelihood that a claim will succeed, however, does not by itself make the process futile. *U.S. Navy Seals 1-26*, 27 F.4th at 347. Rather, the plaintiff must show that the respective reviewing body "has effectively stacked the deck" against his claim for relief. *Id.*

In *U.S. Navy SEALs 1-26 v. Biden*, the district court found that the record "overwhelmingly indicate[d] that the Navy w[ould] deny [] religious accommodations," 578 F. Supp. 3d at 831, and the Fifth Circuit agreed, 27 F.4th at 347. The Navy had "denied all religiously based claims for exemption from COVID-19 vaccination" as of the date of suit. *Id.* With respect to the individual plaintiffs, the Navy had denied 29 of their 35 requests, with the remaining requests still pending and most of the denials on appeal pending final resolution. *U.S. Navy SEALs 1-26*, 578 F. Supp. 3d at 828. The Navy employed a "six-

– 27 –

phase, fifty-step process," in which—despite its policy of assessing requests "on a case-by-case basis"—an administrator would "update a prepared disapproval template with the requester's name and rank." *Id.* (emphasis omitted).  From there, the "review" process commenced, though the district court—affirmed by the Fifth Circuit—characterized this "boilerplate" rejection process as "pre-determined" and contrary to the "individualized review required by law." *Id.*; *U.S. Navy SEALs 1-26*, 27 F.4th at 347.

Unlike in *U.S. Navy SEALs 1-26 v. Biden*, the Army has granted *some* religious exemptions to its COVID-19 vaccine mandate—but not many.  To date, the Army has granted just 123 of them.  *See supra* Section 1.A.ii.  Out of the total 9,068 religious exemptions requested, this amounts to a 1.35% approval rate and, out of the total 2,036 religious-exemption requests that have been decided, a mere 6.04% approval rate.  *See id.* The defendants also concede that 21% of those exemptions were granted to applicants who planned to leave the Army within a year of approval.  *See id.*  That added color renders those 26 approvals meaningless for purposes of this analysis, as the Army granted them based on a technicality—not an individualized RFRA analysis.  *See Doster*, 54 F.4th at 409 (stating that to consider the number of religious exemptions granted to service members intending to "leave the service" within a year "overstat[ed] things").

As for the remaining 97 exemptions, the defendants have refused to provide evidence that would shed light on the rationale behind these exemptions.  Notably, on November 8, 2022, Colonel Kevin Mahoney stated that only 60 religious-exemption requests had been granted—40% of those exemptions (or 24 of them) to soldiers who planned to depart within a year.  Dkt No. 39-1 at 272–73.  Just a month later, the number of approved religious exemptions doubled, and nearly all of them went to soldiers without an upcoming

separation date.  *See supra* Section 1.A.ii.  When the Court questioned the defendants about

the reason for this sudden spike, they claimed that it was prompted by the Army's shift in

focus to "severe illness, hospitalization, and death" rather than "transmission," following an

August 11 press release by the CDC.  Tr. at 18–19.  The defendants could not, however,

point to any official announcement by the Army regarding this change in the calculus.  *Id.* at

20.

Rather than resolving the Court's confusion, the defendants' explanation creates

more of it.  For instance, if a report by the CDC in early August led to more lenient review

procedures, it does not make sense why a spike in approvals did not occur until November.

Moreover, the defendants suggest that the Army likely granted these exemptions to soldiers

who "[we]re not likely to deploy."  Tr. at 21.  If that were the case, then it should have

granted Sergeant Costroff's request, given his non-deployable position and the fact that he

did not receive a final decision on appeal until September 2022.  *See* Dkt. No. 14 at 120,

137.  Regardless, whatever the reason for the surge in approvals after the onset of this

litigation, this inconsistency in outcome reveals arbitrariness in the process.  The defendants

have yet to produce evidence differentiating the requests the Army has granted from the

ones it has denied—and it surely would have if such evidence existed.  Without this critical

information, the Court cannot conclude that requiring the remaining plaintiffs to exhaust

the appellate process will ensure meaningful review of their requests.

In fact, the boilerplate denials issued to all of the plaintiffs—both initially by the

Surgeon General and on appeal by the ASA (M&RA)—undercut any claim that their

requests were meaningfully reviewed.  Each cadet has received identical denial letters that

vary only with respect to the date and each cadet's name and religious denomination.  *See*

– 29 –

*supra* Section 1.B.  Similarly, the denial letters issued to each officer follow a form template, adjusting only for the date, the officer's name, and a mention of his role and contact with others.  *See id.*  Across the board, each letter contains boilerplate language concerning the threat of COVID-19 to the "health" and "readiness of the force," concluding in every case—no matter the sincerity of the applicant's beliefs or the burden posed to them—that "vaccination is the least restrictive means" to ensure "mission accomplishment."  *See id.* Even though Army policy requires consideration of "the effect of . . . denial on the [s]oldier's exercise of religion,"[10] at the hearing, the defendants failed to identify any specific evidence that this had been done.  Tr. at 252–53.  As in *U.S. Navy SEALs 1-26*, here, the defendants' uniform reliance on generic, form language disregards each plaintiff's unique circumstances and exposes the predetermined nature of these denials.

Other evidence further demonstrates that denials of religious-exemption requests are a foregone conclusion.  For instance, Sergeant Galloway was ordered to complete "separation prerequisites" before he had even received a final answer on appeal.  *See supra* Section 1.B.  Cadet Mell's tactical officer withdrew his initial recommendation for approval on appeal in response to orders from his chain of command.  *See id.*  And at least two of the plaintiffs' religious-exemption-request packages contain typos or other errors that expose the Army's reliance on pre-made forms when handling their requests.  *See id.*  Considering this evidence, the marginal approval rate, the lack of transparency from the defendants, and the generic nature of the denials, the Court finds that exhaustion of the appellate process for plaintiffs Bakich and Testa would be futile.

---

[10] Army Regulation 600-20 ¶ 5-6(a)(4).

Similarly, another exception to the *Mindes* exhaustion requirement—inadequacy of administrative remedies—applies to this case.  "[A]n administrative remedy may be inadequate where the administrative body is shown to be biased or has otherwise predetermined the issue before it."  *McCarthy v. Madigan*, 503 U.S. 140, 148 (1992).  The analysis here, then, overlaps with the analysis with respect to futility.  The record shows that, except for a handful of arbitrary, unexplained exemptions, the Army's review process is predetermined against approving religious exemptions.   Thus, the administrative process is inadequate.

The Fifth Circuit has recognized two additional exceptions to the exhaustion requirement.  The third exception states that "exhaustion is not required when the petitioner may suffer irreparable injury if he is compelled to pursue his administrative remedies."  *Von Hoffburg*, 615 F.2d at 638.  It mirrors the second *Mindes* factor (discussed below), which considers "[t]he potential injury to the plaintiff if [judicial] review is refused."  *Mindes*, 453 F.2d at 201.  And the fourth exception provides that "exhaustion may not be required . . . if the plaintiff has raised a substantial constitutional question."  *Von Hoffburg*, 615 F.2d at 638.  It raises the same inquiry as the first *Mindes* factor (discussed below) concerning "[t]he nature and strength of the plaintiff's challenge to the military determination," which favors review of substantial constitutional questions.  *Mindes*, 453 F.2d at 201.  The Court analyzes these issues in greater detail in the next section.  *See infra* Section 3.C.  For now, the Court notes that for the same reasons "those factors weigh[] in favor of judicial review," they "also favor[] excusing the military exhaustion requirement."  *U.S. Navy SEALs 1-26*, 578 F. Supp. 3d at 833.

The Fifth Circuit has held that any one of the four aforementioned exceptions may excuse administrative exhaustion. *Von Hoffburg*, 615 F.2d at 638; *see also McKart v. United States*, 395 U.S. 185, 193 (1969) (holding that the doctrine of exhaustion of administrative remedies is "subject to numerous exceptions"). The Court finds that all four exceptions apply here; however, any one of them is sufficient to excuse the last two plaintiffs from exhausting the Army's appellate review process.

### C.    The four *Mindes* factors weigh in favor of judicial review.

Having determined that the plaintiffs satisfy the two-part threshold *Mindes* inquiry, the Court must next consider whether the four *Mindes* factors support judicial review of the plaintiffs' claims. The Court finds that they do.

First, the nature and strength of the plaintiffs' claims weigh in favor of justiciability. "Constitutional claims[] [are] normally more important" than other types of claims. *Mindes*, 453 F.2d at 201. As such, "[r]esolving a claim founded solely upon a constitutional right is singularly suited to a judicial forum and clearly inappropriate to an administrative board." *U.S. Navy Seals 1-26*, 27 F.4th at 348 (quoting *Downen v. Warner*, 481 F.2d 642, 643 (9th Cir. 1973) (internal quotation marks omitted). The Fifth Circuit has in particular held that courts may review claims—like the ones in this case—that allege violations of "free exercise rights under both the First Amendment and RFRA." *Id.* Further, the claims in this case are not "obviously tenuous." *See Mindes*, 453 F.2d at 201. In fact, as discussed below, the plaintiff's RFRA claim will likely succeed because the Army's vaccine mandate fails to satisfy strict scrutiny. *See infra* Section 5. Therefore, because the plaintiffs have alleged non-frivolous violations of their constitutional rights, the first *Mindes* factor supports judicial review.

Second, the plaintiffs will face irreparable injury apart from judicial review, which weighs in favor of justiciability.  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 295 (5th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).  "This principle applies with equal force to the violation of [RFRA] rights because [RFRA] enforces First Amendment freedoms, and the statute requires courts to construe it broadly to protect religious exercise."  *U.S. Navy Seals 1-26*, 27 F.4th at 348 (quoting *id.*).  Here, the plaintiffs' refusal to take the COVID-19 vaccine has cost them the ability to travel, participate in athletics, attend trainings, and receive promotions, and each plaintiff also faces imminent separation from the Army.  In short, as further discussed below (*see infra* Section 6.A), "[b]y pitting their consciences against their livelihoods, the vaccine requirements would crush [the] [p]laintiffs' free exercise of religion."  *U.S. Navy Seals 1-26*, 27 F.4th at 348.  The second *Mindes* factor thus favors judicial review.

Third, though the "most problematic of the *Mindes* considerations," the degree of interference with military function supports a finding of justiciability.  *See id.*  "[T]here will always be some interference when review is granted."  *Mindes*, 453 F.2d at 201.  Interference only becomes impermissible when it rises to a level that "seriously impede[s] the military in the performance of vital duties."  *Id.*  The defendants assert that requiring the Army "to include unvaccinated [soldiers] in its ranks" would impermissibly interfere with "[m]ilitary readiness" and "the DoD's ability to accomplish its mission."  Dkt. No. 38 at 29.  But, today, 97% of the active force is fully vaccinated.  Dkt. No. 71 at 8.  That leaves the plaintiffs in a small minority of unvaccinated soldiers.  Amongst that minority, the Army has already granted thousands of administrative exemptions and temporary medical

– 33 –

exemptions.  *See supra* Section 1.A.ii.  And it has granted at least 65 permanent medical

exemptions.  *See id.*  "It is therefore illogical" to conclude that the refusal of these ten

plaintiffs to "take a COVID-19 vaccine would 'seriously impede' military function when the

[Army] has [thousands of] service members still on duty who are just as unvaccinated as

[the [p]laintiffs."  *See U.S. Navy Seals 1-26*, 27 F.4th at 349 (quoting *Air Force Officer*, 588 F.

Supp. 3d at 1351).  Therefore, the third *Mindes* factor favors judicial review.

Fourth, the limited military expertise involved with respect to these issues weighs in

favor of judicial review.  "Courts should defer to the superior knowledge and experience of

professionals in matters such as promotions or orders directly related to specific military

functions."  *Mindes*, 453 F.2d at 201–02.  In particular, "complex, subtle, and professional

decisions as to the composition, training, equipping, and control of a military force" should

be left to the military.  *U.S. Navy Seals 1-26*, 27 F.4th at 349 (quoting *Gilligan v. Morgan*, 413

U.S. 1, 10 (1973)).  But if, as the record here suggests, the Army intends to ignore the

religious rights guaranteed by RFRA, "courts must intervene because 'generals don't make

good judges—especially when it comes to nuanced constitutional issues.'"  *Id.* (quoting *Air

Force Officer*, 588 F. Supp. 3d at 1351); *see also Doster v. Kendall*, No. 1:22-CV-84, 2022 WL

982299, at *10 (S.D. Ohio 2022).  Because the issues here fall "well within the confines of

what the Constitution permits of the judicial branch," the last *Mindes* factor supports judicial

review.  *See Air Force Officer*, 588 F. Supp. 3d at 1351.

On balance, each of the four *Mindes* factors weighs in favor of judicial review.

Therefore, although the *Mindes* analysis is likely not necessary in this context due to

RFRA's language, the Court finds that the plaintiffs' claims are justiciable even when

considered under it.

4.      **Ripeness**

The defendants also argue that the plaintiffs' claims are not ripe for review.  Dkt. No.

38 at 22.  Ripeness is "a question of timing."  *Thomas v. Union Carbide Agr. Prod. Co.*, 473

U.S. 568, 580 (1985) (quoting *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 140 (1974)).

"[I]ts basic rationale is to prevent the courts, through premature adjudication, from

entangling themselves in abstract disagreements."  *Id.* (quoting *Abbott Lab'ys v. Gardner*, 387

U.S. 136, 148 (1967)).  "The ripeness inquiry reflects 'Article III limitations on judicial

power' as well as 'prudential reasons for refusing to exercise jurisdiction.'"  *DM Arbor Ct.,*

*Ltd. v. City of Houston*, 988 F.3d 215, 218 (5th Cir. 2021) (quoting *Stolt-Nielsen S.A. v.*

*AnimalFeeds Int'l Corp.*, 559 U.S. 662, 670 n.2 (2010)).  Here, the Court finds that the

plaintiffs' claims are ripe.

A.      **The plaintiffs' claims are constitutionally ripe.**

The standard for constitutional ripeness mirrors the injury-in-fact requirement for

standing.  *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 n.5 (2014).  Both stem

from "Article III's case-or-controversy requirement, which mandates that an 'actual

controversy' exist between the parties."  *DM Arbor Ct., Ltd.*, 988 F.3d at 218 n.1 (quoting

*Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 160 (2016)).  An actual controversy exists when

the injury alleged is "actual or imminent rather than conjectural or hypothetical."  *Miss.*

*State Democratic Party v. Barbour*, 529 F.3d 538, 545 (5th Cir. 2008).  "An allegation of

future injury may suffice if the threatened injury is 'certainly impending,' or there is a

'substantial risk' that the harm will occur."  *Driehaus*, 573 U.S. at 158 (quoting *Clapper v.*

*Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)).  Because an Article III case must exist at

"the time that suit is filed," *Energy Mgmt. Corp. v. City of Shreveport*, 397 F.3d 297, 301 n.3 (5th Cir. 2005), the Court must consider the facts as they existed then.

At the time of filing, each of the plaintiffs had requested a religious exemption to the COVID-19 vaccine, each had received a formal denial of that request from the Surgeon General, and most had received a "final" denial on appeal to the ASA (M&RA).[11]   Dkt. No. 1 ¶¶ 12–21.  The defendants suggest that the plaintiffs' claims will ripen only when each plaintiff has been separated from the Army and sought available administrative relief post-separation.  Dkt. No. 38 at 23.  But the plaintiffs "need not wait until the [Army] has kicked them out for exercising their religion before their claims are ripe."  *Doster*, 54 F.4th at 417. They have already suffered injury due to their vaccination status, as the Army has barred them from partaking in various career-advancing activities like traveling, training, transfer, and promotion.  In fact, the Secretary of Army's own directive expressly provides that soldiers "flagged" for refusing the vaccine are not "eligible" for "favorable personnel action."  Dkt. No. 14 at 13–14.  In addition to this formal discipline, the plaintiffs complain that leadership has ostracized them, threatened them, and pressured them to take the vaccine during the pendency of their exemption requests.

Moreover, further injury to the plaintiffs is imminent.  The DoD has ordered the Army to "impose ambitious timelines" for implementing the vaccine mandate.  *Id.* at 7. And the Secretary of the Army has directed commanders to process separation actions "as expeditiously as possible."  *Id.* at 18.  The Army has already processed nearly two thousand separations.  Dkt. No. 71 at 8.  Even though the defendants maintain that the separation

---

[11] At the time of filing, neither Bakich, Galloway, nor Testa had received a final decision on appeal. *See* Dkt. No. 1 ¶¶ 12, 16, 21.  Since then, Galloway's appeal has been formally denied by the ASA (M&RA).  Dkt. No. 37-2.

process will take "several months" (Dkt. No. 39-1 at 347–50, 365, 367), the process has begun for most of the plaintiffs, and, if permitted to continue, it would inevitably conclude with their discharge.  Further, the defendants have refused to enter into any formal agreement halting these proceedings.  Tr. at 24.  True, the plaintiffs may exercise certain rights to challenge a separation decision, but those rights are "by all accounts . . . theater." *See U.S. Navy SEALs 1-26*, 578 F. Supp. 3d at 826.  The formulaic, generic nature of the Army's review shows that further proceedings will not alter its predetermined outcome as to these plaintiffs.  Therefore, the plaintiffs "need not wait for the [Army] to rubber stamp a constitutional violation before seeking relief in court."  *See id.* at 835.

Still, as three plaintiffs at the time of filing had not yet received a final decision on appeal, they were not considered to be in violation of the vaccine mandate.  But an actual violation is not required when a plaintiff shows (1) that he seeks to engage in conduct "arguably affected with a constitutional interest" but proscribed by law, and (2) a "credible threat" that the government will enforce that law.  *Driehaus*, 573 U.S. at 160 (quoting *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979)).  Here, the plaintiffs' requests for exemption show that they intend "to undertake conduct 'arguably' protected by RFRA" but proscribed by the Army's vaccine mandate—which offers no meaningful, non-arbitrary opportunity to obtain a religious exemption.  *See Doster*, 54 F.4th at 416.  Moreover, a "credible threat" existed at the time of filing that the Army would enforce the vaccine mandate because the DoD and Secretary of the Army had expressly demanded it.  *See* Dkt. No. 14 at 14, 18.  Therefore, even those plaintiffs who have not yet received a final denial of their request on appeal are entitled to bring their claims at this time.

Additionally, a plaintiff's injury is ripe when he "seek[s] a government benefit" but the government has imposed "an unlawful process [for] obtain[ing] [that benefit]." *Doster*, 54 F.4th at 416 (citing Supreme Court cases). A plaintiff need not "proceed through [an] allegedly invalid process to challenge th[at] policy in court." *Id.* (citing *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755–56 (1988)). Here, the plaintiffs challenge the Army's process for weighing religious-exemption requests. They allege that the defendants have "failed to . . . meaningfully consider[] thousands of well-founded religious accommodation requests" while simultaneously granting thousands of secular exemptions. Dkt. No. 1 ¶ 38. They further allege that the "process for [evaluating] religious exemptions is far more onerous than [the] process for [evaluating] secular exemptions." Dkt. No. 46 at 9. The plaintiffs argue that this process has "stacked the deck" against them, in violation of RFRA and the First Amendment. Dkt. No. 30 at 11, 15. Accordingly, they need not complete this allegedly unconstitutional process to challenge it in court.

The defendants do, however, pose valid questions in two cases. First, the USMA Academic Board has already recommended the separation of Cadet Bufkin on separate grounds—namely, his "academic deficiencies"—so Bufkin "is unlikely to be separated based on his vaccination status." Dkt. Nos. 38 at 22; 39-1 at 346–47. Second, Sergeant Galloway, since the denial of his religious-exemption request, has submitted a request for medical exemption, thereby excusing him from the vaccination requirement (and the prospect of separation) during the pendency of those proceedings. Dkt. Nos. 40 at 1; 40-1 at 1. Based on these facts, the defendants suggest that neither plaintiff currently faces imminent injury due to his religiously motivated refusal to vaccinate.

With respect to Cadet Bufkin, even if the Army formally separates him for academic reasons, he must still "reimburse" the Army for the cost of his education. Dkt. No. 39-1 at 346. Normally, he could do that through active-duty enlisted service. *Id.* In this case, however, without a religious exemption, his unvaccinated status would bar him from exercising that option. *Id.* Therefore, even if—as the defendants suggest—the Army may never receive an opportunity to discharge Bufkin for his refusal to vaccinate, its denial of his religious-exemption request still threatens imminent injury in that he will likely need to reimburse the Army through other, more onerous avenues (i.e., repayment). *See* 10 U.S.C. § 2005(a)(3) (stating that when a cadet fails to meet the educational requirements specified in his service agreement and cannot complete the specified period of active-duty service, he "shall be subject to [] repayment provisions").

As for Sergeant Galloway, he seeks a medical exemption based on his "natural immunity" to COVID-19. Tr. at 224–25. His request is certain to fail because the DoD's vaccine mandate expressly requires those who have had a previous COVID-19 infection to receive the vaccine. Dkt. No. 14 at 6. In fact, the Army has never granted an exemption based on "previous [COVID-19] infections" or "positive serology." Dkt. No. 39-1 at 267. Given the flawed basis of Galloway's request for a medical exemption, the Army will surely deny it, and he will remain subject to imminent separation proceedings.

Further, both Bufkin and Galloway claim that they have *already* suffered injury due to their refusal to take the COVID-19 vaccine. Cadet Bufkin alleges that he has been "subjected to coercion and discrimination" by his commanders due to his vaccination status. Dkt. No. 1 ¶ 13. And Sergeant Galloway alleges that his commanders forced him to complete various "separation prerequisites," including a "command-directed behavioral

health appointment," before the Army resolved his religious-exemption appeal. *Id.* ¶ 16. Each plaintiff also alleges that the Army has imposed an unlawful *process* for evaluating religious-exemption requests. So, even if the circumstances delay or preclude separation of these plaintiffs under the vaccine mandate, each has presently established injury.

For all of these reasons, the plaintiffs have alleged constitutionally ripe injuries that are either actual or imminent with a substantial risk of transpiring.

**B.     The plaintiffs' claims are prudentially ripe.**

Prudential ripeness depends on two metrics: (1) "the fitness of the issues for judicial decision," and (2) "the hardship to the parties of withholding court consideration." *Rosedale Missionary Baptist Church v. New Orleans City*, 641 F.3d 86, 91 (5th Cir. 2011) (quoting *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003)). An issue is generally fit for judicial decision if "any remaining questions are purely legal ones." *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 833 F.2d 583, 587 (5th Cir. 1987) (citing *Thomas v. Union Carbide Agr. Prods. Co.*, 473 U.S. 568, 581 (1985)). But even when only purely legal questions remain, the plaintiff must still show that a delay in judicial review would cause hardship. *Choice Inc. of Tex. v. Greenstein*, 691 F.3d 710, 715 (5th Cir. 2012). Hardship may inhere in "legal harms," *id.*, such as "when a government decision . . . compels a party to undertake activity on threat of sanction," *Doster*, 54 F.4th at 418 (citing *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998)). Unlike constitutional ripeness, prudential ripeness depends on the "situation now" rather than the situation at the time of filing. *See Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 140 (1974).

Each element is satisfied here. First, the question central to this case—whether the Army's vaccine mandate survives RFRA's strict scrutiny—is a purely legal one. This

question falls "well within the confines" of what the judicial branch may decide. *See supra* Section 3.C. There is no need to wait for further factual development—namely, for the plaintiffs to exhaust all remaining administrative remedies—because the record indicates that, except for a few arbitrary exceptions, the process is predetermined. *See U.S. Navy Seals 1-26 v. Biden*, No. 4:21-cv-1236, Dkt. No. 150 at 5. Therefore, the plaintiff's claims are fit for judicial review.

Second, if the Court delays review, the plaintiffs will be forced to choose between refraining from allegedly lawful activity or engaging in that allegedly lawful activity and risking significant sanctions. *See id.* (citing *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 681–82 (N.D. Tex. 2016)). The Army has ordered the plaintiffs to vaccinate under the threat of formal discipline and imminent separation. It has thus compelled them to choose between their sincerely held religious beliefs and their livelihoods. *U.S. Navy Seals 1-26*, 27 F.4th at 348. Given the impossible legal dilemma that the plaintiffs face, delayed review of their claims would cause them substantial hardship.

For these reasons, the plaintiffs' claims are prudentially ripe. Having found both constitutional and prudential ripeness, the Court now turns to the merits.

**5.      The plaintiffs are likely to prevail on their RFRA claim.**

The Court finds that the plaintiffs have shown a substantial likelihood of success on their RFRA claim. The plaintiffs have met their burden of demonstrating the sincerity of their religious beliefs and the substantial burden imposed by the vaccine mandate on their religious exercise. But the defendants have not met their burden of demonstrating a compelling governmental interest in burdening the plaintiffs' religious exercise or that the

vaccine mandate is the least restrictive means to achieve that interest. Because the defendants cannot satisfy strict scrutiny, the plaintiffs are likely to prevail.

RFRA "was designed to provide very broad protection for religious liberty," *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 685 (2014), and "affords even 'greater protection for religious exercise than is available under the First Amendment,'" *U.S. Navy Seals 1-26*, 27 F.4th at 350 (quoting *Holt v. Hobbs*, 574 U.S. 352, 357 (2015)). It provides that the "[g]overnment may substantially burden a person's exercise of religion only if it demonstrates that the application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b). This provision applies to any "branch, department, agency, instrumentality, [or] official (or other person acting under color of law) of the Unites States"—including the military. § 2000bb-2(1).

To establish a RFRA violation, the plaintiff bears the initial burden of showing that a government action violates RFRA's general ban on burdening religion. *Holt*, 574 U.S. at 360. The plaintiff must establish that "the relevant religious exercise is 'grounded in a sincerely held religious belief.'" *Ali v. Stephens*, 822 F.3d 776, 782 (5th Cir. 2016) (quoting *id.* at 361). The plaintiff must further show that "the government's action or policy 'substantially burden[s] that exercise' by, for example, forcing the plaintiff 'to engage in conduct that seriously violates [his or her] religious beliefs.'" *Id.* at 782–83 (quoting *Holt*, 574 U.S. at 361).

If the plaintiff carries his burden, the burden shifts to the government to show that its conduct falls within RFRA's narrow exception to its ban on burdening religion. *Holt*, 574 U.S. at 362. In particular, the government must "show that its action or policy (1) is in

furtherance of a compelling governmental interest and (2) is the least restrictive means of furthering that interest." *Ali*, 822 F.3d at 783. The Supreme Court has characterized this test, otherwise known as strict scrutiny, as "the most demanding test known to constitutional law." *See City of Boerne v. Flores*, 521 U.S. 507, 534 (1997).

### A.  The plaintiffs have met their burden of showing that the defendants have substantially burdened their sincere religious beliefs.

The plaintiffs have met the burden of showing (1) the sincerity of their religious beliefs and (2) that the government has substantially burdened their religious exercise. First, the plaintiffs have demonstrated the sincerity of their religious beliefs. The defendants concede to this reality. Tr. at 184. Each plaintiff has thoughtfully articulated his sincere religious objections to taking the vaccine in the form of a detailed memorandum. Some have supplemented their requests with letters of support from their pastors or other religious leaders. *See, e.g.*, Dkt. No. 14 at 39, 282–83. Under similar circumstances, the Fifth Circuit held that service members had met their burden. *See U.S. Navy Seals 1-26*, 27 F.4th at 350. Moreover, each plaintiff's assigned chaplain has personally confirmed the sincerity of the plaintiff's religious beliefs after conducting a formal interview with him.

Second, the plaintiffs have shown that the defendants have substantially burdened their religious exercise, and, again, the defendants do not dispute this point. *See* Tr. at 185. A government action or regulation substantially burdens religious exercise when it "pressures the adherent to significantly modify his religious behavior and significantly violates his religious beliefs." *U.S. Navy Seals 1-26*, 27 F.4th at 350 (quoting *Adkins v. Kaspar*, 393 F.3d 559, 570 (5th Cir. 2004)). Fifth Circuit precedent makes clear that a vaccine requirement that "principally compete[s] against [service members'] faiths and secondarily against their livelihoods" imposes a "substantial burden." *U.S. Navy Seals 1-26*, 27 F.4th at

350.  This case is no different.  Here, the defendants have uniformly rejected the plaintiffs'
requests for exemption to the vaccine mandate.  The plaintiffs thus have no choice but to
take the vaccine or otherwise face separation from the Army.  But receiving the vaccine
under these terms would injure them in a way that "outlast[s] their military service."  *Id.*  It
would "forc[e] them to inject an unremovable substance" into their bodies that contravenes
"their most profound convictions."  *Id.*  This pressure to either violate their consciences or
give up their livelihoods has substantially burdened their religious exercise.  Because the
plaintiffs have met their initial burden, the burden shifts to the defendants to survive strict
scrutiny—a high hurdle that they cannot clear.

> **B.**     **The defendants fail to demonstrate a compelling governmental interest that could justify burdening the plaintiffs' religious rights.**

Based on the evidence before the Court, the defendants have not shown that
enforcing the vaccine mandate against the plaintiffs furthers a compelling governmental
interest.  A compelling interest is one "of the highest order."  *McAllen Grace Brethren Church
v. Salazar*, 764 F.3d 465, 472 (5th Cir. 2014) (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 215
(1972)).  Put differently, "[o]nly the gravest abuses, endangering [a] paramount interest, give
occasion for permissible limitation" of one's religious exercise.  *Id.* (quoting *Sherbert v.
Verner*, 374 U.S. 398, 406 (1963)).  To meet its burden, the government must show more
than a "broadly formulated interest[] justifying the general applicability of [its] mandate";
rather, it must demonstrate an interest in "application of the challenged law 'to the
person'—the particular claimant whose sincere exercise of religion is being substantially
burdened."  *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 420 (2006)
(quoting 42 U.S.C. § 2000bb-1(b)).  Where a law already exempts a particular group, "the

government will have a higher burden in showing that the law, as applied, furthers the compelling interest." *McAllen Grace Brethren Church*, 764 F.3d at 472.

The defendants claim that "requiring the [p]laintiffs to be vaccinated furthers compelling governmental interests in military readiness and in the health and safety of service members." Dkt. No. 38 at 30. The defendants insist that allowing any plaintiff to remain unvaccinated "would undermine the military's compelling interest in ensuring they can carry out their military duties effectively," as remaining healthy and deployable "is a consideration for every one of the [] [p]laintiffs." *Id.* at 32, 34. In support of this conclusion, the defendants cite to statistics "showing COVID-19's harmful impact on military readiness overall" during the pandemic and the "positive effects that COVID-19 vaccination has had on force readiness and health." *Id.* at 32–33.

But the Army's "general interest" in the health and readiness of its force "is insufficient" to justify burdening the plaintiffs' religious exercise under RFRA. *See U.S. Navy Seals 1-26*, 27 F.4th at 351. In the abstract, "[s]temming the spread of COVID-19" may be a compelling interest—and the Army has largely achieved that interest, given the 97% vaccination rate amongst active-duty soldiers. *See U.S. Navy SEALs 1-26*, 578 F. Supp. 3d at 836 (quoting *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020)); *see also Doster*, 54 F.4th at 421. But just because the Army "might have a compelling interest in the abstract does not mean that it has one 'in each marginal percentage point by which' it achieves this abstract interest." *Doster*, 54 F.4th at 422 (quoting *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 803 n.9 (2011)). Rather, RFRA requires the government to show a compelling interest in applying a religious burden "to the person." 42 U.S.C. § 2000bb-1(b). The Court has a duty "to give effect, if possible, to every clause and word" of RFRA, so as

not to render its language superfluous.  *See Duncan v. Walker*, 533 U.S. 167, 174 (2001)

(internal citation omitted).  Here, the phrase "to the person" requires the defendants to

demonstrate a compelling interest in denying the religious-exemption requests of these

particular plaintiffs.  *See Hobby Lobby Stores, Inc.*, 573 U.S. at 726–27.

The evidence before the Court refutes any such compelling interest in the vaccination

of these plaintiffs.  As an initial matter, the Army's vaccine mandate is underinclusive,

which "is often regarded as a telltale sign that the government's interest in enacting a liberty-

restraining pronouncement is not in fact 'compelling.'"  *See BST Holdings, L.L.C. v.

Occupational Safety & Health Admin.*, 17 F.4th 604, 616 (5th Cir. 2021).  The Army has

granted thousands of exemptions on secular (i.e., medical or administrative) grounds, which

suggests that it could also grant exemptions to these ten plaintiffs without impeding its

objectives.  Moreover, the Army does not require soldiers who received the vaccine in 2021

or who only received the primary series to keep up to date with booster shots, despite

evidence that vaccine effectiveness "wane[s] over time" and that "[r]eceipt of a primary

series alone . . . provides minimal protection" against new variants.[12]  The Army has no

reason to differentiate the plaintiffs from those soldiers, who "undercut its interests in

similar ways."  *See Doster*, 54 F.4th at 427.  As the Fifth Circuit held in similar

circumstances, the underinclusiveness of the Army's mandate "undermine[s]" its alleged

interests as to these plaintiffs.  *See U.S. Navy Seals 1-26*, 27 F.4th at 352

In an attempt to avoid this reality, the defendants contend that religious exemptions

are simply "different" than medical and administrative ones.  Dkt. No. 38 at 43.  In

---

[12] *Summary of Guidance for Minimizing the Impact of COVID-19 on Individual Persons, Communities, and Health Care Systems—United States, August 2022*, CENTERS FOR DISEASE CONTROL AND PREVENTION (Aug. 19, 2022), https://www.cdc.gov/mmwr/volumes/71/wr/mm7133e1.htm.

particular, they note that most secular exemptions are "temporary" (*id.* at 35)—but the exemptions that the plaintiffs seek are just that. Just as a soldier could receive a temporary exemption for "a medical condition that will eventually resolve" (*id.*at 36), the plaintiffs seek an exemption only until "a vaccine [] become[s] available that does not conflict with their beliefs" (Dkt. No. 46 at 8). *See Doster*, 54 F.4th at 424 ("[R]eligious and medical exemptions can be 'temporary' in an identical way."). Moreover, Army policy allows for a granted religious exemption to be revoked if emergency circumstances arise. *See* FRAGO 5, ¶ 3.D.8.B.5.B.1; Army Regulation 600-20 ¶ 5-6(f)(3)(a). The defendants also suggest that medical exemptions "comport" with the Army's interests "in a manner that a religious accommodation would not." Dkt. No. 38 at 36. This statement implies that a soldier's sincere desire to remain true to his deeply held religious convictions lacks the same legitimacy as a physical medical condition. But, regardless of the reason for an exemption, each type allows a soldier to remain unvaccinated in spite of the Army's interest in guarding against COVID-19. *See Dr. A v. Hochul*, 142 S. Ct. 552, 556 (2021) ("[A]llowing a [soldier] to remain unvaccinated undermines the [Army]'s asserted [interest] equally whether that [soldier] happens to remain unvaccinated for religious reasons or medical ones.") (Gorsuch, J., dissenting). The defendants, therefore, have not shown how granting a religious exemption would impair this interest more than a secular exemption would.

Further, the plaintiffs' record of high performance during the COVID-19 pandemic—despite the fact that all of them have contracted and, ultimately, recovered from the virus—cuts against the defendants' argument that their unvaccinated status will cause mission failure. The plaintiffs maintain that they have fulfilled their duties and not caused a single mission failure due to their unvaccinated status—a claim that the defendants do not dispute.

In fact, seven of the plaintiffs have received a recommendation from at least one commanding officer in favor of an exemption.  Dkt. Nos. 39 at 21, 88, 130, 132, 247; 39-1 at 60, 103, 105, 156.  Sergeant Costroff and Sergeant Schelske's commanders recommended approval for the very reason that they could continue their "high performance" and so the Army could "retain its acquired talent" given the shortage of those able to perform these "critical" roles.  Dkt. Nos. 39 at 130, 132; 39-1 at 103, 105.  Most times, the commanders who recommended approval were those who most closely supervised each plaintiff.  Presumably, the plaintiffs' immediate commanding officers would not recommend granting a request that would preclude them from accomplishing their mission.

The defendants also neglect to address other evidence in the record that negates their alleged interests.  For instance, the defendants claim to have a compelling interest in "readiness," specifically as it relates to the plaintiffs' ability to quickly deploy.  Dkt. No. 38 at 30, 34.  But that interest cannot possibly pertain to at least seven of the plaintiffs, as five of them are cadets at the U.S. Military Academy who "by policy are non-deployable."  U.S. Dep't of Def. Instruction 1332.45 ¶ 3.4(b), Retention Determinations for Non-Deployable Service Members (July 30, 2018).[13]  Two others—Sergeants Costroff and Schelske—work in non-deployable, office settings as a 35S Signals Collector/Analyst Instructor and Apprentice Signals Collection Course Instructor, respectively.  Dkt. Nos. 39 at 130; 39-1 at 103.  Lieutenant Bakich, too, mainly participates in training and exercise support roles without deployment requirements.  Dkt. No. 39 at 26.  To accept the defendants' generalized "readiness" argument, the Court "would have to find that [the Army] has a compelling

---

[13] Available at: https://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodi/133245p .pdf?ver=2018-08-01-143025-053.

interest in ensuring the immediate deployability of [plaintiffs] who [are] not immediately deployable." *See Doster*, 54 F.4th at 422. Logic instructs otherwise.

Nor do the defendants address evidence that undermines their generalized interest in the "health" of the force. *See* Dkt. No. 38 at 30. For instance, Cadet Conklin and Sabella's commander noted a high vaccination rate and high compliance with safety protocols amongst cadets at the U.S. Military Academy. Dkt. Nos. 39 at 88; 39-1 at 60. One of Lieutenant Bakich and Sergeant Testa's commanders similarly noted a "low" health risk due to the high vaccination rate amongst their units and the general population where they are stationed. Dkt. Nos. 39 at 26; 39-1 at 162. Sergeant Costroff testified that all of his students are vaccinated. Tr. at 196. As a whole, the active force is almost entirely vaccinated. Dkt. No. 71 at 8. Each plaintiff has also contracted COVID-19 before, which, according to the CDC, "considerably reduce[s]" the "risk for medically significant illness" from reinfection.[14] And the plaintiffs have complied with other mitigation protocols that have prevented a mission failure to date. The defendants fail to explain how, despite this evidence, allowing the plaintiffs to remain unvaccinated would threaten their own health or the health of others "in a way that renders them unable to perform their critical duties" or threatens mission accomplishment. *See* Dkt. No. 38 at 34.

Moreover, the defendants do not counter with any evidence that demonstrates a compelling interest with respect to these specific plaintiffs. In fact, at the preliminary injunction hearing, they had an opportunity to produce any such evidence, but they admitted no evidence at all. The defendants insist that the Court should just defer to their

---

[14] *Summary of Guidance for Minimizing the Impact of COVID-19 on Individual Persons, Communities, and Health Care Systems—United States, August 2022*, CENTERS FOR DISEASE CONTROL AND PREVENTION (Aug. 19, 2022), https://www.cdc.gov/mmwr/volumes/71/wr/mm7133e1.htm.

"professional" judgment.  Dkt. No. 38 at 31.  But the defendants bear the burden of proof at this stage.  And RFRA "'demands much more[ ]' than deferring to 'officials' mere say-so that they could not accommodate'" an exemption.  *U.S. Navy Seals 1-26*, 27 F.4th at 351 (quoting *Holt*, 574 U.S. at 369); *see also Austin v. U. S. Navy Seals 1-26*, 142 S. Ct. 1301, 1305 (2022) (stating that a court cannot "simply defer to the [Army's] opinion" or "mere conjecture" that "sending an unvaccinated [soldier] on [] a mission *might* produce [certain] consequences") (Alito, J., dissenting).  To the contrary, RFRA requires an individualized assessment of each plaintiff's specific exemption request and unique circumstances, and the record here is devoid of any such assessment.

The defendants insist that the Army *has* conducted "the individualized, 'to the person' analysis that RFRA requires," but their argument falls short.  Dkt. No. 38 at 32.  They use Sergeant Galloway—and only Sergeant Galloway—as an example.  According to the defendants, for the "specific" reasons that Galloway "cannot perform [his] duties remotely" and "is expected to be able to travel and deploy 'at a moment's notice,'" his religious-exemption request was denied.  *Id.* at 32.  Again, these generalized assertions do not withstand scrutiny because RFRA requires specifics.  Notably, the defendants do not even attempt to explain how the Army has a "compelling" interest in vaccination of any of the other named plaintiffs.  And "[j]udges are not like pigs, hunting for truffles that might be buried in the record."  *Doster*, 54 F.4th at 422 (internal quotation marks and citation omitted).  The defendants have "failed to engage in the properly focused inquiry where it belonged—in [their] briefing."  *Id.*

Regardless, nothing in the record addresses "with any meaningful degree of specificity the factual circumstances of [each] applicant's service" or analyzes "the marginal

detrimental effect, if any, on military readiness and the health of the force" that would result from granting a particular exemption.  *See Colonel Fin. Mgmt. Officer v. Austin*, No. 8:22-CV-1275-SDM-TGW, 2022 WL 3643512, at *16 (M.D. Fla. Aug. 18, 2022).  To the contrary, the Army has issued nearly identical denial letters to each plaintiff that differ only—if at all—with respect to one paragraph that highlights the amount of contact with others required by his role.  Each denial follows the same generic rationale: that the plaintiff's contact with others and expectation of deployability outweigh all other considerations.  Similarly, the recommendations against religious exemption submitted by the plaintiffs' commanders uniformly conclude that the Army's generalized interests in "health" and "readiness" overcome all else.  Across the board, no mention is made of the unique factual circumstances of each plaintiff, including his "age, fitness, health, or natural immunity" or "whether the particular applicant is acutely vulnerable to complications from COVID-19."  *See id.*  Recently, the Sixth Circuit held that the Air Force failed to engage in the proper individualized analysis under strikingly similar facts involving "standard denial memo[s]" that contained boilerplate language except for "a sentence or two on a service member's individual 'circumstances,' typically highlighting that the service member interacts with others."  *Doster*, 54 F.4th at 409, 421.  Likewise, here, the Army's routine reliance on standard language and generic considerations falls far short of the case-by-case analysis that RFRA demands.

Additionally, the procedure employed by the Army for reviewing exemption requests itself undermines the claim that the Army considers religious exemptions on an individualized basis.  Temporary medical exemptions to the COVID-19 vaccine mandate can be directly granted by the applicant's healthcare provider.  Dkt. No. 39-1 at 267.

– 51 –

Further, an applicant's regional health commanding general can approve a permanent medical exemption, with any appeals to be considered by the Surgeon General. *Id.* at 267–68. In contrast, a religious exemption must be approved by the Surgeon General, and the ASA (M&RA) reviews any appeals. *Id.* at 270. Thus, as a matter of structure, the Army has opted to make the process for obtaining religious exemptions less personal and local than the process for medical exemptions. Though an applicant's immediate commanders would be best positioned to assess the marginal benefit, if any, of vaccination in light of the applicant's unique situation, the Army has vested approval authority for religious exemptions in those far removed from the applicant—who, in fact, may have never even interacted with him or observed his duties. To be sure, each religious-exemption-request package contains recommendations from the soldier's chain of command, but there is no evidence that these recommendations—or the rest of the record, for that matter—materially affect the final determination.

The absence of a compelling interest is all the more clear in light of the current, post-pandemic state of COVID-19. A "RFRA assessment by the [Army] ought to depend on data describing the present state of 'the force.'" *Colonel Fin. Mgmt. Officer*, 2022 WL 3643512, at *16. Along with the near-perfect vaccination rate amongst active-duty soldiers, the analysis should consider the relatively weak strain of the virus prevalent today[15] and the resulting decline in the rate of COVID-19-related casualties.[16] But the defendants have not rebutted these mitigating factors, let alone demonstrated how these plaintiffs—who fulfilled

---

[15] Variants of the Virus, https://www.cdc.gov/coronavirus/2019-ncov/variants/index.html (last accessed Dec. 20, 2022).

[16] COVID-19 Projections, https://covid19.healthdata.org/global?view=cumulative-deaths&tab =trend (last accessed Dec. 20, 2022).

their duties during 2020 at the height of the pandemic—will not be able to do so in the current climate.  *See Colonel Fin. Mgmt. Officer*, 2022 WL 3643512, at *16 (finding no compelling interest in the vaccination of a service member against COVID-19 given the emergence of the "weak" Omicron variant and the 95% vaccination rate of the Marines).

In an attempt to bolster their alleged interests, the defendants have provided declarations that discuss the transmissibility and potential symptoms of COVID-19, the favorable effects of the vaccine, and the historical impact of COVID-19 on the military. Dkt. No. 39-1 at 289–335, 352–62.  These declarations particularly focus on measures implemented by the DoD at the height of the pandemic, including a 60-day stop-movement order in March 2020 and the cancellation of 19 trainings during the "first twenty months of the pandemic."  Dkt. No. 39-1 at 353, 355.  But they fail to analyze "the marginal risk," if any, of a particular religious objector remaining unvaccinated, based on his unique characteristics and the "present state of the force."  *See Colonel Fin. Mgmt. Officer*, 2022 WL 3643512, at *16 (internal quotation marks omitted).  RFRA requires that the defendants engage in such an analysis, and their reliance on broad, outdated data misses the mark.

Ultimately, the defendants maintain that "[e]ach of th[e]se [p]laintiffs plays a role in ensuring that the United States maintains a superior combat power and would be unable to fulfill his role were he to become seriously ill."  Dkt. No. 38 at 34.  In other words, the defendants ask the Court to accept that the United States would no longer be able to "maintain[] a superior combat power" without these ten plaintiffs being vaccinated.  *Id.* This argument is overstated.  While the Court applauds the plaintiffs' service and academic records and has no doubt that they serve important roles, it is certain that the United States would be able to maintain its superior combat power if these ten plaintiffs received religious

– 53 –

exemptions.  At the very least, the defendants fall well short of meeting their evidentiary burden to show otherwise, especially given the high vaccination rate amongst the active force, the post-pandemic environment, and the legal reality that generalized interests are insufficient to establish a compelling interest as to these specific plaintiffs.

Finally, the Supreme Court's recent, partial stay of a preliminary injunction in *Austin v. U. S. Navy Seals 1-26* does not indicate otherwise.  There, the Court "seemingly relied" on the military's "extraordinarily compelling interest in maintaining strategic and operational control over the assignment and deployment" of its personnel.  *Doster*, 54 F.4th at 421 (quoting *Austin*, 142 S. Ct. at 1302 (Kavanaugh, J., concurring)).  Here, however, the defendants do not allude to any such interest, and the plaintiffs do not request to interfere with the Army's strategic decision-making.  *See* Dkt. No. 1 at 22–23.  And any relief granted by this Court will not do so.  The Supreme Court's partial stay in *Austin* otherwise has no bearing on whether the Army has a compelling interest in the discipline and separation of these plaintiffs for their refusal to vaccinate.

For these reasons, the defendants have failed to meet their burden of demonstrating a compelling interest in the forced vaccination of the plaintiffs.

### C.   The defendants fail to demonstrate that they have used the least restrictive means to achieve their interest.

Because the defendants have not demonstrated a compelling interest, the Court need not address whether they have implemented the least restrictive means to achieve that interest.  For the sake of completeness, however, the Court considers this inquiry.

The least-restrictive-means test is "exceptionally demanding."  *Hobby Lobby Stores, Inc.*, 573 U.S. at 728.  It requires the government to show that it lacks "other means of achieving its desired goal" that will not "impos[e] a substantial burden on the exercise of

religion" by the plaintiffs. *Id.* The government must show more than "narrow tailoring" to achieve its interest; rather, it must show that no "less restrictive alternative" exists. *See Bd. of Trs. of State Univ. of New York v. Fox*, 492 U.S. 469, 477–78 (1989); *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000). And it "must provide *actual evidence,* not just conjecture, demonstrating that the [action] in question is, in fact, the least restrictive means." *McAllen Grace Brethren Church*, 764 F.3d at 476 (emphasis in original). "[I]f a less restrictive means is available . . . , the [g]overnment must use it." *Holt*, 574 U.S. at 365 (quoting *Playboy Ent. Grp., Inc.*, 529 U.S. at 815).

The plaintiffs propose a variety of alternatives to vaccination that would promote the health and readiness of the force: (1) imposing testing requirements; (2) administering screenings for infection (e.g., temperature checks); (3) exempting plaintiffs who provide evidence of natural immunity; (4) social distancing; (5) transferring the plaintiffs to positions with remote-work capacity or minimal contact with others; (6) placing the plaintiffs in non-deployable status or assigning them to a unit that does not deploy overseas; or (7) simply granting the plaintiffs' religious-exemption requests. Dkt. No. 30 at 22–23.

In response, the defendants claim that the Army considered but rejected these alternatives because (1) remote work options are not available; (2) the effectiveness of masking and distancing fluctuates based on human behavior; (3) periodic testing and temperature checks do not protect against severe illness or death; (4) evidence of immunity due to previous infection is not well established; (5) other assignments suited to the plaintiffs' needs and abilities have not been identified; and (6) deployability of the plaintiffs is central to the Army's interest in readiness. Dkt. No. 38 at 39–42.

The defendants' arguments suffer from several legal flaws. First, the defendants fail to justify why they cannot excuse these plaintiffs from the vaccine mandate for religious reasons when they have excused thousands of others on secular grounds. *See Doster*, 54 F.4th at 425 (citing *Hobby Lobby Stores, Inc.,* 573 U.S. at 730–31). The defendants argue that religious exemptions are simply "different," but, as discussed above, they have not shown that religious exemptions impair the Army's ability to protect against COVID-19 any more than secular exemptions do. *See supra* Section 5.B.

Though the defendants generally conclude that a "uniform practice of vaccination" is the least restrictive means to protect against COVID-19 (Dkt. No. 38 at 38), they neglect to undertake the requisite "focused" inquiry for each plaintiff as to whether alternative means could achieve the Army's alleged compelling interests. *See Doster*, 54 F.4th at 422 (quoting *Hobby Lobby Stores, Inc.*, 573 U.S. at 726); *see also Austin*, 142 S. Ct. at 1305 (stating that "summary rejection" of religious exemptions "was by no means the least restrictive means" to achieve the military's interest in the health of the force) (Alito, J., dissenting). In an attempt to make up for their deficient analysis, the defendants again insist that "the acceptable level of risk to the mission must be a military, not judicial, judgment." Dkt. No. 38 at 38. But RFRA is the law of the land, and the Court cannot turn a blind eye to its requirements so that the defendants can exercise their professional judgment concerning the religious exercise of these plaintiffs. *U.S. Navy Seals 1-26*, 27 F.4th at 351. The people, through their elected representatives, enacted RFRA and made it applicable to the military. The defendants would more properly aim their complaints at Congress—not the Court.

Further, the defendants fail to satisfy their "burdens of going forward with [] evidence and of persuasion" in showing that no less restrictive means could achieve their

interest.  *See Doster*, 54 F.4th at 421 (quoting 42 U.S.C. § 2000bb-2(3)).  For instance, they suggest that the plaintiffs failed to "identify [] specific assignment[s] that [they] would be willing and qualified to perform" that would not have potential for worldwide deployment. Dkt. No. 38 at 41.  But it is the defendants' burden to demonstrate that no such assignments exist.  The defendants also state that "the effectiveness of masking and distancing fluctuates based on . . . how compliant each individual is with the requirements."  *Id.* at 40.  Again, however, the defendants bear the burden of demonstrating that the plaintiffs will not effectively implement required safety protocols.  Notably, despite the defendants' burden of proof, they admitted no evidence at the preliminary injunction hearing.

Additionally, the defendants fail to rebut evidence "built into the record" demonstrating "the efficacy of precautions other than vaccination."  *See Colonel Fin. Mgmt. Officer*, 2022 WL 3643512, at *16.  For instance, Sergeant Schelske successfully taught his course remotely at the beginning of the pandemic.  Cadet Mell has complied with all applicable testing and masking requirements at West Point.  Sergeant Costroff maintains social distancing in the classroom when possible.  Schelske and Costroff both also teach their courses with other instructors who can fill in as needed.  Each of these plaintiffs also contracted COVID-19 at one point and followed applicable quarantining procedures before returning to duty.  Yet the defendants have undertaken no "meaningful effort" to disprove the unrebutted evidence that these measures have worked and that the plaintiffs have successfully served unvaccinated for the entire course of the pandemic.  *See id.*

The defendants also fail to explain why they cannot take full measures to help willing plaintiffs obtain alternative vaccines that do not violate their conscience.  Sergeant Schelske in particular expressed interest in receiving the COVAXIN vaccine, which would comply

with the Army's mandate.  Dkt. No. 46-1 at 2.  He applied to a trial but was denied.  *Id.*
Then, he agreed to travel to India to receive the NOVAVAX vaccine (which at the time he
believed to coincide with his beliefs), but his commander—at the direction of the Army's
lawyers—denied his request for extra time to coordinate travel.  *Id.* at 3.  If, as the
defendants allege, the vaccine mandate serves a compelling interest, "it is hard to
understand why" the Army refuses to "meaningfully facilitate" the plaintiffs' exercise of
other options "to achieve this important goal."  *See Doster*, 54 F.4th at 426 (quoting *Hobby
Lobby Stores, Inc.*, 573 U.S. at 729).

Nor have the defendants demonstrated why they could not simply wait to compel the
plaintiffs to take the vaccine as soon as a need to deploy arises.  *See id.* at 425–26.  The
vaccine mandate expressly contemplates this type of emergency scenario, providing that a
religious exemption "may be revoked under imminent risk conditions."  FRAGO 5,
¶ 3.D.8.B.5.B.1.  Army policy also contains a safety valve that allows for revocation of
religious exemptions upon identification of any "specific and concrete threat to health and
safety."  Army Regulation 600-20 ¶ 5-6(f)(3)(a).  These built-in limitations ensure that health
and deployability remain a top priority for even those soldiers who have been excused from
vaccination requirements in the meantime.  In response, the defendants suggest that the
approximate six-week period it would take for these ten plaintiffs to become fully vaccinated
and officially deployable would impede the Army's objectives.  Tr. at 260.  But this
argument cannot stand in light of the minimal impact of such a brief delay and the nearly
100% vaccinated active force.

For these reasons, the defendants have failed to meet their burden of showing that
they have implemented the least restrictive means to achieve their interests.  Because the

plaintiffs have met their burden, but the defendants have not met theirs, the Court finds that the plaintiffs' RFRA claim is likely to succeed on the merits.[17]

## 6.    The Remaining Factors

### A.    Irreparable Harm

 "To show irreparable injury if threatened action is not enjoined, it is not necessary to demonstrate that harm is inevitable and irreparable." *Humana, Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986).  A plaintiff need only show that he is "likely to suffer irreparable harm in the absence of preliminary relief." *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018). "In general, harm is irreparable where there is no adequate remedy at law, such as monetary damages." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011).   "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn*, 141 S. Ct. at 67.   "This principle applies with equal force to the violation of [RFRA] rights because [RFRA] enforces First Amendment freedoms." *U.S. Navy Seals 1-26*, 27 F.4th at 348 (quoting *Opulent Life Church*, 697 F.3d at 295).

The plaintiffs will suffer irreparable harm absent a preliminary injunction.  The defendants argue that any "adverse employment action" taken against the plaintiffs does not

---

[17] The plaintiffs additionally raise a First Amendment challenge against the defendants.  Dkt. No. 1 ¶¶ 65–71.  But the Court recognizes the undisputed, longstanding principle that "if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court [should] decide only the latter."  *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936).  *See also Ala. State Fed'n of Lab. v. McAdory*, 325 U.S. 450, 470 (1945) ("[I]t is the duty of the federal courts to avoid the unnecessary decision of constitutional questions.").  Therefore, although it appears likely that the plaintiffs would also prevail on their First Amendment claim, the Court refrains from analyzing it because the plaintiffs have already demonstrated a likelihood of success on other grounds.

constitute irreparable injury because the plaintiffs "could be compensated for th[ose] losses." Dkt. No. 38 at 46–47. But, here, the plaintiffs "star[e] down even more than 'a choice between their job(s) and their jab(s).'" *U.S. Navy Seals 1-26*, 27 F.4th at 348 (quoting *BST Holdings, L.L.C.*, 17 F.4th at 618). To the contrary, "by pitting their consciences against their livelihoods, the vaccine requirements would crush the [p]laintiffs' free exercise of religion." *U.S. Navy Seals 1-26*, 27 F.4th at 348. "This intangible injury (the coerced violation of religious beliefs) is irreparable even when the coercion comes from such lesser forms of pressure," such as adverse employment action. *Doster*, 54 F.4th at 428. Because the plaintiffs' tangible injuries "are inextricably intertwined with [their] loss of constitutional rights," they have suffered and will continue to suffer irreparable harm absent immediate relief. *See U.S. Navy SEALs 1-26*, 578 F. Supp. 3d at 839.

### B.    Balance of Harms and the Public Interest

The third and fourth requirements for an issuance of a preliminary injunction—the balance of harms and whether the requested injunction will serve the public interest— "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Therefore, the Court considers them together. The Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (citing *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987)).

As discussed above, refusing to grant a preliminary injunction would cause the plaintiffs "substantial[] harm" because their religious freedoms "are seriously infringed by the [Army]'s vaccine requirements." *U.S. Navy Seals 1-26*, 27 F.4th at 353. "These infringements 'unquestionably constitute[] irreparable injur[ies].'" *Id.* (citing *Opulent Life*

*Church*, 697 F.3d at 295).  When a case, as here, surrounds legitimate claims of religious-freedom violations, "similar logic generally makes it unnecessary to dwell on the discretionary balancing of harms or the public interest." *Doster*, 54 F.4th at 428 (internal citation and quotation marks omitted).  This is because "[t]he government usually cannot rely on the harm from stopping its likely unconstitutional conduct." *Id.*  Further, the public has an interest in the protection of constitutional rights.  *Id.*

Nonetheless, the defendants contend that a preliminary injunction would disserve the public's interest in "national defense" and the military's interest in mission accomplishment.  Dkt. No. 38 at 49.  In particular, they claim that allowing the plaintiffs to remain unvaccinated would threaten their health and "their units' collective abilities to execute their . . . duties" and maintain "readiness." *Id.*  But, considering the state of COVID-19 and the near-perfect vaccination rate amongst the active force, the defendants' concerns are "hyperbolic." *See U.S. Navy SEALs 1-26*, 594 F. Supp. 3d at 788.  In fact, the plaintiffs "are statistically far more likely—in fact, almost guaranteed—to be denied a religious [exemption] than to contract a severe case of COVID-19." *Id.*

The defendants also claim that a preliminary injunction "would interfere with the military's discretion to handle matters of order and discipline."  Dkt. No. 38 at 50.  But the defendants have no right to impose discipline that violates the law.  Further, although an injunction would bar the Army from punishing the plaintiffs for refusing to take the COVID-19 vaccine based on their sincerely held religious beliefs, it would not preclude the Army from "considering the [plaintiffs'] vaccination status in making deployment, assignment, and other operational decisions." *See Austin*, 142 S. Ct. at 1301.  Still able to make these key strategic decisions, the defendants would not experience harm that

outweighs the harm they will cause to the plaintiffs and the public by their substantial and likely illegal burdening of religious freedom.  *See U.S. Navy Seals 1-26*, 27 F.4th at 353.

### 7.      Conclusion

Our first commander in chief cautioned that "[w]hile we are Contending for our own Liberty, we should be very cautious of violating the Rights of Conscience in others."  Letter from George Washington to Colonel Benedict Arnold (Sept. 14, 1775), *in* THE PAPERS OF GEORGE WASHINGTON, 1 REVOLUTIONARY WAR SERIES 455–56 (1985).  And since the Revolutionary War, religion has played a key role in our country's military.  *See Katcoff v. Marsh*, 755 F.2d 223, 225 (2d Cir. 1985).  "When the Continental Army was formed[,] those chaplains attached to the militia of the 13 colonies became part of our country's first national army."  *Id.* (citing P. Thompson, 1 *The United States Army Chaplaincy* xix (1978)).  Congress specifically authorized and required chaplains to be part of the Army.  10 U.S.C. § 3073.  "The great majority of the soldiers in the Army express religious preferences," and "its members experience increased needs for religion as the result of being uprooted from their home environments, transported often thousands of miles to territories entirely strange to them, and confronted there with new stresses that would not otherwise have been encountered if they had remained at home."  *Katcoff*, 755 F.2d at 226–27.  Our Constitution "obligates Congress, upon creating an Army, to make religion available to soldiers" because the Army must not "deprive the soldier of his right under the Establishment Clause not to have religion inhibited and of his right under the Free Exercise Clause to practice his freely chosen religion."  *Id.* at 234.

Here, the Army does not dispute this history or its ongoing obligation to accommodate its soldiers' religious freedom, including compliance with RFRA.  But it has

failed to prove that its ongoing imposition of the COVID-19 vaccine mandate, which indisputably burdens some soldiers' sincerely held religious beliefs, serves a compelling interest through the least restrictive means available. As a result, the Army must retreat from imposing its mandate in this particular field and permit religious exemptions to these plaintiffs.

For all of the reasons stated above, the Court grants the plaintiffs' Motion for Preliminary Injunction (Dkt. No. 29). The Court orders the following preliminary relief, which shall last until the Court orders otherwise:

> The defendants (including their officers, agents, servants, employees, attorneys, and anyone acting in concert with them) are enjoined from taking or continuing any disciplinary, punitive, or separation measures against the plaintiffs named in this action. Such measures include, but are not limited to, adverse administrative actions, non-judicial punishment, administrative demotions, administrative discharges, and courts-martial. The defendants may not initiate or continue any administrative separation or punitive processes against the named plaintiffs. The defendants may not process any of the cadet-plaintiffs through administrative boards due to their vaccination status or impose any other measures that interrupt their ability to undertake their course of study, including discontinuing or prohibiting them from attending classes.

> Any temporary exemption from taking the COVID-19 vaccine currently in place for the plaintiffs shall remain in place during the pendency of this litigation.

This injunction shall not preclude the defendants from considering the plaintiffs' vaccination status in making deployment, assignment, and other operational decisions. *See Austin*, 142 S. Ct. at 1301. No bond is required. *See* Fed. R. Civ. P. 65(c).

So ordered on December 21, 2022.

_____
JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE