UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
SAN ANGELO DIVISION

| | |
|---|---|
| ROBERT SCHELSKE, et al.,<br><br>     Plaintiffs,<br><br>v.<br><br>LLOYD J. AUSTIN, III, in his official capacity as United States Secretary of Defense, et al.,<br><br>     Defendants. | No. 6:22-CV-049-H |

## MEMORANDUM OPINION AND ORDER

Less than one year ago, the Court ordered the Army to cease adverse action against ten service members who declined to receive the mandated COVID-19 vaccine due to their sincerely held religious beliefs. The Court found that the plaintiffs were likely to succeed on their RFRA claims and suffer irreparable harm absent immediate relief. The question now is one of mootness. Despite the Army's consistent resistance throughout this litigation to halting its challenged—and likely illegal—conduct, the plaintiffs' claims are now substantially mooted by two events beyond the Army's control. First, Congress required the Army to rescind its vaccine mandate, which in turn rendered the guidance implementing it ineffective. Second, in materially similar circumstances, the Fifth Circuit held that an appeal was moot due to the rescission of the challenged policies—a holding that largely controls the outcome here. Given these developments, the Court finds that no remediable injury traceable to the Army's conduct remains against any non-separated plaintiff. In contrast, Plaintiff Chrisman—who remains separated due to his refusal to vaccinate—has alleged an injury in fact and, based on RFRA's plain language, need not exhaust administrative remedies before seeking judicial relief. For these reasons, the Court grants in part and denies in part the defendants' Motion to Dismiss (Dkt. No. 105).

1.      **Factual and Procedural History**

   A.      **The plaintiffs file suit, and the Court grants their motion for a preliminary injunction as to the named plaintiffs.**

The Court recounted the events giving rise to this dispute in a prior order. Dkt. No. 78. In short, five active-duty service members in the U.S. Army and five cadets at the U.S. Military Academy (USMA) at West Point sued the defendants—each a federally appointed Department of Defense official—for violating their statutorily and constitutionally protected religious rights. Dkt. No. 1. The plaintiffs alleged that the defendants had substantially burdened their religious exercise by routinely denying their religious-exemption requests to the COVID-19 vaccine mandate without any compelling interest or use of the least restrictive means to achieve that interest. *Id.* The plaintiffs thus challenged the adverse actions taken against them due to their refusal to vaccinate. *Id.*

In their initial complaint, the plaintiffs asked the Court for the following relief: (1) a declaration that the Army's mandatory vaccine policy and its actions to enforce it were illegal and unconstitutional; (2) class certification of other similarly situated service members; (3) a preliminary injunction precluding the defendants from taking further enforcement action against the plaintiffs or those similarly situated to them; and (4) preliminary and final injunctive relief (i) prohibiting the defendants from retaliating against those who sought a religious exemption or taking further punitive action against those whose religious-exemption requests were denied, (ii) directing the defendants to "discontinue their religious discrimination and eradicate it root and branch," and (iii) requiring the defendants to reprocess the plaintiffs' religious-exemption requests without religious discrimination and to provide appropriate restorative relief, including correction of the plaintiffs' personal records and backpay, if warranted. *Id.* at 23.

– 2 –

The plaintiffs then moved for a preliminary injunction to "enjoin [the] [d]efendants from taking further punitive actions" against them due to their refusal to take the COVID-19 vaccine "in violation of their sincerely held religious beliefs." Dkt. No. 29 at 1. The Court granted their motion, finding that the plaintiffs were likely to succeed on their claim under the Religious Freedom Restoration Act because they "met their burden of showing that the defendants ha[d] substantially burdened their sincere religious beliefs," and the defendants "fail[ed] to demonstrate a compelling governmental interest that could justify burdening the plaintiffs' religious rights" or that "they ha[d] used the least restrictive means to achieve their interest." Dkt. No. 78 at 43–44, 54, 63. The Court also found that the plaintiffs would be irreparably harmed apart from preliminary relief. *Id.* at 59.

Thus, the Court enjoined the defendants "from taking or continuing any disciplinary, punitive, or separation measures against the plaintiffs," including but not limited to "adverse administrative actions, non-judicial punishment, administrative demotions, administrative discharges, and courts-martial." *Id.* at 63. The Court further ordered that "[t]he defendants may not initiate or continue any administrative separation or punitive processes against the named plaintiffs." *Id.* Additionally, the Court prohibited the defendants from "process[ing] any of the cadet-plaintiffs through administrative boards due to their vaccination status or impos[ing] any other measures that interrupt their ability to undertake their course of study, including discontinuing or prohibiting them from attending classes." *Id.* In line with Supreme Court precedent, the Court declined, however, to "preclude the defendants from considering the plaintiffs' vaccination status in making deployment, assignment, and other operational decisions." *Id.* (citing *Austin v. U.S. Navy Seals 1–26*, 142 S. Ct. 1301, 1301 (2022)).

– 3 –

**B.** **In response to a congressional directive, the defendants rescind the vaccine mandate and cease adverse action against soldiers who sought a religious exemption.**

The Court recognized when it granted the plaintiffs' motion for preliminary injunction that "much of this litigation may soon be moot." *Id.* at 3. That was because Congress had recently passed the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (NDAA). The NDAA provided that "[n]ot later than 30 days" after its enactment, "the Secretary of Defense shall rescind the mandate that members of the Armed Forces be vaccinated against COVID-19." NDAA, Pub. L. No. 117-263, § 525 (2022). As the Court anticipated, and while the plaintiffs' motions for class certification (Dkt. No. 48) and class-wide preliminary injunction (Dkt. No. 50) remained pending, the President signed the NDAA into law. In response, the Army immediately suspended separation proceedings against soldiers who had declined to receive the COVID-19 vaccine. Fragmentary Order (FRAGO) 35 to Headquarters Department of the Army (HQDA) Execution Order (EXORD) 225-21 ¶ 3.D.28, "COVID-19 Steady State Operations."

In accordance with this congressional directive, on January 10, 2023, Secretary of Defense Lloyd Austin formally rescinded the order that had mandated the vaccination of active-duty service members across the military. Dkt. No. 108 at 46. Secretary Austin declared that "[n]o individuals currently serving in the Armed Forces shall be separated solely on the basis of their refusal to receive the COVID-19 vaccination if they sought an accommodation on religious . . . grounds." *Id.* Secretary Austin also directed the military to "update the records of such individuals to remove any adverse actions solely associated with denials of such requests, including letters of reprimand." *Id.*

– 4 –

Despite formally rescinding the vaccine mandate, Secretary Austin nonetheless applauded the mandate's success in improving the "health" and "readiness" of the force. *Id.* And he indicated that the Department of Defense would continue to "promote and encourage" COVID-19 vaccination for all service members. *Id.* Additionally, Secretary Austin stated that "[a]ll commanders have the responsibility and authority to preserve the Department [of Defense]'s compelling interests in mission accomplishment," including "the ability to maintain military readiness, unit cohesion, good order and discipline, and the health and safety of a resilient Joint Force." *Id.* He also expressly preserved all "[o]ther standing Departmental policies . . . regarding immunizations," including "the ability of commanders to consider, as appropriate, the individual immunization status of personnel in making deployment, assignment, and other operational decisions." *Id.* at 47.

Taking heed of the Department's directions, the Army issued FRAGO 37 to HQDA EXORD 225-21, which ordered the "immediate[]" suspension of "adverse administrative actions based solely on a soldier's refusal to comply with the rescinded mandate." ¶ 3.D.30. About one week later, the Under Secretary of Defense for Personnel and Readiness promulgated amendments to the DoD Coronavirus Disease 2019 Force Health Protection Guidance. Dkt. No. 108 at 56. In particular, the Under Secretary removed the "require[ment]" that service members be vaccinated against COVID-19 and restored the ability of unvaccinated service members to partake in all official travel—not just "mission critical" travel. *Id.* at 61, 73. In FRAGO 38 to HQDA EXORD 225-21, the Army reiterated that "[e]ffective immediately, not fully vaccinated individuals [could] conduct any official travel" not otherwise restricted by Army regulation. ¶ 3.D.15.

Deputy Secretary of Defense Kathleen Hicks then issued a memorandum confirming that, in accordance with the NDAA, the rescission of the COVID-19 vaccine mandate "rendered all DoD Component policies, directives, and guidance implementing" the mandate, including "any limitations on deployability" of unvaccinated service members, "as no longer in effect." Dkt. No. 108 at 90. Secretary Hicks thus directed each military branch to "formally rescind" any conforming guidance still in place "as soon as possible" to the extent it had not already done so. *Id.* Although maintaining "the ability of commanders to consider, as appropriate, the individual immunization status of personnel in making deployment, assignment, and other operational decisions," Secretary Hicks stated that commanders may not "consider a [s]ervice member's COVID-19 immunization status" other than "to comply with DoD Foreign Clearance Guidance," which provides that "DoD personnel must continue to respect any applicable foreign nation vaccination entry requirements." *Id.* at 90–91.

Nonetheless, Secretary Hicks reiterated that "[i]n today's rapidly changing global security environment, vaccines continue to play a critical role in assuring a ready and capable force that is able to rapidly deploy anywhere in the world on short notice." *Id.* at 90. And she suggested that the military could "establish[] . . . a new immunization requirement" in the future to further this objective. *Id.* at 91. In an effort to "establish a process" for instituting any such new requirement, Secretary Hicks revised DoD policy to require that any request to "initiate mandatory immunizations of personnel against COVID-19" be submitted to the Assistant Secretary of Defense for Health Affairs for approval. *Id.*; *see also* Dep't of Def. Instruction 6205.02 ¶ 2.11(g), Dep't of Def. Immunization Program (July 23, 2019). Secretary Hicks did not specify under what

circumstances a new vaccine requirement would be justified.  *See id.*  But she noted her "expectation" that any such proposal be "made judiciously and only when justified by compelling operational needs" and be "as narrowly tailored as possible."  Dkt. No. 108 at 91.

Secretary of the Army Christine Wormuth echoed the praise of the "efforts the . . . Army ha[d] taken to respond to the COVID-19 pandemic" and the plan to "promote and encourage COVID-19 vaccination for all personnel to ensure readiness, facilitate mission accomplishment, and protect [the] force."  *Id.* at 95.  Nonetheless, in response to the Department of Defense's orders, she issued guidance "rescind[ing] all Department of the Army policies specifically associated with the implementation of the COVID-19 vaccination mandate."  *Id.* at 92.  Secretary Wormuth ordered that "[n]o currently serving Soldier shall be separated based solely on [his] refusal to receive the COVID-19 vaccine if [the soldier] sought an exemption on religious . . . grounds."  *Id.*  Further, she directed the Army to (1) cease review of religious-exemption requests to the COVID-19 vaccine mandate; (2) no longer require the COVID-19 vaccine for admission to pre-commissioning programs; and (3) remove travel restrictions based solely on COVID-19 vaccination status.  *Id.*  Secretary Wormuth further advised that she "continue[d] to withhold the authority to impose any non-judicial and judicial actions based solely on a Soldier's refusal to receive the COVID-19 vaccine while the mandate was in effect."  *Id.* at 93.

Additionally, Secretary Wormuth directed the Army to update the personnel records of soldiers whose religious-exemption requests were denied by rescinding all pending involuntary-separation actions, favorably closing flags and removing General Officer Memoranda of Reprimand (GOMORs) and other adverse actions, eliminating any bars to

their continued service, and correcting negative evaluation reports related to their refusal to vaccinate.  *Id.* at 93–94.  Secretary Wormuth required the Army's Human Resources Command (HRC) to within 45 days report all actions taken to update the records of soldiers who sought an exemption.  *Id.* at 94.  Moreover, she required the General Court Martial Convening Authority (GCMCA) to validate that all required actions had been taken within 15 days of the HRC's report.  *Id.*  And if any soldiers "were inadvertently excluded in the report," she directed them to notify their GCMCA.  *Id.*

Because rescission of the vaccine mandate "eliminate[d] the need for the Army to adjudicate pending exemption requests based on religious . . . grounds," Secretary Wormuth also directed the Office of the Surgeon General (OTSG), in coordination with the Assistant Secretary of the Army (Manpower and Reserve Affairs) (ASA (M&RA)), to notify soldiers with pending exemption requests within 30 days that "no further action will be taken" in review of their requests.  *Id.*  For those soldiers who had already been discharged, however, Secretary Wormuth advised that they must exhaust administrative processes, including "petition[ing] the Army Discharge Review Board and the Army Board for Correction of Military Records to request corrections to their personnel records," such as "records regarding the characterization of their discharge."  *Id.* at 95.

In March 2023, the Army executed Secretary Wormuth's orders through HQDA EXORD 174-23, in which it rescinded its previous orders implementing the COVID-19 vaccine mandate.  ¶ 1.A.  EXORD 174-23 restated the types of adverse action to be ceased and the procedures for restorative action.  *Id.* ¶¶ 3.A.1.B, 3.C.1.B, 3.C.1.C–G.  Additionally, it affirmed that the Secretary of the Army "withholds the authority to impose nonjudicial and judicial actions based solely on a soldier's refusal to receive the COVID-19 vaccine

while the mandate was in effect."  *Id.* ¶ 3.D.1.  And it provided that "other than to comply

with DoD foreign clearance guidance, commanders will not require a service member or

group of service members to be vaccinated against COVID-19, nor consider a service

member's COVID-19 immunization status in making deployment, assignment, and other

operational decisions, absent establishment of a new immunization requirement."  *Id.*

¶ 3.D.8.

### C.   The Army's policy governing religious exemptions to immunization requirements remains.

Although the Army rescinded the COVID-19 vaccine mandate, its policy governing

exemptions to immunization requirements remains.  Pursuant to that policy, a soldier may

seek one of two types of exemptions: medical or administrative.  Army Regulation 40-562

¶ 2-6, Immunizations and Chemoprophylaxis for the Prevention of Infectious Diseases (Oct.

7, 2013).  Several reasons could justify a medical exemption: (1) underlying health

conditions, including, for example, pregnancy or a previous adverse response to

immunization; (2) medical evidence demonstrating immunity; or (3) the lack of a "readily

definable" clinical case.  *Id.* ¶ 2-6(a)(1).  A soldier's health care provider may unilaterally

determine whether to grant a medical exemption "based on the health of the vaccine

candidate and the nature of the immunization."  *Id.* ¶ 2-6(a).  Medical exemptions may be

temporary (up to 365 days) or permanent.  *Id.*

Administrative exemptions include religious exemptions, as well as exemptions for

soldiers within 180 days of separation or retirement or those with 30 days or fewer of service

remaining.  *Id.* ¶ 2-6(b).  Whether to grant a religious exemption is a "decision made with

medical, judge advocate, and chaplain input."  *Id.* ¶ 2-6(b)(3)(a).  A military physician must

counsel the applicant regarding the benefits of the vaccine and the "potential risks of

infection incurred by unimmunized individuals." *Id.* ¶ 2-6(b)(3)(a)(2).  Additionally, the

applicant's commander must counsel him "that noncompliance with immunization

requirements may adversely impact deployability, assignment, or international travel." *Id.*

¶ 2-6(b)(3)(a)(3).  Religious-exemption requests to immunization requirements are processed

through an applicant's chain of command, but the Surgeon General serves as the final

"decision authority."  Army Regulation 600-20 ¶ 5-6(e)(1)(b), Army Command Policy (July

24, 2020).  Even if approved, religious accommodations pertaining to medical care "are

temporary and subject to modification or revocation by immediate commanders" in

accordance with Army policy.  *Id.* ¶ 5-6(f)(1).

      Army policy requires that the officials charged with reviewing religious-exemption

requests "review each request individually, considering the full range of facts and

circumstances relevant to the specific request."  Dep't of Def. Instruction 1300.17 ¶ 3.2(d),

Religious Liberty in the Military Services (Sept. 1, 2020).  The framework set forth for

reviewing religious-exemption requests mirrors that detailed in 42 U.S.C. § 2000bb: "It is

the Soldier's responsibility to demonstrate he . . . has a sincerely held religious belief and

that [a] government policy, practice, or duty substantially burdens [his] religious exercise."

Army Regulation 600-20 ¶ 5-6(a)(2).  If the soldier meets his burden, the reviewing authority

must then "demonstrate how/why the government action furthers a compelling government

interest and is the least restrictive means of furthering that interest."  *Id.*  Army policy

enumerates safety, health, military readiness, and mission accomplishment as potential

"[c]ompelling government interests."  *Id.* ¶ 5-6(a)(4); Dep't of Def. Instruction 1300.17

¶ 3.2(d)(1).  But these interests are not absolute—the reviewing authority must consider both

"the effect of approval or denial on military necessity" and "the effect of approval or denial

– 10 –

on the Soldier's exercise of religion."  Army Regulation 600-20 ¶ 5-6(a)(4).  Ultimately, upon considering alternate means, the means "that is least restrictive to the requestor's religious practice and that does not impede a compelling governmental interest will be determinative."  Dep't of Def. Instruction 1300.17 ¶ 3.2(d)(1).

> ### D.   The plaintiffs file an amended complaint, and the defendants move to dismiss the case as moot.

The defendants moved to dismiss this case in January 2023 (Dkt. No. 88), and, in response, the plaintiffs filed an amended complaint (Dkt. No. 92).  The amended complaint adds a new plaintiff, Luke Chrisman, who was separated from the Army in November 2022 due to his failure to comply with the vaccine mandate after the denial of his religious-exemption request.  Dkt. No. 92 at 15–16.  Thus, in addition to the relief requested in their initial complaint (Dkt. No. 1), the plaintiffs ask the Court to, with respect to Plaintiff Chrisman and others similarly situated to him, upgrade their discharges to "honorable," remove adverse characterizations and prohibitive re-enlistment codes from personnel files, and offer reinstatement.  *Id.* at 34.  Plaintiff Chrisman has not, however, sought administrative review of his discharge.  Dkt. No. 124 at 34–35.

In their amended complaint, the plaintiffs ask the Court to order the removal of any adverse actions or reports from personnel records and "direct the institution of special promotion selection boards" to consider promotions for those who were denied a promotion or denied the ability to attend a course required for promotion.  Dkt. No. 92 at 34.  Moreover, they ask the Court to enjoin and direct the revision of the Army's current policy for evaluating religious-exemption requests to immunization requirements, specifically "preventing [the] [d]efendants from using generalized compelling interests to determine

whether a Soldier is eligible for an exemption and implementing a double standard for the processing of medical or other administrative exemptions." *Id.* at 35.

The defendants then moved to dismiss the amended complaint. Dkt. No. 105. They argue that because the Secretary of Defense, in response to a congressional directive, rescinded the vaccine mandate, the plaintiffs' challenge to the mandate and the adverse actions associated with it are moot. *Id.* at 1. The plaintiffs responded in opposition, contending that rescission of the vaccine mandate "was only a part of" the relief sought and that "[m]any prior harms and ongoing harms directly resulting" from the defendants' implementation of the mandate "remain to be remedied." Dkt. No. 109 at 9. The defendants replied. Dkt. No. 112. The motion to dismiss is ripe.

### E.  Courts across the country dismiss related challenges to the military's vaccine mandate as moot.

Since the official rescission of the COVID-19 vaccine mandate, several district courts have dismissed challenges to the mandate across the military as moot.[1] Further, numerous circuit courts have either dismissed related appeals as moot or remanded to the district court to dismiss the case as moot.[2] To date, no court has denied a motion to dismiss and found that a live controversy remains with respect to any challenge to the constitutionality of the

---

[1] *See Bongiovanni v. Austin*, No. 3:22-CV-580, 2023 WL 4352445, at *11–12 (M.D. Fla. July 5, 2023); *Crocker v. Austin*, No. CV 22-0757, 2023 WL 4143224 (W.D. La. June 22, 2023); *Bazzrea v. Mayorkas*, No. 3:22-CV-265, 2023 WL 3958912 (S.D. Tex. June 12, 2023); *Colonel Fin. Mgmt. Officer v. Austin*, No. 8:21-CV-2429, 2023 WL 2764767 (M.D. Fla. Apr. 3, 2023); *Creaghan v. Austin*, No. CV 22-0981, 2023 WL 3274309 (D.D.C. Mar. 10, 2023).

[2] *See Alvarado v. Austin*, No. 23-1419 (4th Cir. Aug. 3, 2023), Dkt. Nos. 25–26; *U.S. Navy SEALs 1–26 v. Biden*, 72 F.4th 666, 669–70 (5th Cir. 2023); *Chief Warrant Officer 4 v. Sec'y of the U.S. Dep't of Def.*, No. 22-13522 (11th Cir. May 12, 2023), Dkt. No. 21; *Roth v. Austin*, 62 F.4th 1114, 1115–16 (8th Cir. 2023); *Navy Seal 1 v. Austin*, No. 22-5114, 2023 WL 2482927 (D.C. Cir. Mar. 10, 2023); *Dunn v. Austin*, No. 22-15286, 2023 WL 2319316 (9th Cir. Feb. 27, 2023); *Short v. Berger*, No. 22-15755, 2023 WL 2258384 (9th Cir. Feb. 24, 2023).

rescinded mandate.  Despite the varying facts, allegations, and posture of each case, courts have nonetheless reached a uniform conclusion: "The mandate recissions have eliminated the actual controversy—the court cannot provide effectual relief[,] and thus the plaintiffs' claims are moot." *Bazzrea*, 2023 WL 3958912, at *4.

Of paramount importance here, the Fifth Circuit recently held that the Navy's appeal of orders preliminarily enjoining its enforcement of the vaccine mandate against service members who sought a religious exemption was moot because the "vaccine policies challenged . . . ha[d] been rescinded and . . . no exception to mootness applie[d]." *U.S. Navy SEALs 1–26*, 72 F.4th at 676.  The Fifth Circuit stated that the "default rule of mootness applie[d]" because the Navy, "[o]beying a newly enacted federal statute, . . . rescinded its COVID-19 mandate.  Then it revoked each of the implementing policies addressed by the preliminary injunction." *Id.* at 672.  No longer facing any adverse action due to their COVID-19 vaccination status, the plaintiffs had "received everything th[e] injunctions required." *Id.*  The court further reasoned that it could not "assume, without evidence to the contrary, that the upper echelons of the Navy, including the Secretary of the Navy, issued the post-rescission policies with an eye toward resuming the challenged conduct as soon as the courts were done." *Id.* at 675.  The Fifth Circuit did, however, note that the mootness of the appeal "d[id] not end the litigation" because the "[p]laintiffs' case remain[ed] before the district court, which w[ould] decide in the first instance whether any of [their] claims [we]re justiciable." *Id.* at 676.  This binding precedent—based on facts nearly identical to those in this case—largely dictates the outcome here.

– 13 –

**F.    Following the Fifth Circuit's holding in *Navy SEALs*, six plaintiffs voluntarily dismiss their claims, but five plaintiffs remain.**

In light of the rapidly changing legal and factual landscape, the Court ordered the parties to file a joint report to supplement their initial filings.  Dkt. No. 115.  In that notice, and following the Fifth Circuit's holding in *Navy SEALs*, the parties jointly stipulated to the dismissal without prejudice of the claims of Huntley Bakich, Samuel Conklin, Dominic Mell, Collin Morrison, Nicholas Saballa, and Peter Testa because they "received all the relief that they required."  Dkt. Nos. 122 at 1; 123 at 1.  The Court then held a telephonic conference, and the parties filed additional notices and appendices.  Dkt. Nos. 128; 131–34.  The remaining plaintiffs—Robert Schelske, Joshua Costroff, Samuel Galloway, Zakai Bufkin, and Luke Chrisman—persist in their claims.  Dkt. No. 122 at 1.

The remaining plaintiffs allege specific, limited ongoing injuries caused by the defendants' past enforcement of the vaccine mandate.  First, Sergeants Costroff, Schelske, and Galloway claim that because the defendants have removed their enlisted record briefs (ERBs)—which previously contained adverse COVID-19-related actions—from the Army's archives, they lack the materials needed to apply to become warrant officers.  Dkt. Nos. 131 at 2; 132 at 4–10.  Those plaintiffs have also declined the defendants' offer to restore their ERBs to the system and redact adverse information with a black redaction tool, claiming that they would "have to explain to the warrant officer selection board" the reason for the redactions in their records.  Dkt. No. 132 at 5, 7, 10.  Second, Plaintiff Chrisman—who was previously separated from the Army due to his refusal to vaccinate—claims that he retains a "general" discharge characterization with the label "MISCONDUCT (SERIOUS OFFENSE)" in his records.  Dkt. No. 124 at 34–35.  Lastly, Cadet Bufkin claims that the defendants' enforcement of the vaccine mandate against him caused him to develop mental-

– 14 –

health problems that resulted in his deficient academic performance, recommendation by the academic board that he be separated from West Point, and placement on administrative leave of absence without pay and allowances.  *Id.* at 26–29.

## 2.    Standards of Review

### A.    Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(1) permits a defendant to move to dismiss a case for lack of subject matter jurisdiction.  "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case."  *Home Builders Ass'n of Miss. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998) (internal citation omitted).  Article III of the Constitution "limits the jurisdiction of federal courts to actual 'Cases' and 'Controversies.'"  *Crane v. Johnson*, 783 F.3d 244, 251 (5th Cir. 2015) (citing U.S. Const. art. III, § 2).  This case-or-controversy requirement "imposes an 'irreducible constitutional minimum of standing,'" consisting of three elements:  "(1) a plaintiff must have suffered an 'injury in fact—an invasion of a legally protected interest which is . . . concrete and particularized, and . . . actual or imminent'; (2) there must be 'a causal connection between the injury and the conduct complained of'; and (3) the injury must be likely to be redressed by a favorable decision."  *Yarls v. Bunton*, 905 F.3d 905, 909 (5th Cir. 2018) (alterations in original) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

"Courts may dismiss for lack of subject matter jurisdiction on any one of three different bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."  *Clark v. Tarrant County*, 798 F.2d 736, 741 (5th Cir. 1986)

(citing *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. May 1981)).  When a defendant challenges the existence of subject matter jurisdiction based on facts, rather than based solely on the face of the pleadings, a court may consider affidavits, testimony, and other evidence in the record.  *Oaxaca v. Roscoe*, 641 F.2d 386, 391 (5th Cir. Unit A Apr. 1981); *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980).  That is because "at issue in a factual 12(b)(1) motion is the trial court's jurisdiction—its very power to hear the case"; therefore, "the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case."  *Williamson*, 645 F.2d at 412–13 (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)).  "[T]he existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims."  *Id.* at 413 (quoting *Mortensen*, 549 F.2d at 891).  The court "may hear conflicting written and oral evidence and decide for itself the factual issues which determine jurisdiction."  *Id.*

When a defendant challenges subject matter jurisdiction based on facts, the plaintiff "is . . . required to submit facts through some evidentiary method and has the burden of proving by a preponderance of the evidence that the trial court does have subject matter jurisdiction."  *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. May 1981).  "A court 'may' consider oral evidence along with written, but an evidentiary hearing is not [always] required."  *Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169, 173 (5th Cir. 1994) (citing *Williamson,* 645 F.2d at 413).  The plaintiff must simply receive "notice and an opportunity to be heard," *In re Eckstein Marine Serv. L.L.C.*, 672 F.3d 310, 320 (5th Cir. 2012), meaning that he "should have an opportunity to develop and argue the facts in a manner that is adequate in the context of the disputed issues and evidence," *Williamson*, 645 F.2d at 414.

An evidentiary hearing may be necessary when it is "indispensable" to resolving "complicated factual disputes underlying the case," *In re Eckstein Marine Serv. L.L.C.*, 672 F.3d at 319, such as when complex facts are "not readily perceivable from the record," *Williamson*, 645 F.2d at 414, or the record is otherwise "ambiguous," *Martin v. Morgan Drive Away, Inc.*, 665 F.2d 598, 602 (5th Cir. Unit A 1982).

When, however, (1) "the parties receive an adequate opportunity to conduct discovery and otherwise present their arguments and evidence to the court"; (2) nothing in the record indicates that they "w[ere] unable to adequately present [their] evidence in writing or that [they] would have been able to make different or more persuasive arguments at an oral hearing"; and (3) "ample written evidence" supports a jurisdictional finding, a hearing is not required. *In re Eckstein Marine Serv. L.L.C.*, 672 F.3d at 319–20; *Moran*, 27 F.3d at 173.

Here, the parties have not requested an evidentiary hearing, but, in any event, the Court does not find one to be necessary. An extensive record is before the Court, including the plaintiffs' verified amended complaint (Dkt. No. 92) and briefing, appendices, and notices filed by both parties in connection with the defendants' motions to dismiss. *See* Dkt Nos. 82; 84; 85; 87; 89; 93; 96; 102; 106–09; 112–13. In addition, the parties have submitted several supplemental notices and appendices concerning factual developments in this case. Dkt. Nos. 122–25; 131–34. The Court also held a telephonic conference to clarify certain factual matters. Dkt. No. 128. Having carefully considered the record, the Court finds that the parties have been afforded adequate notice and opportunity to present their arguments and evidence on subject matter jurisdiction to the Court and that nothing indicates they would present different arguments or evidence at a hearing. Further, although the vast

majority of the facts in this case are undisputed, the Court finds that it can resolve the limited remaining factual disputes based on the ample record evidence and that no factual ambiguities exist that would necessitate an evidentiary hearing.

### B.   Mootness

Article III's case-or-controversy requirement "ensures that the parties . . . retain a 'personal stake' in the litigation." *Moore v. Harper*, 143 S. Ct. 2065, 2076 (2023) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).  A plaintiff must retain a personal stake "at all stages of review, not merely at the time the complaint is filed." *Id.* (quoting *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71 (2013)); *Chafin v. Chafin*, 568 U.S. 165, 172 (2013).  "Mootness doctrine 'addresses whether an intervening circumstance has deprived the plaintiff of [that] personal stake in the outcome of the lawsuit.'" *Moore*, 143 S. Ct. at 2077 (quoting *West Virginia v. EPA*, 142 S. Ct. 2587, 2607 (2022)).  "A case becomes moot only when it is impossible for a court to grant 'any effectual relief whatever' to the prevailing party." *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307 (2012) (quoting *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000)).  Any remaining "concrete interest, however small, in the outcome of the litigation" defeats mootness. *Chafin*, 568 U.S. at 172 (quoting *Knox*, 567 U.S. at 307–08).

Although the "initial burden of establishing the trial court's jurisdiction rests on the party invoking that jurisdiction, once that burden has been met courts are entitled to presume, absent further information, that jurisdiction continues." *Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 98 (1993).  The party asserting mootness therefore "bears the burden to establish that a once-live case has become moot" by pointing to "subsequent events" that "material[ly] change" the circumstances so as to "entirely terminate[]" the

controversy.  *West Virginia*, 142 S. Ct. at 2607 (first citing *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000); and then citing *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 222 (2000)); *Cardinal Chem. Co.*, 508 U.S. at 98.  As discussed below (*see infra* Section 3.A.i), that burden increases where "a defendant claim[s] that its voluntary compliance moots a case."  *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013).  In that circumstance, the defendant must "show[] that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur."  *Id.* (quoting *Friends of the Earth, Inc.*, 528 U.S. at 190).

### C.    Exhaustion

The doctrine of administrative exhaustion provides that "no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted."  *McKart v. United States*, 395 U.S. 185, 193 (1969) (quoting *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51 (1938)).  The exhaustion requirement can either be (1) mandated by federal statute, or (2) imposed through the judicially created doctrine of exhaustion.  *See Info. Res., Inc. v. United States*, 950 F.2d 1122, 1126 (5th Cir. 1992).  When it is mandated by statute, exhaustion becomes a jurisdictional prerequisite to maintaining an action.  *Ross v. Blake*, 578 U.S. 632, 639 (2016) ("[M]andatory exhaustion statutes . . . establish mandatory exhaustion regimes, foreclosing judicial discretion."); *Townsend v. U.S. Dep't of Just. Immigr. & Naturalization Serv.*, 799 F.2d 179, 181 (5th Cir. 1986) ("When exhaustion is statutorily mandated, the requirement is jurisdictional.").

Where, however, "Congress has not clearly required exhaustion, sound judicial discretion governs."  *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992); *NLRB v. Indus. Union of Marine & Shipbuilding Workers of Am.*, 391 U.S. 418, 426 n.8 (1968) ("The requirement of

exhaustion is a matter within the sound discretion of the courts.").  And "judge-made exhaustion doctrine[] . . . remain[s] amenable to judge-made exceptions."  *Ross*, 578 U.S. at 639.  "[C]ourts must balance the interest of the individual in retaining prompt access to a federal judicial forum against countervailing institutional interests favoring exhaustion." *McCarthy*, 503 U.S. at 146.  But "even in this field of judicial discretion," federal courts must give "appropriate deference to Congress' power to prescribe the basic procedural scheme under which a claim may be heard."  *Id.* at 144.  Therefore, "the initial question whether exhaustion is required should be answered by reference to congressional intent," and courts "should not defer the exercise of jurisdiction under a federal statute unless it is consistent with that intent."  *Patsy v. Bd. of Regents of the State of Fla.*, 457 U.S. 496, 501–02 (1982).

3.    **Analysis**

> **A.    The defendants' rescission of the vaccine mandate and its implementing guidance renders claims concerning the lawfulness of the mandate and its application moot, and no exception applies.**

When "an intervening circumstance deprives a plaintiff" of a personal stake in the litigation or "makes it impossible for the court to grant any effectual relief," a court lacks jurisdiction, and the case is moot.  *Payne v. Progressive Fin. Servs., Inc.*, 748 F.3d 605, 607 (5th Cir. 2014) (citing *Chafin*, 568 U.S. at 172); *Flast v. Cohen*, 392 U.S. 83, 95 (1968).  An intervening circumstance includes "where . . . a [government policy] is . . . repealed after plaintiffs bring a lawsuit challenging the legality of that [policy].  In that case, mootness is the default."  *Freedom From Religion Found., Inc. v. Abbott*, 58 F.4th 824, 832 (5th Cir. 2023); *Spell v. Edwards*, 962 F.3d 175, 179 (5th Cir. 2020).  And the Fifth Circuit has made clear that this "default rule" applies in military-vaccine-mandate cases where, as here, in compliance with "a newly enacted federal statute," a military branch "rescind[s]" the

mandate and "revoke[s] each of [its] implementing policies." *U.S. Navy SEALs 1–26*, 72 F.4th at 672.  Similarly, here, because the plaintiffs "have now received" their requested relief—at least with respect to precluding future enforcement of the vaccine mandate against them—and "there is . . . nothing for the [C]ourt to do" on that ground, mootness is the default. *Id.* (quoting *Spell*, 962 F.3d at 179).  The plaintiffs raise several exceptions to mootness, but none apply.  The Court addresses each in turn.

### i.    The voluntary-cessation exception to mootness does not apply.

The plaintiffs first contend that a live controversy remains because even though the NDAA required the rescission of the vaccine mandate, it did not require the rescission of the guidance implementing it, and the defendants' "voluntary" conduct cannot moot this case. Dkt. No. 109 at 22–28.  Precedent forecloses this argument.  The defendants' rescission of the mandate and its implementing guidance was largely involuntary and, to the extent it was voluntary, it is accorded a presumption of good faith.  *See U.S. Navy SEALs 1–26*, 72 F.4th at 674.  Thus, no live controversy remains based on voluntary cessation of the challenged conduct.

### a.    The defendants' rescission of the vaccine mandate and its implementing guidance was primarily involuntary.

The Supreme Court has made clear that a defendant's "voluntary cessation" of a challenged policy or practice does not "deprive a federal court" of its power to determine the legality of that policy or practice.  *Friends of the Earth, Inc.*, 528 U.S. at 189 (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)).  Otherwise, "a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends."  *Already, LLC*, 568 U.S. at 91.  Allegations by a defendant that its voluntary conduct has mooted the

plaintiff's case thus "require closer examination than allegations that 'happenstance' or official acts of third parties have mooted the case." *Frazier v. McDonough*, No. 21-20375, 2022 WL 2871853, at *2 (5th Cir. July 21, 2022) (quoting *Env't Conservation Org. v. City of Dallas*, 529 F.3d 519, 528 n.4 (5th Cir. 2008)).  At its core, the voluntary-cessation exception "evaluates the risk that a defendant is engaging in 'litigation posturing' to avoid judicial review."  *U.S. Navy SEALs 1–26*, 72 F.4th at 673.

But the Fifth Circuit has stated that conduct is only voluntary "when taken free from compulsion" of an enforcement action or a legally binding order.  *Fontenot v. McCraw*, 777 F.3d 741, 747 n.9 (5th Cir. 2015) (citing *Env't Conservation Org.*, 529 F.3d at 528).  For example, in *Environmental Conservation Organization*, members of an environmental group sued the City of Dallas for alleged violations of the Clean Water Act.  529 F.3d at 523. Thereafter, the EPA issued a show-cause order to the City.  *Id.*  Ultimately, the City reached a settlement with the EPA, and in a separate enforcement action, a federal court granted the EPA's motion to enter a consent decree with the agreed settlement terms.  *Id.*  The Fifth Circuit held that the environmental group's original suit against the City was moot.  *Id.* at 529.  In conducting this inquiry, the court declined to characterize the City's compliance with the Clean Water Act as "voluntary."  *Id.* at 528.  The court explained that "[f]ar from voluntary, the City's compliance . . . ha[d] been compelled by an EPA enforcement action and the resulting court-approved consent decree."  *Id.*  The court thus concluded that it did not need to rely on the City's "assurances that it w[ould] not 'return to [its] old ways'" because "official acts of third parties"—not the voluntary acts of the City—had mooted the case.  *Id.* at 528 & n.4 (second alteration in original) (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953)).

As in *Environmental Conservation Organization*, the defendants' rescission of the COVID-19 vaccine mandate here was not voluntary.  "Unlike a typical instance of voluntary cessation, [this] rescission of the COVID-19 vaccination mandate result[ed] not from the Secretary's unilateral decision but from a higher authority, Congress . . . ."  *Colonel Fin. Mgmt. Officer*, 2023 WL 2764767, at *2.  In particular, Congress passed, and the President signed into law, legislation ordering the Secretary of Defense to within 30 days "rescind the mandate that members of the Armed Forces be vaccinated against COVID-19 pursuant to the memorandum dated August 24, 2021, regarding 'Mandatory Coronavirus Disease 2019 Vaccination of Department of Defense Service Members.'"  NDAA, Pub. L. No. 117-263, § 525.  Accordingly, the Secretary of Defense had no choice but to rescind the vaccine mandate or defy a clear congressional directive.

The plaintiffs do not challenge this point but contend that Congress only required "rescission or discontinuation of the prior policy" and did not require "lifting the implementation orders by the Secretary of the Army," including the removal of adverse actions and halting of separation proceedings for soldiers who refused to vaccinate.  Dkt. No. 109 at 23–24.  True, Congress did not explicitly order the Army to rescind its guidance implementing the vaccine mandate.  But it would bely logic to conclude that even though Congress invalidated a policy, it did not invalidate the procedures used to enforce it.  To preserve guidance that served solely to implement the vaccine mandate would render the mandate effective in practice and Congress's order to rescind it meaningless.  In fact, it was the mandate itself that authorized the military branches to "promulgate appropriate guidance to carry out" the COVID-19 vaccination requirement.  Dkt. No. 14 at 6.  It would

– 23 –

thus make sense that with the rescission of the mandate, the authority conferred to the military to execute implementing guidance was likewise rescinded.

In any event, the defendants understood the NDAA to do just that.  In a memorandum following its enactment, Secretary Austin stated that the NDAA "require[d] [him] to rescind the [vaccine] mandate."  Dkt. No. 108 at 46.  After citing this legislation, he rescinded the mandate and ordered the cease of separation proceedings and the removal of adverse actions associated with the denial of exemption requests.  *Id.*  Further, in a subsequent memorandum, the Deputy Secretary confirmed that, "[a]s required by" the NDAA, the mandate was rescinded, which "thereby also rendered all DoD Component policies, directives, and guidance implementing" it "as no longer in effect."  *Id.* at 90.  Despite noting that such guidance "ha[d] not been operative" since the mandate's rescission, the Deputy Secretary directed the heads of each military branch to "formally rescind" that guidance to the extent "they ha[d] not done so already."  *Id.*  The language employed in these orders lacks any indication of voluntariness.  To the contrary, it shows a sole intent to comply with federal law and a belief that the guidance implementing the mandate was ineffective as soon as the mandate itself was rescinded.

The fact that the defendants rescinded the mandate, along with its implementing guidance, despite their unwavering commitment to enforcing it until that point further reveals a lack of voluntariness.  Up until Congress ordered the mandate's rescission, every military branch actively defended the lawfulness of its enforcement in numerous suits across the country—even as the effects of the pandemic waned.  And, in this case, the Army refused to relent in that defense—despite receiving multiple opportunities to do so—even after the NDAA passed in the House and was practically certain to pass in the Senate and

– 24 –

be signed into law by the President.  Before the preliminary-injunction hearing, the Court

attempted to secure the defendants' commitment to staying enforcement of the mandate

while those proceedings transpired, but the defendants declined.  Dkt. No. 60 at 1.  Later, at

the hearing—and in the wake of the NDAA's passage in the Senate—the Court provided

the defendants another chance to enter a binding agreement to halt enforcement against

soldiers who had been denied a religious exemption to the mandate.  Dkt. No. 79 at 24–29.

Again, the defendants declined.  *Id.*  Their position was clear: until required otherwise by

law, they would persist in their enforcement of the mandate.

Moreover, even when officially rescinding the mandate, the defendants continued to

tout its successes and affirm their commitment to seeking total-force vaccination.  In

particular, Secretary Austin applauded the "Department [of Defense]'s work to combat

[COVID-19]" and noted improvement to "the health of . . . Service members and the

readiness of the Force" due to the vaccine.  Dkt. No. 108 at 46.  He went on to say that he

would "continue to promote and encourage COVID-19 vaccination for all Service

members" to "enhance[] operational readiness and protect[] the Force."  *Id.*  Separately,

Secretary Hicks emphasized the "critical role" that vaccines play in "assuring a ready and

capable force that is able to rapidly deploy anywhere in the world on short notice."  *Id.* at

90.  And Secretary Wormuth echoed these sentiments, stating that she was "proud of the

efforts the . . . Army ha[d] taken to respond to the COVID-19 pandemic" and that she

would "continue to promote and encourage COVID-19 vaccination for all personnel to

ensure readiness, facilitate mission accomplishment, and protect [the] force."  *Id.* at 95.  The

Department of Defense's repeated attribution of the force's "health" and "readiness" to the

COVID-19 vaccine, along with its clearly expressed intent to continue promoting total-force

vaccination against COVID-19, further demonstrates the involuntariness of the defendants'
rescission of the mandate and its implementing guidance.

For these reasons, neither the defendants' rescission of the vaccine mandate nor their
rescission of the guidance implementing it is fairly characterized as voluntary.  Rather, the
record shows that both were a reluctant response to a legally binding congressional
directive.  The Court recognizes, however, that in the context of a related challenge to
another branch's enforcement of the vaccine mandate, the Fifth Circuit stated that it "need
not address" whether the defendants' conduct was voluntary because the defendants took at
least some action to remedy the plaintiffs' asserted harms "that the NDAA did not expressly
require: namely, treating unvaccinated and vaccinated servicemembers alike for purposes of
deployment, assignment, and operational decisions."  *U.S. Navy SEALs 1–26*, 72 F.4th at
674 n.7.  The Court thus finds that the defendants acted voluntarily to the extent that they
precluded commanders from considering COVID-19 immunization status in deployment,
assignment, and other operational decisions.[3]  As for the rest of their corrective action, the
Court finds that the defendants did not act voluntarily.

> **b.    In any event, precedent provides the government with a
> presumption of good faith, and the evidence fails to rebut
> that presumption.**

"[A] defendant claiming that its voluntary compliance moots a case bears the
formidable burden of showing that it is absolutely clear the allegedly wrongful behavior
could not reasonably be expected to recur."  *Already, LLC*, 568 U.S. at 91 (quoting *Friends of
the Earth, Inc.*, 528 U.S. at 190).  Government defendants, however, "bear a 'lighter

---

[3] In any event, for the reasons discussed in the next Section, the voluntary-cessation exception to
mootness does not apply.  *See infra* Section 3.A.i.b.

burden' . . . in proving that the challenged conduct will not recur once [a] suit is dismissed as moot." *U.S. Navy SEALs 1–26*, 72 F.4th at 673 (first alteration in original) (quoting *Freedom From Religion Found., Inc.*, 58 F.4th at 833). That is because it is "presume[d] that state actors, as public representatives, act in good faith." *Id.* at 674 (quoting *Freedom From Religion Found., Inc.*, 58 F.4th at 833). A court should thus "assume that formally announced changes to official government policy are not mere litigation posturing" absent contrary evidence. *Id.* (quoting *Yarls*, 905 F.3d at 911). In other words, unless evidence shows that "the [government's] voluntary cessation is a sham for continuing possibly unlawful conduct," a defendant need not demonstrate an "impossibility that the challenged policy will be reenacted." *Sossamon v. Texas*, 560 F.3d 316, 325 (5th Cir. 2009). Indeed, the Fifth Circuit has made clear that the possibility that the Army "could implement a new vaccine mandate in the future" is "insufficient to prove the voluntary-cessation exception." *U.S. Navy SEALs 1–26*, 72 F.4th at 674 (quoting *Freedom From Religion Found., Inc.*, 58 F.4th at 833).

The Fifth Circuit has, however, indicated that the presence of three factors may serve as sufficient evidence to rebut the presumption of good faith generally bestowed to the government: "'(1) the absence of a controlling statement of future intention [not to repeat the challenged policy]; (2) . . . suspicious timing of the change; and (3) the [governmental entity's] continued defense of the challenged polic[y]' after the supposedly mooting event." *Texas v. Biden*, 20 F.4th 928, 962 (5th Cir. 2021) (first, third, and fourth alterations in original) (quoting *Speech First, Inc. v. Fenves*, 979 F.3d 319, 328 (5th Cir. 2020)), *rev'd and remanded on other grounds*, 142 S. Ct. 2528 (2022). The Court considers each of the *Fenves* factors in turn. 979 F.3d at 328.

As for the first factor, the defendants have not issued any "controlling statement" confirming that they will not return to their challenged conduct upon dismissal. The Fifth Circuit has indicated that only a "sworn affirmative statement" by someone who "has control" over the challenged policy qualifies as such a controlling statement. *Id.* at 328–29 (citing *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 769 (6th Cir. 2019)). In contrast, a defendant's unsworn representation of future intent does not suffice. *Biden*, 20 F.4th at 963. Even if it did, nowhere in the record have the defendants affirmatively stated—let alone through any sworn statement—that they will never reimpose a COVID-19 vaccine mandate or enforce it in the same way that they have in this case.[4] The defendants instead contend that the military's orders rescinding the original mandate served as a controlling statement of future intent. Dkt. No. 112 at 10. But while those orders control with respect to the original mandate, they fail to ensure that no COVID-19 vaccine mandate will be imposed or unlawfully enforced in the future.

Precedent makes clear, however, that the lack of a sworn statement is not fatal in these circumstances. The Fifth Circuit has stated that when the repeal of a policy has been "finalized" through "formal" procedures, "no statement of future intention is necessary" to establish mootness. *Freedom From Religion Found., Inc.*, 58 F.4th at 835 n.7. Moreover, in the context of a related military-vaccine-mandate challenge, the Fifth Circuit held that another branch's "promulgat[ion] [of] multiple binding policies" to eradicate the effects of the mandate "assuage[d] any concern that the [military] is trying to duck judicial scrutiny."

---

[4] In fact, the Department of Defense has expressly preserved the right to establish a "new immunization requirement" in the future and declared that "[a]ll commanders" will retain the "responsibility and authority" to "preserve the Department's compelling interests in mission accomplishment," including "to maintain military readiness . . . and the health and safety of a resilient Joint Force." Dkt. No. 108 at 46, 91.

*U.S. Navy SEALs 1–26*, 72 F.4th at 674–75 (citing *Miraglia v. Bd. of Supervisors of La. State Museum*, 901 F.3d 565, 572 (5th Cir. 2018)).  Likewise, here, the Army repealed the vaccine mandate through formal, final action in response to the enactment of binding legislation.  Thus, although the record contains no express disclaimer of the possibility that the defendants will impose an identical COVID-19 vaccine mandate upon the dismissal of this case, their official rescission of the challenged mandate offsets that absence.

Turning to the second factor, the timing of the defendants' rescission of the vaccine mandate and the guidance implementing it was not suspicious.  The Fifth Circuit has held that the timing of a policy change is suspicious when it closely follows the onset of litigation or immediately precedes appellate review.  *Fenves*, 979 F.3d at 329; *Biden*, 20 F.4th at 964.  Neither circumstance is present here.  And under materially similar circumstances, the Fifth Circuit held that there were "no signs of . . . gamesmanship."  *U.S. Navy SEALs 1–26*, 72 F.4th at 674.  The defendants did not rescind the challenged mandate until three months after the plaintiffs filed suit.  *See* Dkt. Nos. 1; 108 at 46.  Until that point, the defendants actively defended the mandate, suggesting that they intended to engage in this litigation until its natural end.  In fact, several other military branches faced nearly identical lawsuits in the months preceding this case.  The defendants thus had ample time to adjust their conduct before this suit was ever filed.  Moreover, the defendants have not sought appellate review, so their rescission of the mandate is not fairly characterized as litigation posturing to obtain a favorable outcome on appeal.  Finally, and most importantly, the facts in this case materially differ from those in *Fenves* and *Biden* because the defendants' rescission of the challenged policy followed a binding congressional directive to do so.  For these reasons,

the plaintiffs' suggestion that the defendants' conduct was a mere "attempt[] to moot ongoing litigation," Dkt. No. 109 at 28, is unconvincing.

The third factor—whether the defendants continue to defend the challenged policy—is satisfied here, and the defendants do not dispute this point. *See* Dkt. No. 112 at 10 (stating that continued defense of a rescinded policy "is only one of three conditions" required for the voluntary-cessation exception to apply). After the enactment of the NDAA and the defendants' formal rescission of the mandate, both the Secretary of Defense and the Secretary of the Army continued to promote "COVID-19 vaccination for all Service members." Dkt. No. 108 at 46, 90, 95. Both cited the same interests in "health," "readiness," and "mission accomplishment" that grounded the defendants' defense of the enforcement of the mandate against the plaintiffs here. *Id.*; *see* Dkt. No. 38 at 30–38. Nonetheless, just because the defendants still support the challenged policy does not undermine their sincerity in rescinding it as required by Congress.

Only when all three *Fenves* factors are satisfied has the Fifth Circuit applied the voluntary-cessation exception to preserve a case that would have otherwise been rendered moot by a governmental defendant's voluntary action. *Fenves*, 979 F.3d at 329; *Biden*, 20 F.4th at 964. Just one factor is clearly satisfied here. Even if that were enough to invoke the voluntary-cessation exception, the Court declines to do so because litigation posturing "typically involves some sign of bad faith or insincerity." *U.S. Navy SEALs 1–26*, 72 F.4th at 674. And, here, case law indicates that the record does not suggest that the defendants have "exhibited gamesmanship" in ceasing the challenged conduct or that such "[wa]s a sham" so that they can revert to that conduct upon dismissal of this case. *See Biden*, 20 F.4th at 962; *Sossamon*, 560 F.3d at 325; *see also U.S. Navy SEALs 1–26*, 72 F.4th at 674 (stating that

– 30 –

"no signs of . . . gamesmanship" were present in the Navy's rescission of the vaccine mandate and cease of adverse action). The Court will not "assume, without evidence to the contrary, that the upper echelons of the [Army], including the Secretary of the [Army]," rescinded the vaccine mandate and its implementing guidance "with an eye toward resuming the challenged conduct as soon as the courts were done." *See U.S. Navy SEALs 1–26*, 72 F.4th at 675. Therefore, even if the defendants' conduct can be characterized as voluntary, it cannot overcome the default of mootness in this case.

> ### ii. The capable-of-repetition-yet-evading-review exception to mootness does not apply.

The plaintiffs next argue that this case is not moot because the challenged conduct is likely to be repeated but too short in duration to allow for judicial review. Dkt. No. 109 at 28–29. The Court finds that this exception does not apply, either.

A case is capable of repetition but likely to evade review when "(1) the challenged action [is] in its duration too short to be fully litigated prior to cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subject to the same action again." *Empower Texans, Inc. v. Geren*, 977 F.3d 367, 370 (5th Cir. 2020) (alterations in original) (quoting *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 170 (2016)). The party seeking to assert the exception bears the burden of showing that it applies. *Id.* (citing *Spell v. Edwards*, 962 F.3d 175, 180 (5th Cir. 2020)). The exception only applies in "exceptional situations." *Id.* (quoting *Kingdomware Techs., Inc.*, 579 U.S. at 170). Its purpose is to "keep a case alive" when a risk exists that "the legal questions posed by cases prone to becoming moot will never be answered." *Spell*, 962 F.3d at 180 (citing 13C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3533.8 (3d ed. 2020)).

**a.      Neither the vaccine mandate nor the Army's religious-exemption policy is inherently likely to evade review.**

The first element of this analysis is met when the duration of a challenged action "is too short to receive 'complete judicial review.'" *Empower Texans, Inc.*, 977 F.3d at 370 (emphasis omitted) (quoting *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 774 (1978)).  The challenged action must be "inherently capable of evading review," meaning it "is always so short as to evade review."  *See Bayou Liberty Ass'n v. U.S. Army Corps of Eng'rs*, 217 F.3d 393, 399 (5th Cir. 2000); *Spencer v. Kemna*, 523 U.S. 1, 18 (1998).  "[T]he question is whether the challenged activity is *by its very nature short in duration,* so that it could not, or probably would not, be able to be adjudicated while fully live."  *Pharmachemie B.V. v. Barr Lab'ys, Inc.*, 276 F.3d 627, 633 (D.C. Cir. 2002) (citation omitted).  The Fifth Circuit and Supreme Court have identified challenges to time-limited punishments, such as a term of suspension[5] or imprisonment,[6] and challenges to a law's application during a pre-specified, limited period of time, such as an election cycle[7] or a term of pregnancy,[8] as conduct likely to evade judicial review.  Each example shares a commonality in that the challenged action itself has an expiration date or its "causal or underlying event or condition . . . is too short to be fully litigated," making complete judicial review impossible.  *See Bazzrea*, 2023 WL 3958912, at *7.

Such is not the case here.  The Army's vaccine mandate lacked an expiration date, which indicates that it was meant to operate indefinitely.  Such is consistent with the

---

[5] *Laurenzo v. Miss. High Sch. Activities Ass'n*, 662 F.2d 1117, 1120 (5th Cir. Unit A Dec. 1981).

[6] *Turner v. Rogers*, 564 U.S. 431, 440 (2011).

[7] *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 661 (5th Cir. 2006).

[8] *Roe v. Wade*, 410 U.S. 113, 125 (1973), *overruled by Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022).

longstanding duration of numerous other military-vaccination requirements.  *See* Army Regulation 40-562 ¶¶ 4-1 to -19.  Enforcement of the mandate thus was not time-limited by the mandate's own terms so as to prevent complete judicial review.  In fact, the mandate very well could have survived long enough to allow for complete review but for an unanticipated, extrinsic event: Congress's enactment of the NDAA.  It was therefore this congressional directive, and not the mandate's own nature, that precluded review.

Nor did the temporary nature of any causal or underlying event or condition automatically limit the mandate's duration.  The plaintiffs contend that "the rapidly changing COVID-19 landscape" did just that.  Dkt. No. 96 at 30.  But the defendants did not tie the mandate's effectiveness to the state of COVID-19 or otherwise indicate that they would reassess the need for the mandate based on improving public health conditions.  To the contrary, they vigorously enforced the mandate—despite the improving state of COVID-19—until Congress required its rescission after one-and-a-half years.  In fact, at the time this suit was filed, the effects of the pandemic had drastically waned, yet the defendants continued enforcement.  And when the defendants finally rescinded the mandate, they made clear that they did so not to conform to the "changing COVID-19 landscape"—as the plaintiffs suggest—but, rather, because the NDAA "require[d]" it and, as a result, "rendered" all guidance implementing the mandate "as no longer in effect."  Dkt. No. 108 at 46, 90.  This evidence further confirms that the defendants intended the mandate to operate indefinitely and would have continued enforcement apart from circumstances beyond their foresight—like the legislation here—requiring otherwise.

The plaintiffs attempt to recharacterize the issue by stating that this case "is not about the vaccine mandate" but, rather, about the "[d]efendants' refusal to grant religious

– 33 –

accommodations to the mandate via a regulatory process that is still in force." Dkt. No. 109 at 28. That argument fares no better. As the plaintiffs acknowledge, the Army's religious-exemption policy is not temporary—it was enforced before the COVID-19 vaccine mandate, and it will be enforced after it. *See* Army Regulation 40-562 ¶ 2-6(b)(3); Dep't of Def. Instruction 1300.17 ¶ 3.2(d). Therefore, to the extent the plaintiffs argue that the Army's religious-exemption process is likely to evade review in general, they are incorrect. Alternatively, to the extent the plaintiffs argue that the process has evaded review in the context of the COVID-19 vaccine mandate, that is only because "pending [religious-exemption] requests [we]re deemed resolved through the elimination" of the mandate. *See* Dkt. No. 108 at 92. But as discussed above, the mandate was not inherently likely to evade review. Therefore, application of the religious-exemption policy to the COVID-19 vaccine mandate was not inherently likely to evade review, either.

> **b.    No reasonable probability exists that the defendants will institute a new vaccine mandate and enforce it in the same manner upon dismissal of the plaintiffs' claims.**

The plaintiffs likewise fail to establish "a 'demonstrated probability' or 'reasonable expectation,' not merely a 'theoretical possibility,' that [they] will be subject to the same government action." *See Lopez v. City of Houston*, 617 F.3d 336, 340 (5th Cir. 2010) (quoting *Libertarian Party v. Dardenne*, 595 F.3d 215, 217 (5th Cir. 2010)). This requires a showing of more than an "opportunity" for the defendant "to act in the same allegedly unlawful manner in the future"; rather, the plaintiff must show a "reasonable probability that the [defendant] will act in that manner if given the opportunity." *Libertarian Party*, 595 F.3d at 217. For example, a plaintiff might satisfy this burden by showing that the challenged

conduct "reflect[s] a policy or a consistent pattern of behavior that [it] has determined to continue." *Id.* at 218.

The Fifth Circuit has held that the mere possibility of COVID-19 worsening or COVID-19 policies being reimposed is insufficient to demonstrate a "reasonable expectation" that a rescinded COVID-19 policy will be reimposed. *Spell*, 962 F.3d at 180. In *Spell*, at the onset of the pandemic, the Governor of Louisiana issued an executive order that restricted in-person church services to ten congregants. *Id.* at 177.  Just before the order expired, the Governor adopted a reopening plan that, by the time of the litigation, allowed churches to operate at fifty percent capacity. *Id.* at 178.  The Fifth Circuit held that the plaintiff's challenge to the Governor's initial executive order was moot, reasoning that "[t]he trend in Louisiana ha[d] been to reopen the state, not to close it down," and "no one knows what the future of COVID-19 holds." *Id.* at 178, 180.  Noting that "it [was] speculative, at best, that the Governor might reimpose the ten-person restriction or a similar one," the Fifth Circuit concluded that a live controversy no longer existed. *Id.* at 180.

The Supreme Court considered a similar executive order issued by the Governor of New York in *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020).  Like the procedural posture in *Spell*, the Governor had recently modified that order and permitted churches to hold services at fifty percent occupancy. *Id.* at 68.  Unlike *Spell*, however, the Governor had a history of "regularly" reclassifying occupational limits in churches without prior notice during the COVID-19 pandemic. *Id.*  The Court thus concluded that this additional evidence of a pattern of practice showed that the petitioners "remain[ed] under a constant threat" that the Governor would reimpose prior occupational restrictions. *Id.*  For that reason, the Court held that the case was not moot. *Id.*

Binding precedent thus makes clear that the mere possibility that a defendant could reenact a rescinded COVID-19 policy is not enough to establish a reasonable probability that it will actually do so, even considering the fluctuating state of COVID-19.  *Spell*, 962 F.3d at 180.  When, however, a defendant's ability to reinstate that policy is coupled with evidence suggesting that it will do so, a heightened probability of repeat conduct exists.  *Roman Cath. Diocese of Brooklyn*, 141 S. Ct. at 68.  Here, as in *Spell*, the possibility that COVID-19 may worsen fails to support any reasonable expectation that the defendants will reimpose a vaccine mandate and enforce it in the same manner in the future, especially given the declared "[e]nd of the [f]ederal COVID-19 [p]ublic [h]ealth [e]mergency"[9] and the widespread loosening of COVID-19 restrictions across society.  *See* 962 F.3d at 180.  The question becomes, then, whether other evidence, like that in *Roman Catholic Diocese of Brooklyn*, converts this theoretical possibility into a demonstrated probability.  *See* 141 S. Ct. at 68.

Here, the defendants do not dispute that they have the authority to impose another COVID-19 vaccine mandate in the future.  In fact, the same order that rescinded the original mandate simultaneously affirmed the defendants' authority to impose a new one.  As provided in that order, "DoD Component heads and commanders will not require a Service member . . . to be vaccinated against COVID-19, nor consider a Service member's COVID-19 immunization status in making deployment, assignment, and other operational decisions, *absent establishment of a new immunization requirement*."  Dkt. No. 108 at 91 (emphasis added).  Therefore, not only does the possibility remain that the defendants will

---

[9] *End of the Federal COVID-19 Public Health Emergency (PHE) Declaration*, Centers for Disease Control and Prevention (May 5, 2023), https://www.cdc.gov/coronavirus/2019-ncov/your-health/end-of-phe.html [https://perma.cc/4TJH-L8PW].

reinstate a COVID-19 vaccination requirement, but the defendants expressly preserved that possibility when rescinding the original mandate.

In addition to this express preservation of authority, other official statements made by the defendants suggest that they support mandatory total-force vaccination. For example, when Secretary Austin ordered the rescission of the mandate, he nonetheless applauded the military's "work to combat [COVID-19]" and the resulting improvements to "the health of . . . Service members and the readiness of the Force." *Id.* at 46. Similarly, when implementing the rescission, Secretary Wormuth praised the "efforts the Department of the Army ha[d] taken to respond to the COVID-19 pandemic." *Id.* at 95. Moreover, both officials declared that they would "continue to promote and encourage COVID-19 vaccination for all Service members" to "ensure readiness, facilitate mission accomplishment, and protect [the] force." *Id.* at 46, 95. The defendants' display of support for the vaccine mandate, even while rescinding it, and their stated mission to "promote" COVID-19 vaccination for all personnel—with or without a formal mandate—demonstrates their continued commitment to a total-force-vaccination policy.

Lastly, in those same orders, the defendants appeared to lay the path by which the military could impose a new COVID-19 vaccine mandate in the future. In particular, Secretary Austin charged commanders with "the responsibility and authority to preserve the Department's compelling interests in mission accomplishment," including "military readiness . . . and the health and safety of a resilient Joint Force." *Id.* at 46. Notably, the defendants relied on these same interests in enforcing the original mandate. *See* Dkt. No. 38 at 30–38. And the defendants' orders rescinding the mandate make clear that their position has not changed, as they credited the mandate for helping to achieve those interests. Dkt.

No. 108 at 46, 95.  Logic therefore dictates that military commanders—under express orders to maintain the "health" and "readiness" of the force, and in light of the defendants' belief that a COVID-19 vaccine mandate would advance those interests—not only have the "authority" but also the "responsibility" to impose a new mandate.

Although this evidence tends to suggest a threat that the defendants will reimpose the rescinded mandate, one critical fact diminishes the likelihood of that outcome: "Congress has unambiguously renounced the mandate and has directed by statute a rescission of the mandate."  *See Colonel Fin. Mgmt. Officer*, 2023 WL 2764767, at *2.  Therefore, even if the defendants in theory could reimpose the same mandate, it is not reasonably probable because such would defy Congress's objective in enacting the NDAA.  The Court rejects the speculative conclusion that the defendants—presumed to act in good faith as government actors—have only temporarily rescinded the vaccine mandate with the intent of imposing a new one when this litigation ends despite apparent congressional aversion to such a requirement.  Moreover, even if the defendants did reimpose a COVID-19 vaccination requirement, no evidence suggests that they would enforce it in the same manner, especially given the widespread litigation and numerous preliminary injunctions that resulted from the enforcement of the original mandate.  For these reasons, the threat that the defendants will resort to the same challenged conduct upon dismissal of this case remains "remote and implausible."  *See id.*  Thus, the Court finds that the plaintiffs fail to satisfy either prong of the capable-of-repetition-yet-evading-review exception to mootness.

      **iii.**    **Because the originally named plaintiffs' claims regarding the lawfulness of the vaccine mandate and its application are moot, their motion for class certification is moot.**

The plaintiffs next assert that the defendants have intentionally "pick[ed] off" named plaintiffs to prevent class certification and that the Court must therefore resolve the claims of the proposed class. Dkt. No. 109 at 29–30. The Court disagrees.

The Fifth Circuit "generally has concurred with the proposition that a purported class action is moot where the named plaintiff's individual claim became moot before class certification." *Rocky v. King*, 900 F.2d 864, 869 (5th Cir. 1990). It has, however, recognized two exceptions to this rule. First, "where a claim is 'capable of repetition, yet evading review,'" the claims of a prospective class may not be moot "even though the named plaintiff's individual claim became moot after the suit was filed but prior to the district court's ruling on the class certification issue." *Id.* at 870. Under these circumstances, class certification may "relate back" to the time of the filing of the complaint. *Id.* at 868 n.1 (citing *Sosna v. Iowa*, 419 U.S. 393, 402 n.11 (1975)). But the relation-back doctrine only applies to "inherently transitory" class-action claims "in which the challenged conduct was effectively unreviewable[] because no plaintiff possessed a personal stake in the suit long enough for litigation to run its course." *Fontenot*, 777 F.3d at 749 (quoting *Genesis Healthcare Corp.*, 569 U.S. at 76).

Second, even when the named plaintiffs "have not presented claims which by their nature are so transitory that no single named plaintiff with such a claim could maintain a justiciable case long enough to procure a decision on class certification," a class-action claim may survive when "the defendants have the ability by tender to each named plaintiff effectively to prevent any plaintiff in the class from procuring a decision on class

certification." *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1050 (5th Cir. Unit A July 1981).  In other words, a defendant may not prevent class certification by providing relief and "pick[ing] off" named plaintiffs who would have otherwise served as representatives of a prospective class. *Id.*; *Fontenot*, 777 F.3d at 750.  This expansion of the relation-back doctrine recognizes "no difference" between "the defendant's purposive acts" and "the naturally transitory nature of the controversy" when each precludes resolution of a class-action claim. *Zeidman*, 651 F.2d at 1050; *Fontenot*, 777 F.3d at 750.

In this case, neither exception applies to relate the plaintiffs' motion for class certification back to the time that their complaint was filed.  First, as discussed above, the plaintiffs' claims were not "capable of repetition, yet evading review."  *See supra* Section 3.A.ii.  As for the second exception, the defendants have not "picked off" the named plaintiffs' claims through "purposive acts" to prevent class certification.  *See Zeidman*, 651 F.2d at 1050.  No evidence suggests that the defendants have resolved the named plaintiffs' injuries in a bad-faith attempt to moot this case before prospective class members can seek relief.  To the contrary, their rescission of the vaccine mandate and reversal of adverse actions associated with it apply universally to all service members who sought a religious exemption.  The defendants have thus provided identical relief to both the named plaintiffs and the prospective class members.  Moreover, as discussed above (*see supra* Section 3.A.i), it was a legally binding congressional directive—not the defendants' strategy to avoid litigation—that prompted them to provide this relief.  For these reasons, the second exception to mootness before class certification does not apply, either.

> iv. **The collateral-consequences exception to mootness does not apply because the originally named plaintiffs do not suffer any lingering injury that the Court can remedy.**

The plaintiffs finally suggest that even if the "primary injury" in this case has ceased, because the defendants' challenged conduct continues to cause them "other harm," this case is not moot under the collateral-consequences exception. Dkt. No. 96 at 34. The plaintiffs overextend this exception to mootness as well.

"[T]he collateral consequences doctrine serves to prevent mootness when the violation in question may cause continuing harm and the court is capable of preventing such harm." *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 365 (5th Cir. 2003) (quoting *Dailey v. Vought Aircraft Co.*, 141 F.3d 224, 227 (5th Cir. 1998)). It "is most often used to enable review of expired criminal sentences" but has also been applied in the civil context. *Dailey*, 141 F.3d at 227. For example, in *Connell v. Shoemaker*, 555 F.2d 483 (5th Cir. 1977), the military prohibited its personnel from renting residential property owned or managed by the appellants due to allegations that they had discriminated against black personnel in renting apartments. *Id.* at 485. When the restriction expired, the Fifth Circuit nonetheless found that the case was not moot because "the imputation of bigotry implicit in the Army's widely publicized sanctions against appellants could not but harm their reputations and, concomitantly, their livelihoods with clientele both black and white." *Id.* at 487. Similarly, in *United States v. Schrimsher*, 493 F.2d 842 (5th Cir. 1974), the Fifth Circuit held that an attorney who had already completed an ordered period of confinement after being held in contempt of court maintained a live claim due to the "collateral consequences" of his criminal contempt conviction, including

potential disciplinary action by a bar association and damage to his reputation in the legal community. *Id.* at 843–44.

Case law thus demonstrates that the collateral-consequences exception requires a lingering injury that, although ancillary to the primary injury alleged, will persist if not remedied by the courts. As discussed in depth below, however, only Plaintiff Chrisman— who maintains a standalone claim because he remains separated from the Army—has alleged an injury due to the defendants' prior enforcement of the vaccine mandate that, if substantiated, can be remedied by the Court at this time. *See infra* Sections 3.B, C. The other plaintiffs fail to allege any remediable, ongoing injury traceable to the challenged conduct. Therefore, the collateral-consequences doctrine does not apply.

> **B.    The Non-Separated Plaintiffs lack standing because they fail to demonstrate any continuing injury that the Court can remedy.**

Despite the rescission of the vaccine mandate and its implementing guidance, Plaintiffs Schelske, Costroff, Galloway, and Bufkin (the Non-Separated Plaintiffs) argue that continuing harms preserve their standing. Namely, Sergeants Schelske, Costroff, and Galloway claim that their records contain adverse actions, and Sergeants Schelske and Costroff claim that they have been denied promotions based on their vaccination status. Further, Cadet Bufkin claims that the defendants' enforcement of the mandate triggered his mental-health problems and, consequently, caused his grades to decline, which resulted in his placement on a leave of absence after being recommended for separation. Finally, the Non-Separated Plaintiffs allege that they remain subject to prosecution due to their refusal to vaccinate and that, apart from an injunction, nothing will stop the defendants from imposing another vaccine mandate. The Court finds that none of these claims confer standing to the Non-Separated Plaintiffs. It discusses each in turn below.

      **i.**     **Because the defendants have taken all reasonable measures to remove adverse actions from the Non-Separated Plaintiffs' records, Sergeants Schelske, Costroff, and Galloway cannot establish an injury-in-fact on that basis.**

To have standing, "a plaintiff must have suffered an 'injury in fact—an invasion of a legally protected interest which is . . . concrete and particularized, and . . . actual or imminent.'" *Yarls*, 905 F.3d at 909 (alterations in original) (quoting *Lujan*, 504 U.S. at 560–61). At the time of their initial response, the Non-Separated Plaintiffs claimed that even though the defendants had rescinded the vaccine mandate and ceased separation proceedings, the defendants had not removed—nor provided assurance that they would remove—adverse actions related to COVID-19 vaccination from their personnel files. Dkt. No. 109 at 16–17. But the present record indicates otherwise. The Army has withdrawn and destroyed GOMORs associated with the Non-Separated Plaintiffs' refusal to receive the COVID-19 vaccine.[10] Dkt. No. 113 at 16–20. Additionally, none of the Non-Separated Plaintiffs are currently flagged or otherwise have adverse actions in their records due to their refusal to comply with the vaccine mandate. *Id.* at 3–14; Dkt. Nos. 131 at 2–4; 133 at 8. The defendants have also eliminated travel restrictions related to COVID-19 vaccination status[11] and precluded its consideration in deployment, assignment, or other operational decisions, other than to comply with foreign countries' vaccination-entry requirements. Dkt. No. 108 at 61, 73, 90–92; FRAGO 38 to HQDA EXORD 225-21, ¶ 3.D.15.

---

[10] The defendants have provided evidence of withdrawal of the GOMOR issued to Cadet Bufkin connected to his refusal to receive the COVID-19 vaccine. Dkt. No. 113 at 16. The remaining Non-Separated Plaintiffs never received a GOMOR on that basis. *Id.* at 4.

[11] Sergeant Galloway initially alleged that his PCS orders included a requirement that he receive the COVID-19 vaccine as a condition to moving back to the United States. Dkt. No. 109 at 12 n.3. But the record shows that the Army has since issued an addendum to these orders that removed that requirement. Dkt. No. 108 at 112.

In their most recent status report, the Non-Separated Plaintiffs do not identify any affirmative, adverse actions related to COVID-19 vaccination that remain in their personnel records.  *See* Dkt. No. 131.  However, Sergeants Schelske, Costroff, and Galloway contend that because the defendants have "completely removed" their enlisted record briefs (ERBs) from the Army's database, they lack the necessary materials to apply to become a warrant officer, which as a result will impede their career progression.  *Id.* at 2; Dkt. No. 132 at 4, 6, 9.  In response, the defendants raise two points.  First, they note that they offered to restore those ERBs to the archives and "redact[] the adverse information using a black redaction tool consistent with the Army's practice of making records corrections in other cases."  Dkt. No. 131 at 3–4.  Sergeants Schelske, Costroff, and Galloway declined this offer because, in their view, the use of black boxes would signal to future selection boards that adverse information had been redacted.  Dkt. No. 132 at 5, 7, 10.

Second, the defendants explain—as supported by the declaration of the Branch Chief for the Army's Soldier Record Branch—that ERBs "are no longer used by the Army" because the Army is transitioning to a new record-keeping system, which has "phased out" ERBs and replaced them with Solider Talent Profiles (STPs).  Dkt. No. 133 at 5–7.  For those soldiers who met with a selection board prior to April 2023, the Army did, however, transfer their ERBs to their Official Military Personnel Files (OMPFs) so that "if the Army experienced a catastrophic data loss," those soldiers' STPs "could be re-built" using the legacy ERBs stored in their OMPFs.  *Id.* at 7.  But these legacy ERBs were stored in the soldiers' Service Folders—not the Performance Folders that are provided to selection boards.  *Id.*  Further, as the new system rolled out, even though the Army admittedly used legacy ERBs to populate the Selection Board Briefs for soldiers with upcoming selection

boards, "that information d[id] not include . . . past flags or assignment considerations, because those items are always redacted" before selection boards.  *Id.*  In any event, the Army has confirmed that Sergeants Schelske, Costroff, and Galloway "will not go before" any boards that will consider their ERBs.  *Id.* at 8, 11–13.

In sum, the record shows that the defendants have taken every reasonable measure to remove adverse COVID-19-related actions from Sergeants Schelske's, Costroff's, and Galloway's personnel records.  As an initial matter, none of the plaintiffs' STPs that are maintained on the updated system contain any adverse COVID-19-related actions, and the plaintiffs do not dispute this point.  Dkt. No. 131 at 3.  Further, the Army has removed their ERBs—which once contained adverse COVID-19-related actions—entirely from its database.  *Id.*  In any event, the Army has confirmed that future selection boards would not consider Sergeants Schelske's, Costroff's, and Galloway's ERBs.  And even if the warrant-officer application will require them to submit their outmoded ERBs, the Army has offered to restore them with the adverse information redacted.  The plaintiffs' claim that black-box redaction will prompt selection boards to inquire regarding the redacted information is speculative.  The Court thus will not require the Army—in defiance of its established procedure—to scrub the plaintiffs' ERBs so as to disguise that they were ever altered because such would not remedy any ascertainable injury.  *See id.* at 4.  In light of the defendants' diligent, reasonable efforts to correct the records of Sergeants Schelske, Costroff, and Galloway, the Court finds that no injury on that basis remains.

ii.   **Sergeants Schelske and Costroff must exhaust statutorily mandated administrative remedies before they may seek judicial review of claims regarding failed promotions.**

At the time of their initial response, Sergeants Schelske and Costroff alleged that they had "been denied promotions" due to their delay in attending the Senior Leadership Course (SLC) caused by their vaccination status. Dkt. No. 109 at 18. Despite conceding that the Army had since permitted them to attend the SLC, they argued that their deferred attendance precluded their promotion. *Id.* The defendants countered with evidence showing that the results of the only selection boards to postdate the plaintiffs' eligibility for (and denial from) attending the SLC had not been released, so any claims of denied promotions due to delayed attendance of the course were speculative. *See* Dkt. No. 108 at 26; Dkt. No. 124 at 5, 13. Since then, the parties have confirmed the results of those boards: Sergeants Schelske and Costroff were both selected as "qualified" for promotion, but neither was promoted. Dkt. No. 124 at 5–6, 14. Sergeant Schelske was given an order of merit list number of 30 out of 75. *Id.* at 5. And Sergeant Costroff was given an order of merit list number of 33 out of 75. *Id.* at 14. It is unclear based on the record what effect, if any, Sergeants Schelske's and Costroff's delay in attending the SLC had on these results.

But the Court need not determine at this time whether Sergeants Schelske and Costroff suffered any promotion-related injury because they have failed to exhaust statutorily mandated administrative remedies. Administrative exhaustion is a prerequisite to the Court's exercise of jurisdiction over promotional claims in the military. *See* Dkt. No. 106 at 32–33; *Ross*, 578 U.S. at 639. Relevant here, 10 U.S.C. § 14502 provides that:

> No . . . court of the United States shall have power or jurisdiction . . .
> over any claim based in any way on the failure of an officer or former
> officer of the armed forces to be selected for promotion by a selection
> board convened under chapter 1403 of this title until . . . the claim has
> been referred to a special selection board by the Secretary concerned and
> acted upon by that board[,] or . . . the claim has been rejected by the
> Secretary without consideration by a special selection board . . . .

10 U.S.C. § 14502(g)(1).  Judicial review of failed military promotions is only appropriate

following "a determination by the Secretary concerned . . . not to convene a special

selection board" or "the action of a special selection board." *Id.* § 14502(h).  If a court finds

error in any such determination by the Secretary or action of a special selection board, it

"shall remand the case to the Secretary concerned, who shall provide for consideration of

the officer or former officer by a special selection board." *Id.*  And the court may not "grant

any relief on such a claim unless the officer or former officer has been selected for

promotion by a special selection board convened . . . to consider the officer's claim." *Id.*

§ 14502(g)(2).

    Thus, the statute here speaks in unambiguous, mandatory terms: "No . . . court . . .

shall have power or jurisdiction" to review promotional decisions until either (1) the

Secretary has declined to convene a special selection board, or (2) if the Secretary has

convened such a board, the board has taken action.  *See id.* § 14502(g)(1).  Only then may a

court engage in judicial review, and if it finds error, it must remand the case to the

Secretary, who will then convene a special selection board.  *Id.* § 14502(h).  The statute's

express limitation on the "jurisdiction" of "court[s]" indicates that exhaustion of this

administrative process is mandatory for "any claim based in any way" on a denied

promotion.  *Id.* § 14502(g)(1); *see Dawson Farms, LLC v. Farm Serv. Agency*, 504 F.3d 592, 605

(5th Cir. 2007) (explaining that exhaustion requirements in statutes that "explicitly mention the 'courts' and directly limit their jurisdiction" are mandatory).

In an attempt to bypass this jurisdictional prerequisite to judicial review, Sergeants Schelske and Costroff contend that they do not ask the Court to review any promotional decisions but simply to direct their claims to a special selection board.  Dkt. No. 109 at 18 n.5.  But the statute makes clear that a court may not remand a promotional claim to a selection board until the Secretary has considered the claim first.  *See* 10 U.S.C. § 14502(h).  Section 14502 thus divests the Court of jurisdiction to review the plaintiffs' claims of failed promotions pending administrative exhaustion.

Sergeants Schelske and Costroff alternatively suggest that Congress superseded this statutory requirement by enacting the Religious Freedom Restoration Act (RFRA), which, in their view, provides a "separate" avenue of review for their claims.  Dkt. No. 109 at 18 n.5 (emphasis omitted) (citing 42 U.S.C. § 2000bb-1(c)).  But the text of Section 14502(g) sweeps broadly and admits of no exceptions: "No . . . court . . . shall have power or jurisdiction . . . over *any* claim based in *any* way on the failure of an officer or former officer of the armed forces to be selected for promotion."  10 U.S.C. § 14502(g)(1) (emphasis added).  "Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'"  *United States v. Gonzales*, 520 U.S. 1, 5 (1997) (citing *Any*, Webster's Third New International Dictionary (1976)).

The text of Section 14502 thus demands application to all claims—including RFRA claims—that arise in the military-promotion context.  And the statute does not otherwise contain any language that would preclude its interference with the operation of other federal statutes.  To the contrary, its "use[] [of] jurisdictional language" and "impos[ition] [of]

– 48 –

jurisdictional consequences" explicitly strips—at least temporarily—the jurisdiction conferred to courts under federal law, including RFRA. *See Patchak v. Zinke*, 138 S. Ct. 897, 905 (2018); *Harkness v. United States*, 727 F.3d 465, 467, 470 (6th Cir. 2013) (holding that Section 14502 "provides the exclusive avenue to judicial review for a [service member] challenging his failed promotion on constitutional grounds"). Given this clear statutory mandate, Sergeants Schelske and Costroff must exhaust available administrative remedies before they may seek judicial review of their claims regarding failed promotions.

### iii. Cadet Bufkin lacks standing to seek relief for his placement on administrative leave because it is not fairly traceable to the challenged conduct.

Cadet Bufkin claims that he has been placed on a leave of absence due to poor academic performance resulting from mental-health struggles caused by the defendants' enforcement of the vaccine mandate. Dkt. No. 109 at 30. The defendants respond that Cadet Bufkin's poor academic record preceded their enforcement of the vaccine mandate and thus is not traceable to their conduct. Dkt. No. 106 at 36–38. Upon review of the record, the Court finds that Cadet Bufkin has not shown a causal connection between the challenged conduct and his placement on leave.

To establish standing, a plaintiff must in part "allege personal injury fairly traceable to the defendant's allegedly unlawful conduct." *California v. Texas*, 141 S. Ct. 2104, 2113 (2021) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006)). Traceability requires "a causal connection between the injury and the conduct complained of." *E.T. v. Paxton*, 41 F.4th 709, 718 (5th Cir. 2022) (quoting *Lujan*, 504 U.S. at 560). Such a connection is absent where a plaintiff's injury is "self-inflicted," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013), or "the result of the independent action of [a] third party," *Lujan*,

504 U.S. at 560.  Where an injury "might have occurred even in the absence of the [challenged conduct]," and "[s]peculative inferences are necessary to connect [the] injury to the challenged action[]," traceability is not established.  *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 45 & n.25 (1976).  For example, an injury that "occurred before, existed at the time of, and continued unchanged after the challenged . . . action . . . cannot be fairly traced to [that action]."  *Cherry v. FCC*, 641 F.3d 494, 498 (D.C. Cir. 2011) (quoting *Microwave Acquisition Corp. v. FCC*, 145 F.3d 1410, 1412 (D.C. Cir. 1998)).

Here, Cadet Bufkin's poor academic performance predated the Army's imposition of the vaccine mandate.  The record shows that Cadet Bufkin had a cumulative GPA of 1.89 following the first term of the 2020–2021 school year (Fall 2020) and that he earned a 0.95 GPA during that semester.  Dkt. No. 108 at 114.  But the Department of Defense did not issue the vaccine mandate until August 2021, and the Army did not begin implementing the mandate until September 2021.  Dkt. Nos. 14 at 6; 39-1 at 264.  Therefore, although Cadet Bufkin indisputably performed unsatisfactorily after that point,[12] his poor performance—which resulted in his placement on a leave of absence—"occurred before, existed at the time of, and continued unchanged" after the challenged conduct.  *See Cherry*, 641 F.3d at 498 (quoting *Microwave Acquisition Corp.*, 145 F.3d at 1412).  Any conclusion that it was the defendants' enforcement of the vaccine mandate—and not some other unrelated, external circumstance or, perhaps, the conduct of Cadet Bufkin himself—that caused his deficient performance thus requires "[s]peculative inferences" to "connect [Bufkin's] injury to the

---

[12] *See* Dkt. No. 108 at 114 (documenting a 1.82 GPA in the first term of the 2021–2022 school year (Fall 2021) and a 0.86 GPA in the second term (Spring 2022)).

challenged action[].'' *See Simon*, 426 U.S. at 45.  For that reason, his injury cannot be fairly traced to the defendants' conduct.

Cadet Bufkin contends that in three semesters preceding the vaccine mandate, he maintained "sufficient" academic performance.  Dkt. No. 109 at 30; *see* Dkt. No. 108 at 114 (documenting a 2.46 GPA in the Fall 2019 semester, a 2.24 GPA in the Spring 2020 semester, and a 2.24 GPA in the Spring 2021 semester).  Certainly, Cadet Bufkin's grades during those semesters did not warrant academic separation.  But barely so.  The below-average trend of his GPA demonstrates a struggle to pass throughout the entirety of his cadet career.  In any event, and irrespective of that trend, during at least one semester before the Army imposed the vaccine mandate—the Fall 2020 semester—Cadet Bufkin earned a GPA (0.95) worse than the Fall 2021 semester that followed the imposition of the mandate (where he earned a 1.82 GPA) and hardly better than the Spring 2022 semester (where he earned a 0.86 GPA).  *See* Dkt. No. 108 at 114.  This evidence is enough to cast doubt on the traceability of Cadet Bufkin's failing grades (and resulting placement on leave) to the defendants' enforcement of the vaccine mandate absent evidence connecting the two.

Cadet Bufkin has, however, produced evidence in an attempt to establish traceability. In a signed declaration, Cadet Bufkin asserts that the reason for his 0.95 GPA during the Fall 2020 semester was that he "struggled with [USMA's] newly implemented COVID-19 learning style" at the outset of the pandemic.  Dkt. No. 124 at 27.  After that semester, he "was placed on academic probation" and then "improve[d] [his] grades"—at least enough to be removed from academic probation.  *Id.*  Then, in December 2021, Cadet Bufkin's religious-exemption request was denied, and he "was told that . . . [he] would have to get the COVID-19 vaccine or face adverse action and separation."  *Id.*  In January 2022, his

grades "significantly declined due to the harassment . . . [he] received for [his] religious beliefs." *Id.* at 27–28.  After that semester, Cadet Bufkin "was referred to an academic board, where [he] was eventually recommended for separation from USMA" and placed on a leave of absence. *Id.* at 28, 33.  During the board process, Cadet Bufkin's attorney "noticed that [he] was having difficulty coping . . . and recommended [that] [he] have a mental health evaluation." *Id.* at 28.  Before departing from USMA, Cadet Bufkin was medically evaluated and diagnosed with situational adjustment disorder with depression, which, according to his doctor, "began in September 2021" and "peaked in March 2022." *Id.*

But the documentation submitted by Cadet Bufkin to the academic board in June 2022 says nothing about the effects of the Army's vaccine mandate on his academic performance.  To the contrary, in his request for reconsideration of the board's recommendation that he be separated, Cadet Bufkin "t[ook] responsibility for [his] academic failures," stating that the "main cause" of his low GPA was that "[he] spent 90% of [his] efforts attempting to work harder[,] not necessarily smarter, and 10% or less . . . asking for help."  Dkt. No. 134-1 at 131.  Even though Cadet Bufkin "identified that [he] was not understanding concepts at a point in [his] classes," in order to "avoid . . . perceived negative attention," he "relied . . . on [his] plan to increase [his] efforts" to no avail.  *Id.* "After repeated low grades," he "fell into a cycle of denial and shame" and "f[ought] a low self-assessment" due to "comparisons of [him]self to [his] peers."  *Id.*  Cadet Bufkin further admitted that "by isolating [him]self from others and the resources available to [him], [he] fell into a state of depression."  *Id.* at 132.  Nonetheless, Cadet Bufkin insisted that if given the chance, he would improve his academic performance by "us[ing] all [of] the

resources . . . available to [him]" and "report[ing] [his] grades on a regular interval and discuss[ing] them" with his advisor.  *Id.*  He also "recognize[d] that . . . [he] must work through the disappointment, frustration, and embarrassment to get help." *Id.*

Although the evidence establishes that Cadet Bufkin's mental-health struggles contributed to his inadequate academic performance, it does not establish that those struggles were caused by the Army's enforcement of the vaccine mandate against him.  In fact, the key records related to Cadet Bufkin's appeal of his separation decision provide an alternative explanation—namely, low self-esteem rooted in comparison to his peers, isolation from those who could offer support, and failure to meet the high standards of USMA.  Notably, at no point in those records did Cadet Bufkin mention COVID-19, the vaccine mandate, or the Army's enforcement of the mandate.  The Court is hard-pressed to conclude that with his education and future career on the line, Cadet Bufkin would decline to fully and transparently explain the reasons for his unsatisfactory performance.  In those same records, Cadet Bufkin even took responsibility for his performance and set forth a plan to raise his grades, which shows that he believed improvement was within his control and independent of extrinsic circumstances like the vaccine mandate.

Cadet Bufkin does, of course, assert in his declaration that the denial of his religious-exemption request and the measures taken to enforce the vaccine mandate against him were the real cause of his depression and his resulting academic struggles.  Dkt. No. 124 at 27–28.  But the Court finds that this statement—prepared for the sole purpose of this litigation—lacks the same persuasiveness as records that were initially prepared for a separate purpose and before the onset of this suit.  The records and evidence do not corroborate the assertions in his declaration.  Thus, in light of Cadet Bufkin's poor academic track record before the

– 53 –

imposition of the vaccine mandate and his documented acceptance of responsibility for his failure to meet USMA's academic standards, the evidence submitted by Cadet Bufkin in support of his claim fails to establish traceability between the defendants' challenged conduct and his recommendation for separation from USMA.

Cadet Bufkin nonetheless argues that a factual dispute remains that necessitates the denial of the defendants' motion to dismiss. Dkt. No. 109 at 30. But he acknowledges Fifth Circuit precedent providing that a trial court may dismiss a case for lack of subject matter jurisdiction based on the "complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Id.* at 10 (quoting *Clark*, 798 F.2d at 741). In accordance with this precedent, the Court resolves a factual dispute here.[13] The Court has considered the entire record, including the verified amended complaint (Dkt. No. 92), Cadet Bufkin's declaration (Dkt. No. 124 at 26–33), and his separation packet (Dkt. No. 134-1 at 117–37). Based on this evidence, the Court finds that Cadet Bufkin has suffered no injury fairly traceable to the defendants' conduct and, thus, lacks standing to seek legal redress for his impending academic separation.

> ### iv.   The Non-Separated Plaintiffs have failed to show a credible threat that the defendants will prosecute them for disobeying the order to vaccinate.

The Non-Separated Plaintiffs additionally seek relief because, according to them, those still serving "remain[] subject to criminal prosecution" for disobeying the once "lawful" order to vaccinate. Dkt. No. 109 at 10–11 (citing 10 U.S.C. § 843, which provides

---

[13] The parties have not requested an evidentiary hearing. In any event, the Court finds that an evidentiary hearing is not necessary because it would not serve to clarify any ambiguities in the record, and nothing in the record indicates that Cadet Bufkin would present different, more persuasive evidence or arguments at a hearing. *See Williamson*, 645 F.2d at 414; *In re Eckstein Marine Serv. L.L.C.*, 672 F.3d at 319–20.

a five-year statute of limitations for a service member to be tried by court martial).  The defendants counter that the prospect of future prosecution is "entirely implausible speculation" and "defies reason" given the Army has "remov[ed] GOMORs and flags associated with the same disobedience."  Dkt. No. 106 at 18.  The Court agrees.

The Non-Separated Plaintiffs do not allege that the Army has initiated criminal prosecution against them.  Nonetheless, they may establish an injury-in-fact by showing a "substantial" and "certainly impending" risk of future prosecution.  *See Attala Cnty., Miss. Branch of the NAACP v. Evans*, 37 F.4th 1038, 1042 (5th Cir. 2022) (first quoting *Clapper*, 568 U.S. at 409; and then quoting *Crawford v. Hinds Cnty. Bd. of Supervisors*, 1 F.4th 371, 375 (5th Cir. 2021)).  This requires demonstration of a "credible," non-speculative threat of prosecution based on their participation in legally proscribed conduct.  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159–60 (2014) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

Whether a credible threat of prosecution exists depends on a case's unique facts, such as whether the government has "disavow[ed]" prosecution and whether it has historically prosecuted others for the same offense.  *Seals v. McBee*, 898 F.3d 587, 592 (5th Cir. 2018) (first citing *Holder v. Humanitarian L. Project*, 561 U.S. 1, 16 (2010); and then citing *Babbitt*, 442 U.S. at 302).  Here, the defendants have discredited the prospect of prosecution as "implausible speculation"; however, they have not expressly disavowed an intent to prosecute the Non-Separated Plaintiffs through any authoritative or otherwise binding statement.  *See* Dkt. No. 106 at 18.  When considered in isolation, that could provide "some reason" to fear future prosecution.  *See Babbitt*, 442 U.S. at 302.

But "[w]hether the [defendants] [have] disavow[ed] prosecution" is "only one factor" in the analysis. *Seals*, 898 F.3d at 592. The Court should also consider the defendants' history of criminally prosecuting individuals for disobeying the order to receive the COVID-19 vaccine—and here, no such history exists. The Non-Separated Plaintiffs have failed to identify any cases where the Army prosecuted soldiers who disobeyed the order to vaccinate, and they certainly have not shown that the Army has done so since the rescission of the vaccine mandate. Moreover, the Army never brought charges against the Non-Separated Plaintiffs even though it could have at any point before the Court issued its preliminary injunction. Nor has it threatened prosecution against them. To the contrary, to "prevent any inconsistent disciplinary action," the Army has made clear that the Secretary of the Army "withhold[s] the authority to impose any non-judicial and judicial actions based solely on a Soldier's refusal to receive the COVID-19 vaccine." Dkt. No. 108 at 93; HQDA EXORD 174-23, ¶ 3.D.1. Therefore, because the Army until this point has not prosecuted—nor threatened to prosecute—any service member for disobeying the order to receive the COVID-19 vaccine, it is unlikely that it will do so now.

The absence of a credible threat of prosecution is even clearer in light of this case's unique procedural posture. Following the Court's issuance of a preliminary injunction, Congress directed the military to rescind the vaccine mandate, and it did. Congress has thus rejected the asserted need for a service-wide COVID-19 vaccination requirement. The contention that the defendants will nonetheless seek to prosecute the Non-Separated Plaintiffs for disobeying the rescinded mandate flies in the face of logic, as such would reinforce an obsolete—and now illegal—policy and undermine the extensive corrective action that the defendants have taken thus far to restore the Non-Separated Plaintiffs to their

pre-vaccine-mandate status.  Even if the Non-Separated Plaintiffs might "theoretically" be subject to prosecution because the defendants have "reserved" the authority to prosecute soldiers for prior noncompliance with the repealed mandate, that possibility alone fails to establish "imminent, or even likely, prosecution" given this contrary evidence.  *See Sacks v. Off. of Foreign Assets Control*, 466 F.3d 764, 772 (9th Cir. 2006).[14]

The Non-Separated Plaintiffs cite several cases for the proposition that a case is not moot where a possibility of prosecution remains, even if the evidence does not show that it is likely.  Dkt. No. 109 at 13.  But the cited case law does not provide the unequivocal support for this claim that they suggest it does.  For example, in *Center for Individual Freedom, Inc. v. Tennant*, 706 F.3d 270 (4th Cir. 2013), following the repeal of a statute whose enforcement had been preliminarily enjoined twice, the Fourth Circuit reluctantly upheld the district court's decision to dissolve the injunctions rather than vacating them as moot. *Id.* at 293.  It reasoned that although the record did not "overwhelmingly demonstrate that the repealed provisions remained 'legally significant,'" the district court did not "abuse[] its discretion" by ensuring that the state "c[ould] not punish offenders for violating the provisions . . . while the injunctions were in effect."  *Id.*  Moreover, even though state law permitted "enforce[ment] [of] a repealed law after the repeal bec[a]me[] effective," neither

---

[14] The plaintiffs cite *Sacks* in support of their claim that "[the] violation of [a] repealed statute does not foreclose relief if the statute was violated."  Dkt. No. 109 at 13.  The Court does not dispute that a prior violation of a repealed law may nevertheless result in a subsequent prosecution. Whether prosecution is "imminent" or "likely," however, is a different question.  Notably, in *Sacks*, the court held that where the petitioner had violated two repealed laws, a threat of enforcement existed as to just the violation where he had received a pre-penalty notice "explain[ing] the charge against him" and a formal penalty notice "demand[ing]" that he pay a penalty within thirty days.  466 F.3d at 770–71.  In contrast, the other violation was not cited in the pre-penalty notice, and even though the government had "explicitly reserved" its right to "bring proceedings" based on similar, prior violations, the court held that no "genuine threat of imminent prosecution" existed.  *Id.* at 772–73.

the district nor the appellate court expressed concern that the plaintiffs would be prosecuted for their violations of the repealed law *before* the injunctions were instituted. *Id.* (citing W. Va. Code § 2-2-8). This case thus falls short of suggesting that a case is never moot so long as it is possible for the enforcement authority to prosecute former violators.

The other cases cited by the Non-Separated Plaintiffs likewise miss the mark. For instance, in *Ramsek v. Beshear*, 989 F.3d 494 (6th Cir. 2021), the Sixth Circuit held that a threat of prosecution existed when the authority who repealed a law did not retain the power to "control prosecution decisions" for prior violations of that law. *Id.* at 500. Here, however, the Secretary of the Army both rescinded the vaccine mandate and retains sole authority to prosecute prior violations of the mandate (and has refrained from exercising that authority to date). The Non-Separated Plaintiffs cite other cases where a plaintiff violated an active law, but the defendants had not yet enforced the law or had temporarily stayed its enforcement. *See Dean Foods Co. v. Tracy*, 990 F. Supp. 646, 650 (W.D. Wis. 1997); *Bowman v. Schwarzenegger*, No. CIV S-07-2164, 2009 WL 799274, at *4 (E.D. Cal. Mar. 23, 2009). Here, however, the Non-Separated Plaintiffs violated a mandate that has been formally repealed and retains no legal effect. Given these distinctions, the cases cited by the Non-Separated Plaintiffs fail to support a credible threat of prosecution.

The Non-Separated Plaintiffs cite two statements by Army leadership that, in their view, suggest that the Army may well prosecute them for refusing to receive the COVID-19 vaccine. Dkt. No. 109 at 11–12. The Court finds neither statement compelling. The first is the testimony of the Under Secretary of Defense for Personnel and Readiness before the

House Armed Services Committee in February 2023.[15]  When asked why the military had

yet to "determin[e] 'appropriate action'" for unvaccinated service members who "did not

submit an exemption . . . request," the Under Secretary responded that officials were still

"evaluat[ing] what needs to be done in those situations" because those service members

disobeyed a lawful order to vaccinate.  *Id.* at 28:08–29:16.  When pressed further, the Under

Secretary clarified that "[t]hose who refused the vaccine and did not put in a request for

accommodation refused a lawful order."  *Id.* at 29:30–37.  Notably, the Under Secretary

made no mention of criminal prosecutions.  Even more importantly, however, his testimony

addressed just those soldiers who had *not* sought an exemption to the vaccine mandate.

And the questions he received centered on the concern that those *who did not seek an*

*exemption* would face discipline even though the Army had rescinded the vaccine mandate.

Given this context, the Under Secretary's reference to the evaluation of disciplinary action

for those who disobeyed a lawful order lacks application to the Non-Separated Plaintiffs—

each of whom properly sought a religious exemption.

The Non-Separated Plaintiffs next point to a February 7, 2023 text-message

exchange between Major Hagen and Cadet Morrison as supporting a threat of future

prosecution.  Dkt. No. 93 at 10, 12.  In response to Cadet Morrison's concern that his

GOMOR would not be withdrawn, Major Hagen speculated that if the courts were to hold

that the military "can make a vaccine mandate, then [he] bet[s] the [adverse] action [will]

continue[]" against unvaccinated soldiers because refusing to vaccinate was "still disobeying

---

[15] *COVID-19's Impact on DoD and its Servicemembers: Hearing Before the H. Armed Servs. Comm.*, 118th
Cong. (Feb. 28, 2023) (statement of Gilbert R. Cisneros, Jr., Under Sec'y of Def. for Pers. &
Readiness), *available at* https://armedservices.house.gov/hearings/covid-19s-impact-dod-and-its-
servicemembers [https://perma.cc/QHV5-DPML].

a legal order." *Id.* at 12.  Again, this statement says nothing about the prospect of future prosecution.  Regardless, it is plainly incorrect.  The Army expressly ordered the removal of GOMORs—and all other adverse actions—from the files of soldiers who sought an exemption.  *See* Dkt. No. 108 at 92–94.  Given the concrete measures taken by the Army to cease adverse action against the Non-Separated Plaintiffs, the Court declines to take an informal, unfounded, speculative statement of one official as evidence that the Army will criminally prosecute the Non-Separated Plaintiffs despite its contrary efforts to date.

For these reasons, the prospect that the defendants will prosecute the Non-Separated Plaintiffs for prior violations of the rescinded vaccine mandate is not only improbable, but also illogical.  The Army has not prosecuted anyone for such a violation, and nothing indicates that it will start now—especially given that Congress has ordered the rescission of the mandate and the Army has ceased its enforcement.  The Non-Separated Plaintiffs nonetheless speculate that the Army may still prosecute them—even though it has not threatened to do so—before the statute of limitations expires.  But mere "[a]llegations of possible future injury" do not suffice to maintain a live controversy.  *Clapper*, 568 U.S. at 409 (alteration in original) (emphasis omitted) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).  Because the Non-Separated Plaintiffs have failed to show an imminent, credible threat of future prosecution, they have established no injury-in-fact.

> **v.   The Non-Separated Plaintiffs have not shown a real and immediate threat that the defendants will impose the same mandate or enforce it in the same manner upon dismissal of this case.**

The Non-Separated Plaintiffs finally claim that they have standing because, as they see it, only a court order will stop the defendants "from reinstituting another unconstitutional mandate with no religious accommodation process whatsoever or another

sham process." Dkt. No. 109 at 20. The defendants respond that any claim that they will reimpose a COVID-19 vaccine mandate is no more than "hypothetical" and "speculative." Dkt. No. 106 at 29–31. Because the Non-Separated Plaintiffs have not shown a certainly impending threat that the defendants will reimpose the same vaccine mandate and enforce it in the same manner, they lack standing on the basis of future injury.

The injury-in-fact and redressability elements of standing intersect where, as here, a plaintiff seeks injunctive or declaratory relief. *Stringer v. Whitley*, 942 F.3d 715, 720 (5th Cir. 2019). That is because an injunction "cannot conceivably remedy any past wrong"; therefore, a plaintiff seeking one "can satisfy the redressability requirement only by demonstrating a continuing injury or threatened future injury." *Id.* (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 108 (1998)) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983)). To obtain relief for a future injury, the plaintiff must show that such an injury is "certainly impending" or that "there is a real and immediate threat of repeated injury." *Attala Cnty., Miss. Branch of the NAACP*, 37 F.4th at 1042 (first quoting *Clapper*, 568 U.S. at 409; and then quoting *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974)). "[M]ere '[a]llegations of possible future injury' do not suffice." *Id.* (second alteration in original) (quoting *Clapper*, 568 U.S. at 409). Rather, a plaintiff must demonstrate "at least a 'substantial risk' that the injury will occur." *Id.* (quoting *Crawford*, 1 F.4th at 375).

As discussed above (*see supra* Section 3.A.ii.b), the record does not demonstrate a "certainly impending" or "real and immediate threat" that the defendants will reimpose the same vaccine mandate or, even if they did, that they would enforce it in the same manner. Although the defendants retain the ability to impose new vaccination requirements in the future, this possibility alone cannot establish the injury-in-fact necessary for standing. This

is especially so in light of the current legal climate: Congress has expressly ordered the rescission of the challenged mandate.  The Court rejects the assumption that the defendants—government actors presumed under the law to act in good faith—will attempt to circumvent this congressional directive by rescinding the original mandate and immediately instituting an identical one upon dismissal of this case.  Further, given the numerous legal challenges to the military's enforcement of the rescinded mandate—several of which resulted in preliminary injunctions—it belies logic to conclude that the defendants would resort to the same enforcement mechanisms, including the same generalized review of religious-exemption requests, that gave rise to this litigation.  Thus, absent evidence of a certainly impending future injury, "'[n]o matter how vehemently the parties continue to dispute the lawfulness' of the original mandate, . . . there is no live case or controversy for the Court to act on."  *Crocker*, 2023 WL 4143224, at *5 (quoting *Yarls*, 905 F.3d at 909).

The Non-Separated Plaintiffs contend that notwithstanding the rescission of the vaccine mandate and the cease of enforcement proceedings, the Army's religious-exemption policy itself violates RFRA.  Dkt. No. 109 at 21.  They in particular complain that the policy "contain[s] a double standard of localized decision makers for secular exemptions, but centralized top-level decision makers for religious exemptions" and allows "generalized compelling interests to determine whether a [s]oldier is eligible for an exemption."  *Id.*; Dkt. No. 92 at 35.  But none of the Non-Separated Plaintiffs remain subject to this policy (or have shown an imminent risk that they will be subject to it) because the underlying vaccine mandate from which they would need an exemption no longer exists, and there is no certainly impending risk that the defendants will reimpose the mandate.  Accordingly, no active "case" or "controversy" based on any existing or certainly impending injury-in-fact

– 62 –

requires judicial resolution.  *See Yarls*, 905 F.3d at 909.  Should the defendants impose a new vaccination requirement and subject the Non-Separated Plaintiffs to the religious-exemption policy, they may challenge it at that time.  Until then, absent a live dispute between the parties, the Court lacks jurisdiction to issue an advisory opinion resolving hypothetical legal questions concerning that policy.[16]  *See Carney v. Adams*, 141 S. Ct. 493, 498 (2020); *Hodgson v. H. Morgan Daniel Seafoods, Inc.*, 433 F.2d 918, 920 (5th Cir. 1970).

Irrespective of whether a live dispute exists, the Non-Separated Plaintiffs argue that the Court has jurisdiction to enter a declaratory judgment because such would "serve as a basis for monetary damage claims for members in the class" in subsequent litigation under the preclusive principles of res judicata or collateral estoppel.  Dkt. No. 96 at 37–38.  But this argument contradicts the established jurisdictional principle that only "a substantial controversy . . . of sufficient immediacy an[d] reality" can "warrant the issuance of a declaratory judgment."  *See Golden v. Zwickler*, 394 U.S. 103, 108 (1969).  Even assuming the Non-Separated Plaintiffs would have standing to seek damages in subsequent actions, they cannot satisfy the requirement that an "immedia[te]" and "real[]" controversy exist in the present action based on standing they anticipate having in the future.  In any event, the Fifth

---

[16] In any event, without determining the constitutionality of the Army's religious-exemption policy, the Court notes that the policy incorporates the standards set forth in RFRA and requires individualized consideration of religious-exemption requests.  *See* Dep't of Def. Instruction 1300.17 ¶ 3.2(d); Army Regulation 600-20 ¶ 5-6(a)(2), (4).  The Court recognized as much in its order granting the plaintiffs' motion for a preliminary injunction.  Dkt. No. 78 at 9–10.  The Court found, however, that the defendants had run afoul of this policy by failing to engage in the individualized review that it required and relying on generalized interests such as "health," "readiness," and "mission accomplishment" that—although capable of serving as compelling interests—had largely already been achieved and would not be advanced by the forced vaccination of the plaintiffs.  *Id.* at 29–30, 44–54.  The deficiencies in the review process were exacerbated by other official policy providing top-level Army officials—rather than soldiers' immediate commanders—final decision-making authority over religious-exemption requests.  *Id.* at 51–52.  Nonetheless, it is unclear whether this review structure in itself violates RFRA absent any failure by the Army to provide individualized consideration of religious-exemption requests.

Circuit has indicated that where, as here, defendants are sued only in their official capacities, a judgment against them "will not operate as a collateral estoppel in any further suit for damages that may be brought against [them] solely in their private capacities." *Unimex, Inc. v. U.S. Dep't of Hous. & Urb. Dev.*, 594 F.2d 1060, 1062 n.3 (5th Cir. 1979). Therefore, even if the Court issued a declaratory judgment here, that judgment would lack preclusive effect on future claims for damages against the defendants in their individual capacities. For these reasons, the Non-Separated Plaintiffs have failed to show the injury-in-fact necessary for standing to seek declaratory or injunctive relief.

### C. Plaintiff Chrisman has standing to seek relief related to his discharge, and RFRA does not require administrative exhaustion before proceeding here.

Although this case is substantially moot for the reasons discussed above, one claim remains. The amended complaint introduces Plaintiff Chrisman, who was separated allegedly due to his refusal to vaccinate after being denied a religious exemption. Dkt. No. 92 at 15–16. With respect to Plaintiff Chrisman (and prospective, similarly situated class members), the amended complaint seeks the correction of personnel records and/or offers of reinstatement. *Id.* at 34. The defendants argue that Plaintiff Chrisman cannot obtain such relief without first exhausting the administrative process for review of discharge decisions.[17] Dkt. No. 106 at 18. But RFRA's text, structure, and historical context make clear that a plaintiff need not administratively exhaust RFRA claims before filing suit.

---

[17] Notably, the defendants do not argue that this Court should abstain from review entirely under *Mindes v. Seaman*, 453 F.2d 197 (5th Cir. 1971)—only that the Court should withhold review until Plaintiff Chrisman has exhausted administrative remedies. *See* Dkt. No. 106 at 18. In any event, as previously noted by the Court, the Fifth Circuit has held that RFRA expressly renders justiciable claims brought under it. Dkt. No. 78 at 24 (citing *U.S. Navy Seals 1–26 v. Biden*, 27 F.4th 336, 345–46 (5th Cir. 2022)). And even when considering the *Mindes* factors, they favor judicial review of RFRA claims in the military. *Id.* at 32–34.

The Court recognizes that the Fifth Circuit has "firmly adhered" to the judge-made doctrine that "a plaintiff challenging an administrative military discharge will find the doors of the federal courthouse closed pending exhaustion of available administrative remedies." *Hodges v. Callaway*, 499 F.2d 417, 420 (5th Cir. 1974). "For purposes of this requirement, two types of administrative bodies provide review of discharge decisions." *Id.* First, the Army Discharge Review Board has authority to "review the discharge or dismissal" of any former soldier and "change a discharge or dismissal, or issue a new discharge, to reflect its findings." 10 U.S.C. § 1553(a)–(b); 32 C.F.R. § 581.2(c) (2022). Second, the Army Board for Correction of Military Records is to "consider[] individual applications" for record corrections "properly brought before it" and thereafter "direct[] or recommend[] correction of military records to remove an error or injustice." 10 U.S.C. § 1552(a); 32 C.F.R. § 581.3(c) (2022). These administrative boards retain authority to both correct personnel records and reinstate soldiers to active duty. *Von Hoffburg v. Alexander*, 615 F.2d 633, 640 (5th Cir. 1980).

Despite direction from both the Secretary of Defense and Secretary of the Army to "petition [his] Military Department's Discharge Review Boards and Boards for Correction of Military . . . Records" to obtain review of his discharge decision, Plaintiff Chrisman has declined to exhaust these avenues. *See* Dkt. No. 108 at 47, 95. And upon further questioning by the Court, Plaintiff Chrisman has confirmed that he does not intend to seek administrative review. Dkt. Nos. 124 at 34–35; 131 at 1. Therefore, the Fifth Circuit has generally dictated the correct course of action under these circumstances: The Court should refrain from hearing any claim for reinstatement or an upgrade to a discharge decision pending Plaintiff Chrisman's exhaustion of the administrative remedies set out by statute.

*See Hodges*, 499 F.2d at 421; *see, e.g.*, *McCurdy v. Zuckert*, 359 F.2d 491, 494–95 (5th Cir. 1966); *Tuggle v. Brown*, 362 F.2d 801, 802 (5th Cir. 1966); *Stanford v. United States*, 413 F.2d 1048, 1048–49 (5th Cir. 1969); *Davis v. Sec'y of the Army*, 440 F.2d 817, 819 (5th Cir. 1971).

But this case materially differs from Fifth Circuit precedent invoking the judicially created exhaustion doctrine in the military.  Those cases surrounded service members' claims that the discharge procedures applied to them violated either the military's administrative regulations[18] or the service member's due-process rights.[19]  None of those claims derived from RFRA—or any statutory source, for that matter.

In contrast, here, Congress has expressly "rendered justiciable [Plaintiff Chrisman's] claim[] under RFRA." *U.S. Navy Seals 1–26*, 27 F.4th at 345–46.  "Because [Plaintiff Chrisman's] claim[] arise[s] from this *statutory* source," the Court "may not adopt common-law [exhaustion] rules as if [it] were regulating a *court-created* claim." *Doster v. Kendall*, 54 F.4th 398, 413 (6th Cir. 2022) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014)).  "[E]ven in th[e] field of judicial discretion," the Supreme Court has stated that the "fashioning of exhaustion principles" must be "consistent with congressional intent and [RFRA's] statutory scheme." *McCarthy*, 503 U.S. at 144.  "[P]olicy considerations alone cannot justify judicially imposed exhaustion unless exhaustion is consistent with congressional intent." *Patsy*, 457 U.S. at 513.  Thus, unlike the cases where

---

[18] *See Hodges*, 499 F.2d at 419 (involving a claim that the Army "should have followed the procedures outlined in AR 635-212 for discharges based on misconduct"); *McCurdy*, 359 F.2d at 492 (involving a claim that the Air Force violated its governing regulations by convening a discharge board instead of initiating disciplinary proceedings).

[19] *See Stanford*, 413 F.2d at 1048 (involving a claim that the military denied a service member "his 'constitutional rights' of indictment by a grand jury and a trial by a petit jury" by issuing him a dishonorable discharge); *Davis*, 440 F.2d at 818 (involving a due-process challenge to the administrative regulation under which the plaintiff was discharged).

the Fifth Circuit has historically required administrative exhaustion in the military, because Congress has directly spoken here, the Court is obliged to consider the "interpretive question" of whether RFRA "require[s] exhaustion" in this case. *Doster*, 54 F.4th at 411, 413. Based on RFRA's text, structure, and historical context, the Court finds that it does not.

Textually, RFRA permits judicial resolution of Plaintiff Chrisman's claim. RFRA provides that "[a] person whose religious exercise has been burdened in violation of this section may assert that violation as a claim . . . in a judicial proceeding and obtain appropriate relief against a government." 42 U.S.C. § 2000bb-1(c). "[T]he term 'government' includes a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States," so it includes the military-official defendants here. *See id.* § 2000bb-2(1). And conduct covered under RFRA includes "all Federal law, and the implementation of that law, whether statutory or otherwise," so RFRA reaches the actions taken by the defendants to enforce the former vaccine mandate, including the involuntary separation of Plaintiff Chrisman. *See id.* § 2000bb-3(a). The plain text of RFRA thus invites the Court to consider Plaintiff Chrisman's claim. The question remains, however, whether the Court may engage in this review prior to the exhaustion of administrative remedies.

Two of RFRA's structural characteristics and context provide guidance. First, in RFRA's "Judicial relief" section, Congress provided that "[s]tanding to assert a claim or defense under [RFRA] shall be governed by the general rules of standing under article III of the Constitution." *Id.* § 2000bb-1(c). "Congress's directive seems clear on its face—the text expressly tells [courts] to apply the rules of standing under Article III and makes no mention

of prudential (non-Article III) standing rules." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1155 (10th Cir. 2013) (Gorsuch, J., concurring).  By specifically invoking Article III's limits, the text thus "suggests that courts should not adopt other judge-made limits to 'govern' a RFRA claim." *Doster*, 54 F.4th at 414 (citing *Hobby Lobby Stores, Inc.*, 723 F.3d at 1155 (Gorsuch, J., concurring)); *see also Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 103 n.9 (1979) ("If, as is demonstrated in the text, Congress intended standing . . . to extend to the full limits of Art. III, the normal prudential rules do not apply . . . .").

Second, RFRA's sister statute, the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), expressly adopts the exhaustion requirements set forth in the Prison Litigation Reform Act of 1995.  42 U.S.C. § 2000cc–2(e); *see* 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under . . . any . . . Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.").  Where Congress has expressly required exhaustion in one part of a statutory scheme, "[b]asic interpretive rules" counsel against reading in an "implied military-exhaustion requirement" in another part.  *Doster*, 54 F.4th at 414 (citing *Patsy*, 457 U.S. at 509–12).  Given that RLUIPA's text demonstrates that Congress contemplated exhaustion, the canon of *expressio unius est exclusio alterius* ("the expression of one thing implies the exclusion of another") suggests that "Congress considered the unnamed possibility and meant to say no to it."  *See Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 381 (2013) (quoting *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003)).

Moreover, the historical context preceding RFRA's enactment confirms this conclusion.  After the Supreme Court decided *Sherbert v. Verner*, 374 U.S. 398 (1963),

plaintiffs "could use 42 U.S.C. § 1983—the cause of action that permits suits against state actors for constitutional violations—to challenge" neutral state laws that "substantially burden[ed] religion" and "flunked [strict] scrutiny." *Doster*, 54 F.4th at 414. Later, in *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), the Supreme Court departed from strict scrutiny when analyzing facially neutral laws burdening religion. *Doster*, 54 F.4th at 414. However, in enacting RFRA, Congress "sought 'to restore' *Sherbert*'s strict-scrutiny test." *Id.* (citing 42 U.S.C. § 2000bb(a)(4), (b)(1)). A "pre-*Smith* free-exercise claim under § 1983" thus "represents the most analogous cause of action to RFRA." *Id.* And just as "§ 1983 did not require a plaintiff to exhaust a free-exercise claim with a state actor in order to sue that actor," RFRA does not demand exhaustion, either. *Id.* at 415 (citing *Patsy*, 457 U.S. at 516).

For these reasons, the Court finds that the judicially created, prudential doctrine of administrative exhaustion—though firmly adhered to in other contexts—does not comport with the congressional directive found in RFRA's statutory scheme. *See McCarthy*, 503 U.S. at 144. The Court is therefore left with its "virtually unflagging" duty to "'hear and decide' cases within its jurisdiction" under RFRA, including Plaintiff Chrisman's claim here.[20] *See Lexmark Int'l, Inc.*, 572 U.S. at 126 (quoting *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013)). This is not to say, of course, that an administrative-exhaustion requirement can never be judicially imposed in the military context. But where Congress has directly spoken against such a requirement, as it did by enacting RFRA, the Court must listen.

---

[20] To the extent Plaintiff Chrisman seeks reinstatement, the Court may also consider any associated request for backpay. *See infra* Section 3.D.

Even if administrative exhaustion were required in the RFRA context, the Fifth Circuit has recognized at least four "established exceptions to the exhaustion doctrine . . . applicable to military discharge actions." *Von Hoffburg*, 615 F.2d at 638.  In particular, exhaustion is not required where: (1) the administrative process would fail to "provide a genuine opportunity for adequate relief"; (2) the plaintiff "may suffer irreparable injury if he is compelled to pursue his administrative remedies"; (3) exhaustion of the administrative process "would be futile"; or (4) "the plaintiff has raised a substantial constitutional question." *Id.*  This Court previously found that the plaintiffs' exhaustion of the administrative process "would be futile" and "inadequate" (Dkt. No. 78 at 27–31); however, the circumstances now have materially changed.  The defendants, in compliance with a congressional directive, have since rescinded the vaccine mandate, undertaken substantial steps to remedy injuries to soldiers who were denied a religious exemption, and specifically instructed soldiers who were separated on how to seek review of discharge decisions.  Plaintiff Chrisman has not alleged that the defendants have declined to provide relief to soldiers who petitioned a discharge decision since the mandate was rescinded or otherwise demonstrated that the review process is ineffective despite the extensive corrective action taken thus far by the defendants.  Therefore, because it remains unknown whether the administrative process would be futile or fail to provide adequate relief, neither exception excuses the exhaustion of administrative remedies here.

Nonetheless, the remaining two exceptions apply.  First, Plaintiff Chrisman may suffer irreparable injury if he is forced to exhaust administrative review.  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir.

2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).  "This principle applies with equal force to the violation of [RFRA] rights because [RFRA] enforces First Amendment freedoms, and the statute requires courts to construe it broadly to protect religious exercise." *U.S. Navy Seals 1–26*, 27 F.4th at 348 (alterations in original) (quoting *Opulent Life Church*, 697 F.3d at 295).  Plaintiff Chrisman alleges not just that the defendants "pitt[ed] [his] conscience[] against [his] livelihood[]," but that he was in fact separated and received a general discharge, which cited "Misconduct (Serious Offense)" as the justification, due to his religiously motivated refusal to vaccinate.  *See id.*; Dkt. No. 92 at 15–16.  Because this tangible injury is inextricably intertwined with the alleged violation of his constitutional rights, Plaintiff Chrisman will likely suffer irreparable harm every day that it remains unrectified.  *See Elrod*, 427 U.S. at 373–74; *Doster*, 54 F.4th at 428.  Second, Plaintiff Chrisman raises a substantial question related to religious rights—namely, whether the defendants have violated his free-exercise rights under RFRA.  *See U.S. Navy Seals 1–26*, 27 F.4th at 347–48.  The Fifth Circuit has held that "[c]ourts are specifically equipped to address RFRA claims and, by the same token, the issues are less suitable for administrative adjudication."  *Id.* at 347.  Thus, even if an administrative-exhaustion requirement were consistent with RFRA, both the irreparable-injury and the substantial-constitutional-question exception would excuse that requirement here.[21]

---

[21] The Court recognizes that the defendants believe administrative exhaustion is required here and that the Fifth Circuit has not squarely addressed this point of law.  Accordingly, the Court would seriously consider a motion to certify this Order for interlocutory appeal limited to the issue of whether Plaintiff Chrisman must exhaust administrative remedies before seeking judicial review of his discharge.  *See* 28 U.S.C. § 1292(b) (providing that a district court may certify an order for interlocutory appeal if it (1) "involves a controlling question of law," (2) as to which "there is substantial ground for difference of opinion," and (3) "an immediate appeal from the order may materially advance the ultimate termination of the litigation").

**D.      The plaintiffs may seek backpay in connection with claims for reinstatement, but the Court lacks jurisdiction to consider any claim for backpay connected to delayed promotions.**

The defendants argue that the doctrine of sovereign immunity bars the plaintiffs' request for backpay because it would not constitute appropriate equitable relief under RFRA. Dkt. No. 106 at 34–36. The plaintiffs respond that their request for backpay is properly characterized as equitable because it is intertwined with their other claims for injunctive relief. Dkt. No. 109 at 19 n. 5. The Court finds that although sovereign immunity bars the plaintiffs' request for backpay connected to failed promotions, it does not bar their request for backpay connected to their claims for reinstatement.

The doctrine of sovereign immunity bars suit against the federal government and, consequently, deprives federal courts of jurisdiction absent congressional waiver. *St. Tammany Par. ex rel. Davis v. Fed. Emergency Mgmt. Agency*, 556 F.3d 307, 316 (5th Cir. 2009) (citing *Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 287 (1983)); *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 734 (5th Cir. 2019). Any such waiver of sovereign immunity "must be unequivocally expressed in statutory text." *Lane v. Pena*, 518 U.S. 187, 192 (1996); *Wagstaff v. U.S. Dep't of Educ.*, 509 F.3d 661, 664 (5th Cir. 2007). Relevant here, RFRA provides that "[a] person whose religious exercise has been burdened in violation of this section may . . . obtain appropriate relief against a government." 42 U.S.C. § 2000bb-1(c). Analyzing RFRA's sister statute, RLUIPA, the Supreme Court held that "appropriate relief" does not "so clearly and unambiguously waive sovereign immunity to private suits for damages that [the Court] c[ould] 'be certain that [the government] in fact consents' to such a suit." *Sossamon v. Texas*, 563 U.S. 277, 285–86 (2011) (quoting *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 680 (1999)). It would

naturally follow, then, that in line with the holding in *Sossamon*, the identical "appropriate relief" language employed in RFRA likewise fails to constitute an unequivocal waiver by Congress of the government's immunity to damages claims.

The plaintiffs argue that *Tanzin v. Tanvir*, 141 S. Ct. 486 (2020)—a case decided after *Sossamon*—demands the opposite conclusion. Dkt. No. 96 at 36. There, the Court held that monetary damages constitute "appropriate relief" in RFRA suits against government employees. *Tanzin*, 141 S. Ct. at 492. Notably, however, that case involved damages claims against defendants sued in their *individual* capacities. *Id.* at 489. Distinguishing the facts from those in *Sossamon*, the Court stated that "[t]he obvious difference" between the two was that the case at hand "feature[d] a suit against individuals, who d[id] not enjoy sovereign immunity," while the defendants in *Sossamon* did. *Id.* at 492–93. Here, like the defendants in *Sossamon*, the defendants have been sued in their official capacities (*see* Dkt. No. 92 at 17), so they are entitled to sovereign immunity. Thus, as the Supreme Court held in *Sossamon*, the term "appropriate relief" in RFRA does not unequivocally waive the defendants' sovereign immunity to claims for monetary damages.

Nonetheless, RFRA does waive the right of governmental defendants to avoid suits under it that are equitable in nature. *Cf. Sossamon*, 563 U.S. at 285 (stating that a statute may waive the government's sovereign immunity with respect to other types of relief even if it does not waive immunity to compensatory damages). Generally, an action for monetary damages is legal, not equitable, in nature. *Chauffeurs, Teamsters & Helpers, Loc. No. 391 v. Terry*, 494 U.S. 558, 570 (1990) (quoting *Curtis v. Loether*, 415 U.S. 189, 196 (1974)). But the Supreme Court has held that "monetary recovery sounds in equity" in two types of cases. *Borst v. Chevron Corp.*, 36 F.3d 1308, 1324 (5th Cir. 1994) (citing *Terry*, 494 U.S. at 570–71).

The first is where damages are "restitutionary in nature." *Id.* (citing *Terry*, 494 U.S. at 570). Restitution applies in "action[s] for disgorgement of improper profits" where money has been "wrongfully held by" a defendant. *Terry*, 494 U.S. at 570–71 (alteration in original) (quoting *Tull v. United States*, 481 U.S. 412, 424 (1987)). The remedy "is limited to 'restoring the status quo and ordering the return of that which rightfully belongs'" to the plaintiff. *Tull*, 481 U.S. at 424 (quoting *Porter v. Warner Holding Co.*, 328 U.S. 395, 402 (1946)).

      The second type of case is where damages are "intertwined with claims for injunctive relief." *Borst*, 36 F.3d at 1324 (citing *Terry*, 494 U.S. at 571). For example, the Fifth Circuit has held that when a plaintiff seeks reinstatement to a position he held before an alleged legal violation deprived him of that position, a "prayer for back pay is not a claim for damages" but "an integral part of the equitable remedy of injunctive reinstatement." *Harkless v. Sweeny Indep. Sch. Dist.*, 427 F.2d 319, 324 (5th Cir. 1970). That is because "[a]n inextricable part of the restoration to prior status is the payment of back wages properly owing to the plaintiff[], diminished by [his] earnings, if any, in the interim." *Id.* Stated differently, "[b]ack pay is merely an element of the equitable remedy of reinstatement." *Id.*

      In this case, the plaintiffs generally seek "back pay" in their amended complaint but do not specify for whom. *See* Dkt. No. 92 at 35. In their briefing, however, the plaintiffs suggest that they seek backpay for both those who "were deprived of promotions" and those who "were illegally discharged." Dkt. No. 96 at 36. The Court considers both claims here.

      As for the first claim, because the Court "ha[s] no jurisdiction" to order special selection boards until the plaintiffs have exhausted statutorily mandated administrative remedies, it also "ha[s] no jurisdiction" to order backpay in connection with such relief. *See Chandler v. U.S. Air Force*, 272 F.3d 527, 530 (8th Cir. 2001). In any event, such relief

resembles the non-restitutionary relief sought in *Terry*. There, the plaintiffs—truckdrivers party to a collective bargaining agreement—were laid off and recalled several times. 494 U.S. at 561. They filed multiple unsuccessful grievances with the Union, challenging the order of the layoffs and recalls and the denial of their seniority rights. *Id.* at 561–62. Then they sued the Union, seeking lost wages due to its alleged violation of the duty of fair representation while handling their grievances. *Id.* at 562–63. Upon review, the Supreme Court characterized the plaintiffs' request for backpay as legal, rather than equitable, in nature. *Id.* at 570. It reasoned that because the backpay sought "[wa]s not money wrongfully held by the Union, but wages and benefits they would have received . . . had the Union processed [their] grievances properly," it "[wa]s not restitutionary." *Id.* at 570–71. The same reasoning applies here. The backpay sought by the plaintiffs is not money wrongfully held by the defendants but, rather, wages they would have received had they been promoted. For this reason, it does not qualify as restitutionary.

Nor is this claim for backpay due to denied promotions intertwined with any claim for injunctive relief. Nowhere in the plaintiffs' amended complaint do they request that they be retroactively promoted; instead, they request "special promotion selection boards" to "consider/re-consider" promotions. *See* Dkt. No. 92 at 34. Even if granted, such relief would not guarantee retroactive promotions. As such, retroactive pay would not serve as an "integral part" of injunctive relief and, therefore, is improperly characterized by the plaintiffs as equitable.[22] *See Harkless*, 427 F.2d at 324. Therefore, because the plaintiffs'

---

[22] In any event, the Court lacks jurisdiction to require retroactive promotions unless administrative remedies have been exhausted and a special selection board has convened and recommended a promotion. *See* 10 U.S.C. § 14502(g). This is not to say, however, that if the relevant military board were to retroactively promote a soldier, a court could not award backpay. *See Dehne v. United States*, 970 F.2d 890, 894 (Fed. Cir. 1992).

requested backpay in connection with failed promotions satisfies neither criterion to qualify as "equitable," it is barred by the defendants' sovereign immunity.

The Little Tucker Act, which provides that "district courts shall have original jurisdiction . . . of . . . claim[s] against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress," also fails to provide jurisdiction.  *See* 28 U.S.C. § 1346(a)(2).  That is because the Act "is itself only a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages."  *United States v. Testan*, 424 U.S. 392, 398 (1976).  The Act only "confers jurisdiction . . . whenever the substantive right exists."  *Id.*  Therefore, "[a] substantive right must be found in some other source of law" for a court to exercise jurisdiction.  *United States v. Mitchell*, 463 U.S. 206, 216 (1983).  Where, as with RFRA, "the substantive law on which [a plaintiff] relies can[not] fairly be interpreted to mandate an award of monetary damages against the government," a court lacks jurisdiction over that claim.  *See Chandler*, 272 F.3d at 530.

The plaintiffs' request for backpay for those seeking reinstatement, however, does not share the same fate.  Again, the Fifth Circuit has made clear that backpay is "an integral part of the equitable remedy of injunctive reinstatement."  *Harkless*, 427 F.2d at 324.  Although the Fifth Circuit has recognized that a claim for damages is not intertwined with injunctive relief when it constitutes a "separate" legal claim that provides distinct relief,[23] where a plaintiff seeks reinstatement—which entails "restoration to prior status"—the Fifth

---

[23] *See, e.g.*, *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 504 (1959) (distinguishing claims for treble damages and declaratory relief in an antitrust action); *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 475–77 (1962) (distinguishing claims for a money judgment and temporary and permanent injunctions in a breach-of-contract and trademark-infringement action).

Circuit has identified backpay as an "inextricable part" of that equitable relief. *Id.* Here, the plaintiffs seek offers of reinstatement for separated class members. *See* Dkt. No. 92 at 28, 34. Thus, under Fifth Circuit precedent, their claim for backpay is integral to that relief. Moreover, unlike cases where a claim for reinstatement had been previously dismissed, the claim for reinstatement here remains, so this is not a case where "the only remedy sought" is backpay. *See Terry*, 494 U.S. at 570. Therefore, because the plaintiffs seek reinstatement for prospective class members who remain separated from the Army, the defendants' sovereign immunity does not bar backpay in that context.

The defendants cite *Dehne*, 970 F.2d at 894, for the proposition that "backpay can only be awarded for work actually performed." Dkt. No. 106 at 36. In *Dehne*, however, the plaintiff did not seek backpay pursuant to a RFRA claim. Rather, he sought backpay under statutes that the court held neither expressly nor implicitly established a right to backpay for constructive military service. *Dehne*, 970 F.2d at 893. In contrast, here, RFRA provides that "[a] person whose religious exercise has been burdened in violation of this section may . . . obtain appropriate relief against a government." 42 U.S.C. § 2000bb-1(c). And, as explained above, such "appropriate relief" may include backpay because it is integral to the plaintiffs' equitable claim for reinstatement. Therefore, the plaintiffs may seek backpay in connection with their claims for reinstatement.

**4.     Conclusion**

For these reasons, the Court grants in part and denies in part the defendants' Motion to Dismiss (Dkt. No. 105). The defendants' rescission of the vaccine mandate, as directed by Congress, and their reversal of adverse actions against soldiers who sought a religious exemption have largely mooted the plaintiffs' claims. Therefore, the Court dismisses the

claims of the following plaintiffs without prejudice for lack of subject matter jurisdiction: Robert Schelske, Joshua Costroff, Samuel Galloway, and Zakai Bufkin.  In addition, the Court approves the parties' joint Stipulation of Dismissal (Dkt. No. 122) of the claims of Huntley Bakich, Samuel Conklin, Dominic Mell, Collin Morrison, Nicholas Saballa, and Peter Testa.  Those claims shall also be dismissed without prejudice pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii).

Nonetheless, the addition of Plaintiff Chrisman, who seeks relief related to his discharge, has breathed life into this otherwise moot action.  The Court finds that it retains jurisdiction to determine his claim.  Moreover, given the outcome-determinative nature of the exhaustion issue and because the Fifth Circuit has not squarely addressed it, the Court notes that it would seriously consider a motion to certify this Order for interlocutory appeal limited to the issue of whether Plaintiff Chrisman must exhaust administrative remedies before seeking judicial review of his discharge.

Finally, because the operative Motion to Dismiss superseded the defendants' original Motion to Dismiss, the Court denies the defendants' original Motion to Dismiss (Dkt. No. 88) as moot.  Given recent, significant developments in the facts and law governing this case, the Court also denies the plaintiffs' Motion for Class Certification (Dkt. No. 48), Motion for Class-Wide Preliminary Injunction (Dkt. No. 50), and Request to Update Class Definition (Dkt. No. 95) as moot without prejudice to refiling.  Any prospective motion for class certification or class-wide preliminary injunction shall be limited to the remaining claims not dismissed by this Order.

So ordered on September 14, 2023.

JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE