UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
SAN ANGELO DIVISION

| | |
|---|---|
| LUKE T. CHRISMAN, individually and on behalf of all others similarly situated, | |
| Plaintiff, | |
| v. | No. 6:22-CV-049-H |
| LLOYD J. AUSTIN, III, in his official capacity as United States Secretary of Defense, et al., | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

This case revolves around the Army's COVID-19 vaccine mandate and eleven service members who declined to receive the vaccine due to their sincerely held religious beliefs. Through complex, contentious, and often fast-paced litigation, the ten original plaintiffs won a preliminary injunction preventing the defendants from taking adverse action against them, but their claims were ultimately mooted out. However, the claims of one plaintiff, Luke Chrisman, survived, and the defendants later settled with him. The plaintiffs' attorneys now seek attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

The Court grants in part the plaintiffs' motion for attorneys' fees and costs (Dkt. No. 155). Although the ten original plaintiffs are not prevailing parties, Chrisman is a prevailing party due to the settlement order in this case. Based on the Court's calculation of the lodestar, the plaintiffs' attorneys are entitled to recover $942,347.19 in attorneys' fees and costs from the defendants.

1.    **Factual and Procedural Background**

The Court has recounted the factual and procedural background of this case in detail in two prior Orders.  Dkt. Nos. 78; 139.  In short, five active-duty service members in the U.S. Army and five cadets at the U.S. Military Academy at West Point (the original plaintiffs), along with one separated service member, sued the defendants—each a federally appointed Department of Defense (DoD) official—for violating their statutorily and constitutionally protected religious rights.  Dkt. Nos. 1; 93.  The plaintiffs alleged that the defendants had substantially burdened their religious exercise by routinely denying their religious-exemption requests to the COVID-19 vaccine mandate without any compelling interest or use of the least restrictive means to achieve that interest.  *Id.*  The plaintiffs thus challenged the adverse actions taken against them due to their refusal to vaccinate.  *Id.*

A.    **The Army's Vaccine Mandate**

In August 2021, the military issued its COVID-19 vaccine mandate.  Specifically, the Department of Defense issued a directive entitled "Mandatory Coronavirus Disease 2019 Vaccination of Department of Defense Service Members."  Dkt. No. 14 at 6.  It directed each military branch to pursue "full vaccination" of its service members against COVID-19.  *Id.*  A service member was considered "fully vaccinated" after receiving an FDA-approved or emergency-use vaccine, but not if he had a previous COVID-19 infection.  *Id.*  The branches were ordered to "promulgate appropriate guidance" and "impose ambitious timelines" for implementation of this mandate.  *Id.* at 6–7.

Taking heed of this mandate, in September 2021, the Army issued Fragmentary Order (FRAGO) 5 to Headquarters Department of the Army (HQDA) Execution Order

(EXORD) 225-21, "COVID-19 Steady State Operations" (hereinafter FRAGO 5).[1] Dkt.
No. 39-1 at 264.  FRAGO 5 provided that any soldier who refused to take the vaccine
without an approved exemption must be "legally ordered to do so."  FRAGO 5 ¶ 3.D.8.B.2.
"[F]ailure to obey th[at] order may result in adverse administrative or punitive action."  *Id.*

   The Army's vaccine mandate allowed for two types of exemptions: medical and
administrative.  *Id.* ¶ 3.D.8.B.5.  Medical exemptions "may be temporary (up to 365 days)
or permanent."  *Id.* ¶ 3.D.8.B.5.A.  Administrative exemptions included religious
exemptions and those provided for in the Army's existing policies, including exemptions for
soldiers already near the end of their service.  *Id.* ¶ 3.D.8.B.5; *see also* Army Regulation
40-562 ¶ 2-6(b), Immunizations and Chemoprophylaxis for the Prevention of Infectious
Diseases (Oct. 7, 2013).  An applicant's healthcare provider could unilaterally approve a
temporary medical exemption, and a permanent medical exemption only required approval
from the Regional Health Command-Commanding General where the applicant was
assigned.  Dkt. No. 39-1 at 267–68.  A denial of a permanent medical exemption could be
appealed to the Surgeon General.  *Id.* at 268.

   In contrast, a religious exemption required the applicant to submit a request in
memorandum format and meet with a chaplain, healthcare provider, and immediate
commander.  *Id.* at 268–70.  The request was then processed up the chain of command to
the Surgeon General, with each commander making a recommendation of approval or
denial.  *Id.*  If the request was denied, the applicant could appeal to the Assistant Secretary
of the Army (Manpower and Reserve Affairs) (ASA (M&RA)), but the appeal had to go

---

[1] Available at: https://armyreup.s3.amazonaws.com/site/wp-content/uploads/2021/09/
14205311/FRAGO-225-21.pdf [https://perma.cc/W2D9-X27H].

through the soldier's entire chain of command again, with updated recommendations, and a new chaplain and medical provider would conduct a supplementary review of the record. Dkt. No. 71 at 10–11.

FRAGO 5 stated that the review process must comply with the Army's existing policies regarding religious exemptions, which specifically implicated the Religious Freedom Restoration Act (RFRA).  FRAGO 5 ¶ 3.D.8.B.5.B; *see* DoD Instruction 1300.17 ¶ 3.2(d), Religious Liberty in the Military Services (Sept. 1, 2020);[2] Army Regulation 600-20 ¶ 5-6(a)(4), Army Command Policy (July 24, 2020).[3]  However, the military struggled to comply with the applicable standards.  *See* Dkt. No. 14 at 26.  As of December 8, 2022, the Army had denied 1,913 religious-exemption requests and approved 123.  Dkt. No. 71 at 8.

Further, the Army set forth dire consequences for those who refused the vaccine. Pursuant to a directive by the Secretary of the Army, an unvaccinated soldier would be "flagg[ed]" until "[he] [was] fully vaccinated, receive[d] an approved medical or administrative exemption, or [was] separated from the Army."  Dkt. No. 14 at 13.  Flagged soldiers were not eligible for "[f]avorable personnel actions," including, but not limited to, reenlistment, promotion, attendance at military and civilian schools, or assumption of command.  *Id.* at 14.  Commanders were also authorized to "impose bars to continued service . . . for all [s]oldiers who refuse the mandatory vaccination order without an approved exemption or a pending exemption request."  *Id.*

---

[2] Available at: https://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodi/130017p.pdf [https://perma.cc/72DB-D7S5].

[3] Available at: https://www.armyresilience.army.mil/ard/images/pdf/Policy/600-20%20Army%20 Command%20Policy.pdf [https://perma.cc/ZX58-HC7J].

If the soldier's request for an exemption was denied, in accordance with FRAGO 5, his commander would request issuance of a General Officer Memorandum of Reprimand (GOMOR).  Dkt. No. 39-1 at 274.  The soldier would receive an opportunity to respond, and the General Officer would decide whether to store the GOMOR in the soldier's permanent file.  *Id.* at 275.  In addition, under FRAGO 5 and a second directive by the Secretary of the Army, commanders were required to initiate separation proceedings against a noncompliant soldier.  *Id.*; Dkt. No. 14 at 18.  The basis for any such separation was, with respect to enlisted personnel, the "Commission of a Serious Offense"; with respect to officers, "Misconduct, Moral or Professional Dereliction"; and with respect to cadets, "Misconduct."  Dkt. No. 14 at 18–19, 21.  Barring any "additional misconduct," personnel separated on this basis were "issued either an Honorable or General (under honorable conditions) characterization of service."  *Id.* at 18.  They were "not . . . eligible for involuntary separation pay" and "may be required to repay" portions of "unearned" advancements.  *Id.* at 20.  Exceptions were made for soldiers who voluntarily separated or retired and for soldiers close to the end of their service, but commanders were otherwise directed to process separation actions "as expeditiously as possible."  *Id.* at 18–20.

### B.    The Original Plaintiffs

The ten original plaintiffs brought suit challenging the Army vaccine mandate in October 2022.  Each had requested an exemption to the mandate due to religious opposition to the use of fetal cell lines in developing the COVID-19 vaccine.  Dkt. No. 14 at 37, 64, 99, 122, 149, 184, 225, 261, 281, 319.  The plaintiffs' assigned chaplains had confirmed the sincerity of their beliefs.  Dkt. Nos. 14 at 43, 80, 101, 123, 152, 232, 259, 284, 321; 39 at 246.  However, the Surgeon General denied each plaintiff's request for a religious

exemption in strikingly similar denial letters, with boilerplate language. *See* Dkt. Nos. 14 at 46, 124, 161, 193, 233, 263, 287, 327; 39 at 59, 95.  And on appeal, the ASA (M&RA) affirmed the denials with uniform template letters and boilerplate language. *See* Dkt. Nos. 14 at 91, 113, 137, 205, 253, 273, 292; 37-2 at 2.

After submitting their requests for religious exemptions, the plaintiffs received adverse treatment by the Army.  They collectively complained of having been passed over for leadership roles, Dkt. No. 14 at 182; barred from attending career-advancing courses and trainings, *id.* at 33, 120, 279–80, 314–15; restricted from transferring to different posts, *id.* at 315; precluded from participating in events, trips, internships, and athletics, *id.* at 97, 182, 223, 260; and harassed and alienated by leadership, *id.* at 62, 223.  Nearly every plaintiff had been issued a GOMOR from his commander, formally denoting the Army's initiation of separation proceedings against him for his refusal to obey the "lawful order" that he take the COVID-19 vaccine.  Dkt. Nos. 14 at 207; 39-1 at 364, 366–67; 47-1 at 2, 4, 6; 56-1 at 2.

The original plaintiffs alleged that the defendants had violated their rights under RFRA and the First Amendment by substantially burdening their sincerely held religious beliefs without a compelling interest or narrow tailoring to achieve that interest.  Dkt. No. 1 ¶¶ 54–71.  The plaintiffs sought relief in the form of: (1) a declaration that the challenged actions were unconstitutional and illegal; (2) class certification of those similarly situated to the plaintiffs; (3) a preliminary injunction enjoining the defendants from taking punitive action against the plaintiffs and those similarly situated due to their requests for religious exemptions to the vaccine mandate; and (4) a permanent injunction (i) enjoining the defendants from retaliating, discriminating, or taking punitive measures against those who participate in this litigation or request a religious exemption, (ii) directing the defendants to

"discontinue their religious discrimination and eradicate it root and branch," and
(iii) directing the defendants to reprocess religious-exemption requests without
discrimination and provide restorative relief as necessary.  *Id.* at 22–23.

    C.    The Preliminary Injunction

    The original plaintiffs then sought a preliminary injunction to "enjoin [the
d]efendants from taking further punitive actions" against them due to their refusal to take
the COVID-19 vaccine "in violation of their sincerely held religious beliefs."  Dkt. No. 29 at
1.  The motion was fully briefed (Dkt. Nos. 38; 46), and the parties presented argument and
evidence to the Court in a hearing (Dkt. No. 77).

    The Court then granted the preliminary injunction on December 21, 2022.  Dkt. No.
78.  It found that the plaintiffs were likely to succeed on their claim under RFRA because
they "met their burden of demonstrating the sincerity of their religious beliefs and the
substantial burden imposed by the vaccine mandate on their religious exercise," and the
defendants failed to "demonstrat[e] a compelling governmental interest in burdening the
plaintiffs' religious exercise or that the vaccine mandate is the least restrictive means to
achieve that interest."  *Id.* at 41–42, 63.  The Court also found that the plaintiffs would be
irreparably harmed apart from preliminary relief.  *Id.* at 59.

    Thus, the Court enjoined the defendants "from taking or continuing any disciplinary,
punitive, or separation measures against the plaintiffs," including but not limited to
"adverse administrative actions, non-judicial punishment, administrative demotions,
administrative discharges, and courts-martial."  *Id.* at 63.  The Court further ordered that
"[t]he defendants may not initiate or continue any administrative separation or punitive
processes against the named plaintiffs."  *Id.*  Additionally, the Court prohibited the

defendants from "process[ing] any of the cadet-plaintiffs through administrative boards due to their vaccination status or impos[ing] any other measures that interrupt their ability to undertake their course of study, including discontinuing or prohibiting them from attending classes." *Id.* The Court declined, however, to "preclude the defendants from considering the plaintiffs' vaccination status in making deployment, assignment, and other operational decisions." *Id.* (citing *Austin v. U.S. Navy Seals 1–26*, 142 S. Ct. 1301, 1301 (2022)).

### D. The Rescission of the Mandate

However, when it granted the preliminary injunction, the Court noted that Congress had recently passed the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (NDAA). *Id.* at 3. The NDAA provided that "[n]ot later than 30 days" after its enactment, "the Secretary of Defense shall rescind the mandate that members of the Armed Forces be vaccinated against COVID-19." Pub. L. No. 117-263, § 525, 136 Stat. 2395, 2571 (2022). The President signed the NDAA into law on December 23, 2022. *Id.* In response, the Army immediately suspended separation proceedings against soldiers who had declined to receive the COVID-19 vaccine. FRAGO 35 to HQDA EXORD 225-21 ¶ 3.D.28.

In accordance with this congressional directive, on January 10, 2023, Secretary of Defense Lloyd Austin formally rescinded the order that had mandated the vaccination of active-duty service members across the military. Dkt. No. 108 at 46. Secretary Austin declared that "[n]o individuals currently serving in the Armed Forces shall be separated solely on the basis of their refusal to receive the COVID-19 vaccination if they sought an accommodation on religious . . . grounds." *Id.* Secretary Austin also directed the military to "update the records of such individuals to remove any adverse actions solely associated with denials of such requests, including letters of reprimand." *Id.* Accordingly, the Army

ordered the "immediate[]" suspension of "adverse administrative actions based solely on a soldier's refusal to comply with the rescinded mandate."  FRAGO 37 to HQDA EXORD 225-221 ¶ 3.D.30.

Deputy Secretary of Defense Kathleen Hicks then issued a memorandum confirming that, in accordance with the NDAA, the rescission of the COVID-19 vaccine mandate "thereby also rendered all DoD Component policies, directives, and guidance implementing" the mandate "as no longer in effect."  Dkt. No. 108 at 90.  Secretary Hicks thus directed each military branch to "formally rescind" any conforming guidance still in place "as soon as possible" to the extent it had not already done so.  *Id.*

Secretary of the Army Christine Wormuth then issued guidance "[a]ccordingly . . . rescind[ing] all Department of the Army policies specifically associated with the implementation of the COVID-19 vaccination mandate."  *Id.* at 92.  She ordered that "[n]o currently serving Soldier shall be separated based solely on [his] refusal to receive the COVID-19 vaccine if [the soldier] sought an exemption on religious . . . grounds."  *Id.*  She directed the Army to update the personnel records of soldiers whose religious-exemption requests were denied by rescinding all pending involuntary-separation actions, favorably closing flags and removing GOMORs and other adverse actions, eliminating any bars to their continued service, and correcting negative evaluation reports related to their refusal to vaccinate.  *Id.* at 93–94.  Secretary Wormuth also stated that she "continue[d] to withhold the authority to impose any non-judicial and judicial actions based solely on a Soldier's refusal to receive the COVID-19 vaccine while the mandate was in effect."  *Id.* at 93.  However, for soldiers who had already been discharged, Secretary Wormuth advised that they must exhaust administrative processes, including "petition[ing] the Army Discharge

Review Board and the Army Board for Correction of Military Records to request corrections to their personnel records," such as "records regarding the characterization of their discharge." *Id.* at 95. The Army then carried out Secretary Wormuth's orders. HQDA EXORD 174-23 ¶¶ 3.A.1.B, 3.C.1.B, 3.C.1.C–G, 3.D.1.

### E.    The Amended Complaint and the Motion to Dismiss

In the wake of the NDAA, the defendants moved to dismiss this case. Dkt. No. 88. In response, the plaintiffs filed an amended complaint. Dkt. No. 92. The amended complaint added a new plaintiff, Luke Chrisman, who was separated from the Army in November 2022 due to his refusal to comply with the vaccine mandate after the denial of his religious-exemption request. *Id.* at 15–16. Thus, in addition to the relief requested in their initial complaint (Dkt. No. 1), the plaintiffs asked the Court to, with respect to Chrisman and others similarly situated to him, upgrade their discharges to "honorable," remove adverse characterizations and prohibitive re-enlistment codes from personnel files, and offer reinstatement. *Id.* at 34.

The amended complaint also asked the Court to order the removal of any adverse actions or reports from personnel records and "direct the institution of special promotion selection boards" to consider promotions for those who were denied a promotion or denied the ability to attend a course required for promotion. *Id.* Moreover, the plaintiffs asked the Court to enjoin and direct the revision of the Army's current policy for evaluating religious-exemption requests to immunization requirements, specifically "preventing [the d]efendants from using generalized compelling interests to determine whether a Soldier is eligible for an exemption and implementing a double standard for the processing of medical or other administrative exemptions." *Id.* at 35.

The defendants then moved to dismiss the amended complaint, arguing that the rescission of the vaccine mandate rendered the case moot.  Dkt. No. 105.  The Court granted in part and denied in part the motion to dismiss.  Dkt. No. 139.  It determined that the defendants' rescission of the vaccine mandate and its implementing guidance, including its removal of adverse actions and halting of separation proceedings, was involuntary and largely mooted the plaintiffs' claims.  *Id.* at 21–26.  The Court also found that any voluntary action in precluding commanders from considering vaccination status in operational decisions was entitled to a presumption of good faith and that no other exception to mootness applied.  *Id.* at 26–38, 41–42.  As a result, the plaintiffs' motion for class certification was also moot.  *Id.* at 39–40.

The Court then determined that the original plaintiffs lacked standing because they could not demonstrate a continuing injury-in-fact.  *Id.* at 42–64.  Among other reasons, the defendants had taken all reasonable measures to remove adverse actions from those plaintiffs' records, and there was no credible threat of prosecution by the defendants against the plaintiffs.  *Id.* at 43–45, 54–60.  However, the Court concluded that Chrisman's claim remained live.  *Id.* at 64–71.  He had alleged a continuing injury in the form of his separation and general discharge citing "Misconduct (Serious Offense)," and the Court concluded that he did not need to administratively exhaust his claims.  *Id.*

Accordingly, the Court approved the joint stipulation of dismissal of the claims of six plaintiffs (Dkt. No. 122) and dismissed without prejudice the claims of the remaining original plaintiffs.  *Id.* at 77–78.  It also denied the pending motions for class certification (Dkt. No. 48), a class-wide preliminary injunction (Dkt. No. 50), and to update the class

definition (Dkt. No. 95) as moot without prejudice.  *Id.* at 78.  However, Chrisman's claim

continued.  *Id.*

### F.    Current Posture

About two months after the Order resolving the motion to dismiss, Chrisman and the

defendants settled this case at mediation, and the Court signed and entered the parties'

Agreed Order Resolving Claims.  Dkt. Nos. 150; 151.  The agreed order required the

defendants to make certain corrections to Chrisman's military records:

> A.  Correction of Plaintiff Chrisman's Form DD-214 . . . :
>
> i.  Upgrade of Plaintiff Chrisman's discharge characterization to "Honorable."
>
> ii.  Correction of the narrative explanation provided for Plaintiff Chrisman's separation to "Secretarial Authority."
>
> iii. Correction of Plaintiff Chrisman's separation code to correspond with the corrected narrative explanation.
>
> iv.  Correction of Plaintiff Chrisman's reentry code to "1."
>
> B.  Defendants shall remove other adverse actions on Plaintiff Chrisman's military records related to the substance of this matter, including removal of Plaintiff Chrisman's General Officer Memorandum of Reprimand.

Dkt. No. 150 at 1–2.  The Court retained jurisdiction to enforce the required corrections and

over any claim for attorneys' fees and costs.  *Id.* at 2.  All other claims were dismissed with

prejudice.  *Id.*

The plaintiffs then moved for an award of attorneys' fees and costs, pursuant to 42

U.S.C. § 1988.  Dkt. No. 155.  The defendants responded (Dkt. No. 160), and the plaintiffs

replied (Dkt. No. 166).  The Court then granted the defendants leave to file a surreply (Dkt.

No. 171), which they did (Dkt. No. 175).  The motion is ripe for consideration.

2.     **Standard of Review**

Under the "American Rule," parties must generally bear their own attorneys' fees. *See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247 (1975). However, under 42 U.S.C. § 1988, "[i]n any action or proceeding to enforce a provision of . . . the Religious Freedom Restoration Act of 1993 . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs[.]" 42 U.S.C. § 1988(b). Such awards in civil-rights cases "facilitate plaintiffs' access to the courts to vindicate their rights by providing compensation sufficient to attract competent counsel." *McClain v. Lufkin Indus., Inc.*, 649 F.3d 374, 381 (5th Cir. 2011).

As a threshold matter, courts must determine whether the party seeking fees is a "prevailing party." A plaintiff prevails "when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Farrar v. Hobby*, 506 U.S. 103, 111–12 (1992). Once this standard is met, "a prevailing plaintiff should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983) (internal quotation marks and quotation omitted).

Then, the court must determine what fee is "reasonable," using a two-step process. *Id.* at 433. First, it must calculate the lodestar, or "the number of hours reasonably expended multiplied by the prevailing hourly rate in the community for similar work." *Jimenez v. Wood County*, 621 F.3d 372, 379 (5th Cir. 2010), *revised on other grounds*, 660 F.3d 841 (5th Cir. 2011) (en banc). The movant must show "the reasonableness of the hours billed and that the attorneys exercised billing judgment." *Black v. SettlePou, P.C.*, 732 F.3d 492, 502 (5th Cir. 2013). Such a showing requires an adequate record "of the hours charged

and of the hours written off as unproductive, excessive, or redundant." *Saizan v. Delta Concrete Prods. Co.*, 448 F.3d 795, 799 (5th Cir. 2006). The record cannot be "so vague" as to "preclude[] meaningful review" of the work performed during the hours specified. *League of United Latin Am. Citizens No. 4552 (LULAC) v. Roscoe Indep. Sch. Dist.*, 119 F.3d 1228, 1233 (5th Cir. 1997). The movant must also produce evidence "that the requested rates are in line with those prevailing in the relevant community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Wheeler v. Mental Health & Mental Retardation Auth. of Harris Cnty.*, 752 F.2d 1063, 1073 (5th Cir. 2013).

Second, the court may adjust the lodestar upwards or downwards based on the twelve *Johnson* factors. *Jimenez*, 621 F.3d at 380. "[T]here is a 'strong presumption' that the lodestar figure is reasonable" because it generally already accounts for "most, if not all, of the relevant factors constituting a 'reasonable' attorney's fee." *Perdue v. Kenny A. ex rel. Winn*, 599 U.S. 542, 553–54 (2010) (quoting *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 566 (1986)). However, if the lodestar does not in fact adequately account for a relevant factor, an adjustment may be justified. *See id.* at 554. The court may consider: (1) the time and labor required; (2) the novelty and difficulty of the issues in the case; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee charged for those services in the relevant community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714,

717–79 (5th Cir. 1974), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87 (1989). Again, to avoid double counting, any factor accounted for in the initial lodestar calculation cannot justify further adjustment. *Black*, 732 F3d at 502.

### 3.    Analysis

In this case, Chrisman is a prevailing party entitled to recover attorneys' fees. However, the original plaintiffs are not prevailing parties, and the Court adjusts the lodestar calculation accordingly. Chrisman may recover $921,106.25 in attorneys' fees and $21,240.94 in costs, for a total of $942,347.19.

> ### A.    The original plaintiffs are not prevailing parties, but Chrisman is a prevailing party.

The Court concludes that the ten original plaintiffs are not prevailing parties under Fifth Circuit precedent because the preliminary injunction did not cause the defendants to moot this case. However, Chrisman is a prevailing party because the requirements of the agreed order in this case provided him with judicially sanctioned, material relief. Thus, Chrisman is entitled to recover attorneys' fees.

A plaintiff is a prevailing party when there has been a "material alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute." *Tex. State Tchrs. Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792–93 (1989). A plaintiff need not win on every claim; it is enough if he "has succeeded on 'any significant issue in litigation which achieve[d] some of the benefit the parties sought in bringing suit.'" *Id.* at 791–92 (alteration in original) (quoting *Nadeau v. Helgemoe*, 581 F.2d 275, 278–79 (1st Cir. 1978), *abrogated on other grounds by Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Hum. Res.*, 532 U.S. 598 (2001)). However, if "the plaintiff's success on a legal claim can

be characterized as purely technical or *de minimis*," he is not properly a prevailing party. *Id.*
at 792.

The Fifth Circuit applies a three-part test for prevailing-party status: "(1) the plaintiff
must achieve judicially-sanctioned relief, (2) the relief must materially alter the legal
relationship between the parties, and (3) the relief must modify the defendant's behavior in a
way that directly benefits the plaintiff at the time the relief is entered." *Romain v. Walters*,
856 F.3d 402, 406 (5th Cir. 2017) (quoting *Petteway v. Henry*, 738 F.3d 132, 137 (5th Cir.
2013)).  In other words, there must be "a court-ordered change in the legal relationship
between the plaintiff and the defendant." *Buckhannon*, 532 U.S. at 604 (cleaned up) (quoting
*Tex. State Tchrs. Ass'n*, 489 U.S. at 792).  The original plaintiffs fail this test, but Chrisman
passes it.

### i.   The preliminary injunction does not make the original plaintiffs prevailing parties.

Although the original plaintiffs were granted a preliminary injunction in this case,
they are not prevailing parties because that success did not cause the requisite changes in the
parties' legal relationship or the defendants' conduct.  The Supreme Court has not yet
addressed the question of whether winning a preliminary injunction makes a plaintiff a
prevailing party if there is no final decision on the merits.  *See Sole v. Wyner*, 551 U.S. 74, 83
(2007); *but see Stinnie v. Holcomb*, 77 F.4th 200, 203 (4th Cir. 2023) (addressing "whether a
preliminary injunction may ever confer 'prevailing party' status under 42 U.S.C.
§ 1988(b)"), *cert. granted sub nom. Lackey v. Stinnie*, 144 S. Ct. 1390 (2024) (No. 23-621).
However, under Fifth Circuit precedent, a plaintiff can sometimes be a prevailing party if
his "sought-for preliminary injunction has been granted and the case is thereafter mooted

before a final judgment on the merits." *Amawi v. Paxton*, 48 F.4th 412, 418 (5th Cir. 2022).

In that circumstance, a plaintiff:

> (1) must win a preliminary injunction, (2) based upon an unambiguous indication of probable success on the merits of the plaintiff's claims as opposed to a mere balancing of the equities in favor of the plaintiff, (3) that causes the defendant to moot the action, which prevents the plaintiff from obtaining final relief on the merits.

*Id.* at 417–18 (quoting *Dearmore v. City of Garland*, 519 F.3d 517, 524 (5th Cir. 2008)).  Thus, when a case becomes moot after the grant of a preliminary injunction, that injunction only confers prevailing-party status if the defendants mooted the case because of the injunction. *See id.* at 418.  The plaintiff may demonstrate causation by, "for example, . . . establishing a compelling timeline, an outright admission, or the statutory language itself." *Id.* at 419.  Ultimately, he must show that the mooting event was a "direct response to the district court's preliminary injunction." *Id.* at 418 (emphasis omitted) (quoting *Dearmore*, 519 F.3d at 524).

The first two requirements of the *Dearmore* test are easily met here.  The original plaintiffs won a preliminary injunction based upon an unambiguous indication of probable success on the merits.  Dkt. No. 78 at 41–59, 63.  However, the parties disagree as to whether the preliminary injunction caused the defendants to moot this case.  The plaintiffs assert that "the actual mooting actions—rescission of the adverse actions and a policy not to pursue enforcement for past violators who sought religious accommodations—were voluntary actions, not required by the NDAA, that post-dated the entry of injunctive relief." Dkt. No. 156 at 15–16.  However, the defendants argue that the plaintiffs cannot show a causal link between the preliminary injunction and the mooting actions.  Dkt. No. 162 at 13–15.  The Court concurs with the defendants.

This case closely parallels the situation in *Amawi v. Paxton*.  There, the plaintiffs sought to enjoin the enforcement of a Texas statute.  48 F.4th at 415.  However, before the hearing on the preliminary injunction, the legislature "voted out of committee a new bill . . . that would make [the challenged statute] inapplicable to" the plaintiffs.  *Id.* at 415.  The district court granted the preliminary injunction based on the plaintiffs' probable success on the merits.  *Id.*  Then, 12 days after the injunction was granted, the new bill was signed into law, which mooted the case.  *Id.*  The Fifth Circuit held that the plaintiffs were not prevailing parties because they could not "show[] that [the new bill] was passed *in direct response* to the district court's preliminary injunction."  *Id.* at 418 (emphasis in original).  The bill had been introduced in the legislature before the injunction was granted.  *Id.*  And the plaintiffs had provided no evidence "that the legislature had the preliminary injunction in mind when it completed passage of [the bill]."  *Id.*  The court also observed that "'[t]he mere fact that a legislature has enacted legislation that moots an [action], without more, provides no grounds for assuming that the legislature was motivated by' the 'unfavorable precedent.'"  *Id.* (alterations in original) (quoting *Am. Bar Ass'n v. FTC*, 636 F.3d 641, 649 (D.C. Cir. 2011)).

Similarly, the preliminary injunction in this case was granted after Congress had already passed the NDAA.  *See* Dkt. No. 78 at 3.  Like the new bill in *Amawi*, "[t]he introduction of the ameliorative statute . . . predated the district court's action," which undermines any inference that the mooting action was caused by the preliminary injunction.  *See* 48 F.4th at 419.  The NDAA was signed into law only a few days after the injunction was entered, and there is no indication that the President "had the preliminary injunction in mind when [he] completed passage" of the Act.  *See id.* at 418.  Finally, Secretary Austin's

rescission of the mandate was "require[d]" by the NDAA.  *See* Dkt. No. 108 at 46.  Thus, it cannot be said that this Court's preliminary injunction caused the primary mooting events in this case.

The defendants' removal of adverse actions from service members' records was not caused by the preliminary injunction, either.  The plaintiff argues that the removals were not required by the NDAA and were instead done to moot out this case.  Dkt. No. 156 at 15–16.  However, the Court has previously concluded that most of the defendants' "corrective action," including the removal of adverse actions, was not voluntary but instead compelled by Congress and the NDAA.  *See* Dkt. No. 139 at 23, 26.  In short, Congress's invalidation of the vaccine mandate also "invalidate[d] the procedures used to enforce it," such as the issuance of GOMORs and the initiation of separation proceedings against non-vaccinated service members.  *See id.* at 23–24; *see also* Dkt. Nos. 14 at 6, 13–14, 18; 39-1 at 264, 274–76.  The Court also concluded that the defendants' resolution of some of the original plaintiffs' injuries did not appear to be "a bad-faith attempt to moot this case," but a response to "a legally binding congressional directive."  Dkt. No. 139 at 40.  Accordingly, the Court finds that the removal of adverse actions was because of the NDAA, not because of the preliminary injunction in this case.

The plaintiffs also have not shown a sufficient causal link between the injunction and the defendants' decision to not punish service members who sought accommodations while potentially punishing those who did not.  The military's consideration of potential discipline only against service members who refused the vaccine without seeking an accommodation did contribute to the conclusion that the non-separated plaintiffs lacked an injury-in-fact.  *See* Dkt. No. 139 at 58–59.  However, the plaintiffs have failed to raise anything more than

mere argument that the decision was made because of this Court's injunction. *See* Dkt. Nos. 156 at 15–16; 166 at 7–8. The Court finds that this speculation does not support a finding that the defendants made their enforcement decisions "in direct response to" the injunction in this case. *See Amawi*, 48 F.4th at 418 (emphasis omitted).

Nor is there "a compelling timeline" that points towards causation. *See id.* at 419. The plaintiffs stress that the removal of adverse actions and decision not to punish those who sought accommodations took place after the preliminary injunction was entered. *See* Dkt. Nos. 156 at 12, 15–16; 166 at 7–8. But those actions also took place after the passage of the NDAA. As a result, the timing of these actions does not create a strong inference that they were caused by the injunction. The gaps in time between the injunction and the challenged decisions also undermine the plaintiffs' argument. For example, in *Dearmore*, "[a]lmost immediately following the district court's issuance of the preliminary injunction," the defendant informed the plaintiff that it would amend the challenged ordinance. 519 F.3d at 525–26. The defendant then amended the ordinance 12 days after the injunction. *Id.* at 526. However, that same kind of immediacy is not present here. Secretary Austin's rescission of the mandate and instruction that service members who sought accommodations would not be separated occurred about three weeks after the injunction. *See* Dkt. Nos. 78; 108 at 46. And Secretary Wormuth's policy memorandum was released about two months after the injunction. *See* Dkt. Nos. 78; 108 at 92. Because these actions also took place after the NDAA and were not particularly close in time to the injunction, the Court finds that the timing of these actions does not point towards causation.

In sum, although the original plaintiffs won a preliminary injunction on the merits, they cannot show that the defendants mooted this case in response to that injunction. The

timing of the NDAA and the defendants' other actions does not support such an inference. And the plaintiffs fail to provide any evidence beyond mere speculation that the defendants had this injunction in mind when making its decisions about adverse actions and potential punishment. Thus, the original plaintiffs are not prevailing parties for purposes of Section 1988.

### ii.     The agreed order makes Chrisman a prevailing party.

In contrast, the Court concludes that the agreed order entered in this case makes Chrisman a prevailing party. The Supreme Court has held that a "settlement agreement[] enforced through a consent decree" can confer prevailing-party status. *Buckhannon*, 532 U.S. at 604 (cleaned up). Accordingly, a plaintiff who obtains a settlement order signed by the district court that materially alters the legal relationship between the parties and modifies the defendant's behavior in a way that directly benefits the plaintiff at the time is a prevailing party. *See Romain*, 856 F.3d at 406–07. However, if there is no significant change in the relationship between the parties or the defendant's conduct or the benefit conferred is insignificant, the relief is "purely technical or de minimis," and the plaintiff is not a prevailing party. *Petteway*, 738 F.3d at 137; *Jenevein v. Willing*, 605 F.3d 268, 271 (5th Cir. 2010).

Here, the Court signed an Agreed Order Resolving Claims requiring the defendants to make certain corrections to Chrisman's military records within 30 days and retaining jurisdiction to enforce the terms of the Order. Dkt. No. 150. Thus, Chrisman obtained a settlement agreement enforced through a consent decree. And because the agreed order required the defendants to go above and beyond the relief given to other separated soldiers and provided a significant benefit to Chrisman, Chrisman is a prevailing party.

Court-ordered relief materially alters the legal relationship between parties if it makes the defendant do something it would not have done otherwise.  For example, in *Romain v. Walters*, the plaintiffs sued a state agency after it failed to request a state-wide waiver of a certain requirement for federal food stamp benefits.  856 F.3d at 404.  Although the plaintiffs moved for a temporary restraining order and a preliminary injunction, the case settled before those motions were decided.  *Id.* at 404–05.  The parties' proposed settlement order noted that the governor-elect intended to extend the waiver.  *Id.* at 405.  But the settlement order also required the defendant to ensure that benefits were issued by a certain date, ensure that the plaintiffs and class members would not lose their benefits in the meantime, and issue notice to the plaintiffs and class members about the order and new waiver.  *Id.* at 406.  The district court denied the plaintiffs' request for attorneys' fees, reasoning that any relief to the plaintiffs was attributable to the voluntary action of the state agency in applying for the waiver, not the suit.  *Id.*  However, the Fifth Circuit held that the plaintiffs were prevailing parties.  *Id.*  The court concluded that the order "materially altered the legal relationship of the parties by making [the d]efendant subject to additional requirements not included under the [food stamp] program."  *Id.*  Because the requirements "go above and beyond the requirements of simply applying for the waiver," the order changed the legal relationship.  *Id.*  Further, the order modified the defendant's behavior "by requiring [the d]efendant to both obtain the waiver and issue a new notice," and "[the p]laintiffs benefitted from no longer having to determine other ways to meet the work requirement."  *Id.* at 406–07.

Similarly here, the agreed order materially altered the relationship between the parties by requiring the defendants to do more than they otherwise would.  The defendants

argue that there was no material alteration because Chrisman would have received the same correction of his records by petitioning the Army Discharge Review Board or the Army Board for the Correction of Military Records.  Dkt. No. 162 at 16–18.  However, this argument proves the point.  Before the agreed order was entered, Chrisman was required to petition the review boards for his record corrections.  Dkt. No. 108 at 95; *see also* Dkt. No. 106 at 18 (defendants arguing that Chrisman had to administratively exhaust by petitioning the review boards before bringing suit for a correction of his records).  Thus, the agreed order required the defendants to go above and beyond their normal commitments—they had to make the corrections without Chrisman submitting a petition or going through the administrative process.  *See* Dkt. No. 150.  This is a sufficient change in the legal relationship between the parties.

Other requirements in the agreed order also changed the legal relationship between the parties.  The defendants note that "'there was no evidence that' the Board of Corrections would have denied [Chrisman's] records correction to begin with."  Dkt. No. 162 at 18 (quoting *Tex. State Tchrs. Ass'n*, 489 U.S. at 791–92).  But the relinquishment of that discretion is another material alteration in the relationship between the parties.  *Compare* Dkt. No. 163 at 3–4 (instructing that the review boards "generally" or "normally" should grant certain corrections), *with* Dkt. No. 150 at 1 ("Defendants *shall* make the following corrections to the military records of Plaintiff Chrisman . . . ." (emphasis added)).  The agreed order also required the defendants to make the corrections within 30 days, Dkt. No. 150 at 1, while a petition to the review boards could take a year or longer, *see Contact Information*, Army Rev. Bds. Agency, https://arba.army.pentagon.mil/contact.html [https://perma.cc/DY4V-B7HB].  And perhaps most significantly, the corrections required

– 23 –

by the agreed order are enforceable by this Court. Dkt. No. 150 at 2; *cf. Farrar*, 506 U.S. at 113 (noting that a material alteration of the legal relationship occurs when "the plaintiff becomes entitled to enforce a judgment, consent decree, or settlement against the defendant"). Thus, the Court concludes that the agreed order constituted a material alteration in the legal relationship between Chrisman and the defendants.

Further, the benefit to Chrisman is not de minimis. As the Court previously noted, Chrisman's general discharge citing "Misconduct (Serious Offense)" was part of a "tangible injury . . . inextricably intertwined with the alleged violation of his constitutional rights," and Chrisman "likely suffer[ed] irreparable harm every day that it remain[ed] unrectified." Dkt. No. 139 at 71. Chrisman thus benefits by receiving the corrections in a timely fashion, without any additional effort on his part or uncertainty as to the outcome. The corrections themselves are also a significant benefit because they "afford[] Mr. Chrisman lifetime G.I. Bill benefits, a clearing of his military records, and the ability to re-enlist or re-join the service in the future." Dkt. No. 166 at 9. With this relief, Chrisman has "'achieved exactly the outcome [he] desired' in the litigation," making him a prevailing party. *See Jenevein*, 605 F.3d at 272 (quoting *Walker v. City of Mesquite*, 313 F.3d 246, 250 (5th Cir. 2002)); Dkt. No. 157 at 79 ("For Mr. Chrisman, he received all of the relief that he wanted, a clearing of his record and name and an upgrade of his discharge.").

In sum, Chrisman is a prevailing party and may be awarded attorneys' fees under Section 1988. However, the ten original plaintiffs are not prevailing parties and may not receive fees, and the Court takes this into consideration when assessing the reasonableness of the fee request.

**B.    The Court multiplies the hours reasonably expended by Chrisman's attorneys by the prevailing rates in the community to reach a lodestar of $921,106.25.**

Having determined that plaintiff Chrisman is a prevailing party, the Court must determine what constitutes a reasonable fee award. *Hensley*, 461 U.S. at 429. To do so, the Court must calculate the lodestar. *Jimenez*, 621 F.3d at 379. Upon multiplying "the number of hours reasonably expended" by "the prevailing hourly rate in the community for similar work," the lodestar in this case equals $921,106.25. *See id.*

**i.    Hours Reasonably Expended**

First, the Court must determine the number of hours that Chrisman's attorneys reasonably expended in pursuit of his claims. *Id.* Upon review of the time entries, the Court finds that Chrisman's attorneys reasonably expended 1,097.96 hours on the litigation of his claims and the claims intertwined with his.

**a.    Chrisman's and the original plaintiffs' claims share a common core of facts and related legal theories.**

The Court notes that the plaintiffs' attorneys seek compensation for all time expended in this litigation—including time related to the original plaintiffs' claims. The plaintiffs have produced time entries as early as August 29, 2022, and claim a total of 1,871.3 hours expended. Dkt. Nos. 157 at 36; *see* Dkt. Nos. 156 at 27; 167 at 6–7, 25–26, 33, 38; 169-1 at 3; 173-1 at 6; 173-2 at 3. Although only Chrisman is a prevailing party for the purposes of Section 1988, because his claims and the original plaintiffs' claims are interrelated, plaintiffs' counsel may recover for hours expended in pursuit of the original plaintiffs' claims that were reasonably necessary for Chrisman's claims.

A prevailing party cannot be awarded fees for "work on an unsuccessful claim" or for a non-prevailing plaintiff because that work "cannot be deemed to have been 'expended

– 25 –

in pursuit of the ultimate result achieved.'" *See Hensley*, 461 U.S. at 435 (quotation omitted); *Ramirez v. Lewis Energy Grp.*, 197 F. Supp. 3d 952, 958 (S.D. Tex. 2016). However, if the relevant "claims . . . share a 'common core of facts' or 'related legal theories,' a fee applicant may claim all hours reasonably necessary to litigate those issues." *Fessler v. Porcelana Corona De Mexico, S.A. DE C.V.*, 23 F.4th 408, 416 (5th Cir. 2022) (alteration in original) (quoting *La. Power & Light Co. v. Kellstrom*, 50 F.3d 319, 327 (5th Cir. 1995)); *see also Hensley*, 461 U.S. at 435. Thus, a prevailing plaintiff may recover fees for time spent on a non-prevailing plaintiff's factually or legally related claims because that time contributed to the prevailing plaintiff's claim. *See Norris v. Hartmarx Specialty Stores*, 913 F.2d 253, 257 (5th Cir. 1990); *Williams v. Kaufman County*, No. 3:97-CV-0875-L, 2003 WL 21755913, at *7 (N.D. Tex. July 30, 2003); *Garcia v. Las Brisas Quick Hand Car Wash, Corp.*, No. 1:09-CV-22599, 2011 WL 13173814, at *5 (S.D. Fla. July 15, 2011), *report and recommendation adopted by* 2011 WL 13174050 (S.D. Fla. Aug. 1, 2011). And "[w]here time spent on unsuccessful issues is difficult to segregate, no reduction of fees is required." *Abell v. Potomac Ins. Co. of Ill.*, 946 F.2d 1160, 1169 (5th Cir. 1991). When faced with related successful and unsuccessful claims, the Court has discretion to either "attempt to identify specific hours that should be eliminated, or . . . simply reduce the award to account for the limited success." *Hensley*, 461 U.S. at 436–37.

Since Chrisman is the only prevailing party, the defendants argue that he can only recover fees for the work related to the amended complaint and the motion to dismiss that complaint. Dkt. No. 162 at 33–34. They assert that he cannot recover fees for work on the original plaintiffs' claims or the class claims because their claims and Chrisman's claims were not based on the same facts or legal theories. *Id.* at 34–35. In response, the plaintiffs

argue that all of their claims were intertwined, because "the same misconduct by [the d]efendants, with the same claims for that misconduct, were at the heart of all claims of all [p]laintiffs." Dkt. No. 166 at 17–18.

The Court finds that Chrisman's, the original plaintiffs', and the putative class's claims shared a common core of facts and related legal theories. All of the plaintiffs' claims arose out of the same central facts: the Army's COVID-19 vaccine mandate; the process required to apply for a religious exemption to the mandate; the denial of almost all requests for a religious exemption, including the plaintiffs'; and the use of adverse actions to enforce the mandate. *See* Dkt. Nos. 1 ¶¶ 1–3, 27–34, 38; 49 at 10, 12; 92 ¶¶ 1–3, 29–33, 35–37, 46; 95 at 1. The core of this lawsuit was not the specific adverse actions taken against each plaintiff, as the defendants attempt to assert, *see* Dkt. No. 162 at 34, but the processes the Army used to enforce the vaccine mandate against those with sincere religious objections. Further, the claims for Chrisman, the original plaintiffs, and the putative class rely on the same legal theories—that the defendants' enforcement of the vaccine mandate violated RFRA and the First Amendment. The plaintiffs all argued that the denial of their requests for a religious exemption created a substantial burden on their religious exercise; that the burden was not in furtherance of a compelling governmental interest, given the granting of secular exemptions; and that the vaccine mandate was not the least restrictive means or narrowly tailored. Dkt. Nos. 1 ¶¶ 54–59, 65–68; 49 at 12–14; 92 ¶¶ 69–74, 80–83. Thus, all of the plaintiffs' claims share the same core facts and law. And because the claims are interrelated, Chrisman may recover for "all hours reasonably necessary to litigate those issues," including time spent on the original plaintiffs' claims. *See Fessler*, 23 F.4th at 416.

This case is somewhat unusual because it is easier to identify the hours expended on Chrisman's successful claims. *See, e.g.*, Dkt. No. 157 at 54–55 (documenting the beginning of Siri & Glimstad's work to amend the complaint and the initial interview with Chrisman). Therefore, as a starting point for determining the reasonable number of hours expended, the Court considers the hours incurred in amending the complaint, the motion to dismiss the amended complaint, and the remainder of the litigation.

After a careful review of the billing records, the Court determines that plaintiffs' counsel spent 466.6 hours in those stages of the litigation. *See* Dkt. Nos. 157 at 54–69, 88–92, 117–21, 136–38; 167 at 6. For much of that legal work, it is impossible to segregate the time spent on Chrisman's claims from the time spent on the non-prevailing plaintiffs' claims, so the Court will not reduce those hours. *See Abell*, 946 F.2d at 1169. However, to the extent that the billing records indicate that work was clearly done only on behalf of a non-prevailing plaintiff, such as communications with a plaintiff by name or work regarding harms unique to a non-prevailing plaintiff, the Court eliminates those hours. *See id.*; *Norris*, 913 F.2d at 257 (noting that a prevailing party cannot recover fees "for any legal work undertaken solely to develop the discrete claims and issues of" non-prevailing plaintiffs). This results in the elimination of 75.6 hours. *See generally* Dkt. Nos. 157; 167. Thus, the Court finds that plaintiffs' counsel billed 391.0 hours in litigating Chrisman's successful claims from the amended complaint through the settlement:

| Attorney | Hours Billed | Non-Prevailing Plaintiffs | Total |
|---|---|---|---|
| Aaron Siri | 18.9 | - | 18.9 |
| Elizabeth Brehm | 6.6 | - | 6.6 |
| Wendy Cox | 187.3 | 59.3 | 128.0 |
| Dana Smith | 46.6 | 12.5 | 34.1 |
| Gina Mannella | 17.5 | 0.5 | 17.0 |
| Christopher Wiest | 93.6 | 2.4 | 91.2 |
| Thomas Bruns | 41.5 | 0.2 | 41.3 |
| John Sullivan | 54.6 | 0.7 | 53.9 |
| **Total** | 466.6 | 75.6 | **391.0** |

*See generally* Dkt. Nos. 157; 167.

Further, the Court also finds that much of the substantive legal work on the original plaintiffs' claims was reasonably necessary for and contributed to the successful litigation of Chrisman's claims. The time spent on the original complaint was necessary to establish the key facts and legal theories shared with Chrisman's claims. *Compare* Dkt. No. 1, *with* Dkt. No. 92. The preliminary-injunction litigation further developed those facts, such as the different processes for medical versus religious exemptions, and greatly advanced the legal arguments that the defendants' actions likely violated RFRA. *See* Dkt. Nos. 78 at 5–13, 41–59; 92 ¶¶ 34, 46. And the work performed by plaintiffs' counsel in litigating the mootness and standing issues in the first motion to dismiss was likely vital to the survival of Chrisman's claim. *See* Dkt. No. 139 at 64, 71. In short, Chrisman's success depended on his counsel's prior work in developing the facts and legal arguments at the heart of all of the plaintiffs' claims. Based on the billing records, the Court determines that plaintiffs' counsel expended a total of 514.5 hours in substantive legal work—research, drafting, reviewing,

revisions, and preparation for and participation in the preliminary-injunction hearing—in those stages of the litigation.  Those hours were allocated as follows:

| Attorney | Complaint | Preliminary Injunction | First Motion to Dismiss | Total |
|---|---|---|---|---|
| Aaron Siri | - | 24.1 | 2.0 | 26.1 |
| Elizabeth Brehm | 1.9 | 7.1 | - | 9.0 |
| Wendy Cox | 31.4 | 119.1 | 20.8 | 171.3 |
| Dana Smith | - | 23.8 | 24.5 | 48.3 |
| Gina Mannella | - | 5.8 | - | 5.8 |
| Christopher Wiest | 8.8 | 82.1 | 18.3 | 109.2 |
| Thomas Bruns | 3.0 | 64.5 | 13.2 | 80.7 |
| John Sullivan | 16.6 | 42.2 | 5.3 | 64.1 |
| **Total** | 61.7 | 368.7 | 84.1 | **514.5** |

*See generally* Dkt. No. 157.

Finally, plaintiffs' counsel is claiming an additional 326.1 hours spent litigating the attorneys' fees motion.  *See* Dkt. Nos. 167 at 6–7, 25–26, 33, 38; 169-1 at 3; 173-1 at 6; 173-2 at 3; *Cruz v. Hauck*, 762 F.2d 1230, 1233 (5th Cir. 1985).  The total hours at issue are:

| Attorney | Chrisman's Claims | Original Plaintiffs' Claims | Fee Request | Total |
|---|---|---|---|---|
| Aaron Siri | 18.9 | 26.1 | 10.7 | 55.7 |
| Elizabeth Brehm | 6.6 | 9.0 | 41.4 | 57.0 |
| Wendy Cox | 128.0 | 171.3 | 7.0 | 306.3 |
| Dana Smith | 34.1 | 48.3 | 135.6 | 218.0 |
| Catherine Cline | - | - | 20.1 | 20.1 |
| Gina Mannella | 17.0 | 5.8 | 21.8 | 44.6 |
| Nicky Tenney | - | - | 13.1 | 13.1 |
| Christopher Wiest | 91.2 | 109.2 | 42.8 | 243.2 |
| Thomas Bruns | 41.3 | 80.7 | 19.7 | 141.7 |
| John Sullivan | 53.9 | 64.1 | 13.9 | 131.9 |
| **Total** | 391.0 | 514.5 | 326.1 | **1,231.6** |

> **b.** **Although most of the hours expended are reasonable, certain reductions are necessary.**

To determine the number of hours for the lodestar, the Court must determine "whether the total number of hours claimed were reasonable and whether specific hours claimed were reasonably expended." *LULAC*, 119 F.3d at 1232. Courts must "exclude all time that is excessive, duplicative, or inadequately documented." *Jimenez*, 621 F.3d at 379–80. Accordingly, the fee applicant must demonstrate that they exercised billing judgment by recording both "the hours charged and . . . the hours written off as unproductive, excessive, and redundant." *Saizan*, 448 F.3d at 799. Further, "when the supporting documentation is too vague to permit meaningful review," the Court may "properly reduce or eliminate hours." *La. Power & Light Co.*, 50 F.3d at 326. "The proper remedy for omitting evidence of billing judgment . . . [is] a reduction of the award by a percentage intended to substitute for the exercise of billing judgment." *Saizan*, 448 F.3d at

799; *see also Aguayo v. Bassam Odeh, Inc.*, No. 3:13-CV-2951-B, 2016 WL 7178967, at *4

(N.D. Tex. Dec. 8, 2016) (noting that a court may either make line-item cuts or make "a

simple across-the-board reduction by a certain percentage . . . particularly when fee

documentation is voluminous" (quotation omitted)).

The defendants raise several challenges to the plaintiffs' billing judgment, arguing

that the hours claimed are vague, excessive, duplicative, and reflect non-compensable work.

*See* Dkt. No. 162 at 36–42.  The defendants urge that a reduction by at least 40% or 50% is

necessary to account for these issues.  *Id.* at 36, 42.  Most importantly, the defendants argue

that plaintiffs' counsel generally "billed an excessive total amount of hours on discrete

tasks," such as the preparation of the complaint, the preliminary-injunction motion, and the

amended complaint, and performed duplicative work on those tasks.  *Id.* at 38–40.  The

Court generally disagrees.

First, the Court rejects the defendants' argument that the hours spent on the initial

complaint and motion for preliminary injunction were excessive because those filings were

identical or overly similar to counsel's other challenges to the military vaccine mandate.  *See*

*id.*  Although the general legal theories underlying those cases are the same, the complaint

and preliminary-injunction motion in this case involved unique factual allegations about the

Army's particular policies and the plaintiffs, included documentation to support those

allegations, and discussed different authorities.  *Compare* Dkt. Nos. 1; 14; 30, *with* Pls.' Mot.

for an Emergency TRO & Prelim. Inj., *Doster v. Austin*, No. 1:22-cv-084 (S.D. Ohio Feb. 22,

2022), ECF No. 13.  Thus, the Court will not reduce plaintiffs' counsel's requested hours

merely because they previously brought cases with similar legal theories that had similar

pleadings or briefing.  Further, the Court has already reduced the hours billed on the initial

complaint by limiting the compensable hours for the initial complaint to those spent on substantive research, drafting, and revisions and omitting several hours related to developing the relevant facts for each original plaintiff.  *See* Dkt. No. 157 at 36–37.

In addition, the Court disagrees that the hours spent litigating the preliminary injunction were excessive or duplicative.  The preliminary injunction involved factual issues about the Army's enforcement of its vaccine mandate and the resulting harms to the plaintiffs; multiple justiciability arguments, including the propriety of judicial abstention with regard to military affairs; and religious-liberty law.  *See* Dkt. Nos. 30; 38; 46; 72.  Given the importance of the relief sought, the complexity of the issues, and the defendants' posture, *see, e.g.*, Dkt. No. 61 at 1–2 (noting that the defendants had refused to stay disciplinary action against the plaintiffs while the NDAA was pending), the Court finds that the time briefing the motion and in preparation for the hearing was reasonably necessary. Nor was preparing additional plaintiffs as potential witnesses and having them present at the hearing if their testimony were necessary, *see* Dkt. No. 166 at 23, unreasonably excessive. Finally, having five attorneys at the hearing was not necessarily duplicative.  For example, although Siri did not speak at the hearing, he was not a mere passive observer, as the defendants claim.  *See* Dkt. No. 162 at 39–40.  Rather, he participated in discussions with the clients before the hearing and outlined rebuttal points during the hearing.  *See* Dkt. No. 157 at 49; *see also Veasey v. Abbott*, No. 2:13-CV-193, 2020 WL 9888360, at *21 (S.D. Tex. May 27, 2020) (noting the value of second chairs and of teamwork between lawyers focused on different issues of the case), *aff'd*, 13 F.4th 362 (5th Cir. 2021).  Further, Sullivan served as the plaintiffs' in-district counsel in this case.  *See* Dkt. No. 26.  Thus, the Court declines to find that their presence at the hearing was unreasonable or duplicative.

Similarly, the Court determines that multiple attorneys contributing to the pleadings, motions, and briefing in this case was not improperly duplicative.  Wiest and Bruns have testified that the plaintiffs' attorneys each reviewed the pleadings "from the perspective of their experience, which . . . varied," due to the different areas of law involved in this case. Dkt. No. 157 at 78, 100.  In light of the intertwined, difficult issues in the case and the government's aggressive litigation posture, it is eminently reasonable that the plaintiffs' attorneys were continuously engaged in each stage of the litigation and brought their different perspectives and areas of expertise to bear.

However, the Court finds that the hours billed for the fee litigation are excessive. The fee litigation was more substantive than in an average case, given that the plaintiffs' status as a prevailing party was at issue, the discovery dispute, *see* Dkt. Nos. 158; 160; 161, and the defendants' motion to strike and file surreply, *see* Dkt. Nos. 168; 169; 171.  But each filing passed through each firm, with edits and substantive work often done at partner rates. *See* Dkt. Nos. 167 at 15–20, 25–26, 31–33, 38; 169-2 at 2–3; 173-1 at 5–6; 173-2 at 2–3.  And unlike the merits litigation, there are likely diminishing returns from receiving several unique perspectives on a more common motion.  The Court also notes that the hours expended on the fee litigation approach the hours expended on Chrisman's claims.  *See supra* Section 3.B.i.a.  Given these factors, a 20% reduction in the hours billed for the attorneys' fees litigation is appropriate.  *See Veasey*, 2020 WL 9888360, at *20 (noting cases reducing charges on fee litigation to 80%); *Kostic v. Tex. A&M Univ.-Com.*, No. 3:10-CV-2265-M, 2015 WL 9997211, at *8 (N.D. Tex. Dec. 28, 2015) (noting that a 20% reduction would sufficiently account for "any time entries that are duplicative, excessive, or vaguely recorded"), *report and recommendation adopted by* 2016 WL 407357 (N.D. Tex. Feb. 3, 2016).

The defendants also contend that plaintiffs' counsel used vague time entries, billed unreasonable hours related to travel, and billed for non-compensable clerical time.  Dkt. No. 162 at 37–38, 40–42.  Regarding the first point, hours may be reduced if the records are "too vague to permit meaningful review," such as where the entries are "not illuminating as to the subject matter" or "vague as to precisely what was done."  *La. Power & Light Co.*, 50 F.3d at 326 (quoting *Leroy v. City of Houston*, 906 F.2d 1068, 1080 (5th Cir. 1990)).  However, courts may also look to "the number of hours spent on such tasks, the more detailed entries surrounding them, and their dates of entry, which indicates the point in the proceedings in which the particular services were rendered."  *Olibas v. Native Oilfield Servs., LLC*, 104 F. Supp. 3d 791, 811 (N.D. Tex. 2015).  As to the second objection, courts in the Fifth Circuit often reduce fees for travel time by 50% unless there is some indication that the attorney was working while traveling.  *See Bowman v. Prida Constr., Inc.*, 568 F. Supp. 3d 779, 785–86 (S.D. Tex. 2021) (collecting cases).  Third, a plaintiff may recover fees for paralegal work only "if the work is legal rather than clerical."  *Vela v. City of Houston*, 276 F.3d 659, 681 (5th Cir. 2001).  In other words, the paralegal's work must be "similar to the work typically completed by attorneys."  *Bowman*, 568 F. Supp. 3d at 786 (quoting *City of Dimmit v. Helmerich & Payne Int'l Drilling Co.*, No. SA-16-CV-01049-RCL, 2018 WL 1095585, at *3 (W.D. Tex. Feb. 27, 2018)).  "Purely clerical or secretarial tasks," such as filing legal documents, calendaring events, communications regarding scheduling issues, and preparing, assembling, and redacting documents and exhibits, are not recoverable by either attorneys or paralegals.  *Id.* at 786–87 (quoting *Missouri v. Jenkins by Agyei*, 491 U.S. 274, 288 n.10 (1989)).  The Court addresses those objections as to the individual attorneys and paralegals in turn.

### 1.     Aaron Siri

Aaron Siri, the managing partner at Siri & Glimstad LLP, billed a total of 89 hours in this case, although the Court found that he is entitled to recover up to 55.7 hours.  *See supra* Section 3.B.i.a; Dkt. Nos. 156 at 27; 167 at 6–7; 169-1 at 3.  Much of his involvement in the case was through team calls, though he participated most substantively at the class-certification stage, at the preliminary-injunction hearing, and at mediation.  *See* Dkt. Nos. 157 at 44, 45–49; 167 at 13.  The Court has reviewed the billing entries challenged as vague by the defendants and finds that such entries do not warrant a further decrease in Siri's requested hours.  The subjects of these entries are reasonably inferable from context.

With regard to travel time, Siri's billing records note that he was working while traveling to Lubbock for the preliminary-injunction hearing (4.6 hours), so no deduction is necessary there.  Dkt. No. 157 at 49.  However, the entries for his travel to and from Lubbock for the mediation do not indicate that he was working while traveling.  Dkt. No. 167 at 13.  Thus, those entries for 5.1 and 5.6 hours are reduced by 50%.

### 2.     Elizabeth Brehm

Elizabeth Brehm, a partner at Siri & Glimstad, billed 76.5 hours in this case, and the Court determined that she may recover up to 57 hours.  Brehm participated in various calls and meetings throughout the litigation and reviewed most major filings, and she was heavily involved in the attorneys' fees litigation.  *See* Dkt. No. 167 at 15–20.  Although the defendants challenge some of her billing entries as vague, the Court finds that Brehm's entries are fairly detailed, and she has also exercised billing judgment by eliminating hours that may be duplicative or unnecessary.  *See, e.g.*, Dkt. No. 157 at 38, 44.  No reduction is necessary on that count.  However, Brehm's records reflect some instances of billing for

purely clerical work, such as transmitting documents.  *See* Dkt. No. 167 at 20.  The Court finds that 0.7 hours of clerical work should be deducted from her hours on the fee motion.

### 3.      Wendy Cox

An associate at Siri & Glimstad, Wendy Cox billed 523.5 hours in this litigation, and the Court found that she may recover up to 306.3 hours.  Much of this deduction was due to her role as the point-of-contact for the plaintiffs, since her hours suffered the most from the removal of hours solely related to non-prevailing plaintiffs.  Cox was heavily involved throughout the case in research, drafting, and corresponding with co-counsel and with the plaintiffs.  *See generally* Dkt. No. 157.  However, as the defendants note, many of Cox's entries are vague.  Dkt. No. 162 at 37.  Most of her entries regarding correspondence with plaintiffs do not identify the subject matter of the correspondence, making it more difficult to discern whether that time was reasonably expended.  *See, e.g.*, Dkt. No. 157 at 61 (listing "read and respond to emails from B. Schelske," "read and respond to emails from plaintiffs," "read and respond to text messages and phone call from plaintiffs").  A 10% deduction in Cox's hours, applied after all other deductions, is appropriate to account for the vagueness of her entries.

Further, the defendants challenge several of Cox's time entries as clerical work. Having reviewed the records, the Court concurs.  *See, e.g.*, Dkt. No. 167 at 12 (billing multiple 0.1-hour increments for correspondence about scheduling).  Accordingly, 4.7 hours are deducted from her hours on Chrisman's claims and 0.1 hour is deducted from her hours on the fee motion.

### 4.     Dana Smith

Dana Smith, an associate at Siri & Glimstad, billed 310.1 hours in the case, and the Court determined that she was entitled to up to 218 hours.  Like Cox, Smith was involved in research, reviewing filings, and correspondence throughout much of the case, but the bulk of her hours was billed in the fee litigation.  *See* Dkt. No. 167 at 15–20.  Besides arguing that some of the hours Smith billed were excessive or duplicative, as addressed above, the defendants do not identify any particular challenges to Smith's records in their brief. However, in its review of the billing records, the Court has identified 0.7 hours of clerical work that are thus deducted from Smith's hours on the fee motion.  *See* Dkt. No. 167 at 16 (billing for organizing documents in Clio).

### 5.     Catherine Cline

Another associate at Siri & Glimstad, Catherine Cline, only entered the litigation in the attorneys' fees fight and billed 20.1 hours.  Her work centered around research and drafting related to the defendants' request for discovery and an extension.  *See* Dkt. No. 167 at 18–19.  The Court did not identify any clerical work or other required deductions.

### 6.     Christopher Wiest

Christopher Wiest is the sole member and owner of Chris Wiest, Attorney at Law, PLLC, and he billed 317.5 hours in this case.  Dkt. Nos. 156 at 27; 167 at 25–26; 173-2 at 3. The Court then found that he could recover up to 243.2 hours.  *See supra* Section 3.B.i.a. Wiest was involved in research, drafting, and editing almost all of the pleadings and briefings in this case, and he also participated in both the preliminary-injunction hearing and the mediation.  *See* Dkt. No. 157 at 85, 87, 92.  Although Wiest does bill in larger intervals than most of his counsel, such increments are reasonable given the nature of his tasks.  *See,*

*e.g.*, *id.* at 85 (billing 8.4 hours to "[d]raft, edit, and revise Preliminary Injunction Motion"). The defendants argue that several of Wiest's billing records are vague, such as describing "[e]mails with DOJ" without any indication of subject matter.  *See* Dkt. No. 157 at 87. However, the Court finds that in the context of the surrounding entries, such as the lead-up to the preliminary-injunction hearing, the entries are not so vague that they preclude review and do not require a reduction.

However, the Court does find that 3.0 hours billed are non-compensable clerical work because they relate to preparing or assembling appendices.  Dkt. No. 157 at 89–90; *see Bowman*, 568 F. Supp. 3d at 786.  The Court deducts that time from Wiest's claimed hours. Further, three of Wiest's billings for travel time do not indicate that he was working during that time, so the Court reduces those hours by 50%.  Dkt. No. 157 at 87, 92.

### 7.    Thomas Bruns

Thomas Bruns is a named partner at Bruns, Connell, Vollmar & Armstrong, LLP. He billed 181.6 hours in this litigation, which the Court determined should be 141.7 hours. *See supra* Section 3.B.i.a; Dkt. Nos. 156 at 27; 167 at 33; 173-1 at 6.  Bruns participated in review and revisions of multiple pleadings and motions and attended the preliminary-injunction hearing.  *See* Dkt. No. 157 at 108–10, 112–13.  The Court has reviewed the entries that the defendants allege to be vague and find that they are generally surrounded by entries that offer more context, so the Court can reasonably review those hours.  Further, the Court has not identified any clerical work billed as legal work.  However, Bruns' travel entries do not indicate that he worked while traveling, so a 50% reduction to those hours is appropriate.  *Id.* at 113.

### 8.    John Sullivan

John Sullivan owns S|L Law PLLC and billed 173.1 hours in this case, and the Court found that 131.9 hours are compensable.  *See supra* Section 3.B.i.a; Dkt. Nos. 156 at 27; 167 at 38; 169-1 at 3.  Most of his work involved reviewing and revising filings, and he attended both the preliminary-injunction hearing and the mediation.  *See* Dkt. No. 157 at 134, 136, 138.  Once again, the defendants challenge several of his billing entries as overly vague, such as documenting correspondence without its subject matter.  *See, e.g.*, *id.* at 136. However, the Court finds that the timing of those entries, such as in the middle of correspondence with the defendants leading up to the preliminary-injunction hearing, permits the Court to find that they are not overly vague.

The Court does note that several of Sullivan's billing entries reflect two or more tasks without indicating how long each task took.  *See, e.g.*, *id.* at 134 (billing 2.7 hours for "[r]eview and evaluate Complaint; emails w/legal team re: case").  Such entries are generally for short enough periods of time that the Court can infer that the time was reasonable.  As to his travel time, Sullivan billed 9.3 hours for "[a]ttend PI hearing; travel from hearing," without any indication that he was working while traveling.  *Id.* at 136. Based on the other billing entries in this case, the Court determines that the hearing lasted 6 hours and concludes that the remaining 3.3 hours in that entry represent Sullivan's travel time.  *See id.* at 49, 136.  Those 3.3 hours are reduced by 50%.  Further, the Court found one 0.1 entry of non-billable clerical work, correspondence about service, which it deducts from Sullivan's hours.  *Id.* at 137.

### 9.    Gina Mannella

Gina Mannella is a paralegal at Siri & Glimstad who provided almost all of the billed paralegal services throughout this litigation.  The defendants argue that none of her hours are compensable because all of her work was clerical and non-legal.  Dkt. No. 162 at 40–41. The Court disagrees.  Some of Mannella's tasks, such as redacting documents, assembling appendices, and filing documents, *see* Dkt. No. 157 at 57, 59, are indeed clerical and non-compensable.  *See Bowman*, 568 F. Supp. 3d at 786–87.  The Court has identified 7.3 hours related to clerical tasks that must be deducted from Mannella's hours on Chrisman's claims and 1.0 hour that must be deducted from her time on the fee motion.  However, other tasks, such as reviewing and proofreading pleadings, *see* Dkt. No. 157 at 60, are similar to an attorney's work and are properly billable.  *Bowman*, 568 F. Supp. 3d at 786.

### 10.    Nicky Tenney

Finally, Nicky Tenney is another paralegal at Siri & Glimstad who worked on the attorneys' fees litigation.  The Court's review of the records revealed 0.4 hours of non-billable clerical work, which it deducts from her hours.

In sum, the Court has carefully reviewed the billing records and made hourly deductions of non-compensable clerical work and percentage deductions to account for excessive hours, vagueness, or travel time.  The following hours were reasonably expended on the litigation:

| Attorney | Chrisman's Claims | Original Plaintiffs' Claims | Fee Request | Total |
|---|---|---|---|---|
| Aaron Siri | 13.55 | 26.1 | 8.56 | 48.21 |
| Elizabeth Brehm | 6.6 | 9.0 | 32.56 | 48.16 |
| Wendy Cox | 110.97 | 154.17 | 4.83 | 269.97 |
| Dana Smith | 34.1 | 48.3 | 107.92 | 190.32 |
| Catherine Cline | - | - | 16.08 | 16.08 |
| Gina Mannella | 9.7 | 5.8 | 16.64 | 32.14 |
| Nicky Tenney | - | - | 10.16 | 10.16 |
| Christopher Wiest | 88.2 | 101.3 | 34.24 | 223.74 |
| Thomas Bruns | 41.3 | 74.75 | 15.76 | 131.81 |
| John Sullivan | 53.8 | 62.45 | 11.12 | 127.37 |
| **Total** | 358.22 | 481.87 | 257.87 | **1,097.96** |

### ii. Reasonable Rates

Next, the Court must determine the reasonable hourly rates for the attorneys and paralegals involved in this litigation.  The plaintiffs request the following rates: $975 per hour for Siri, Brehm, and Sullivan; $875 per hour for Cox; $850 per hour for Bruns; $825 per hour for Wiest; $775 per hour for Smith and Cline; and $240 per hour for the paralegals, Mannella and Tenney.  Dkt. No. 166 at 26.  The Court finds that each rate is reasonable for the relevant legal market in light of the attorneys' skill and experience.

The reasonable hourly rate is "calculated according to the prevailing market rates in the relevant community."  *Blum v. Stenson*, 465 U.S. 886, 895 (1984).  The "relevant market . . . is the community in which the district court sits."  *Tollett v. City of Kemah*, 285 F.3d 357, 368 (5th Cir. 2002) (quotation omitted).  The plaintiff must "produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably

comparable skill, experience and reputation." *Blum*, 486 U.S. at 895 n.11.  Usually, this is done "through affidavits of other attorneys practicing there," *Tollett*, 285 F.3d at 368, and courts may also consider "fee awards in the same district," *Casas*, 2023 WL 2727550, at *8 (quoting *Jiwani v. United Cellular, Inc.*, No. 3:13-CV-4243-M-BK, 2014 WL 4805781, at *4 (N.D. Tex. Sept. 29, 2014)).  A court should consider "an attorney's customary billing rate" if the rate "is within the range of prevailing market rates," *La. Power & Light Co.*, 50 F.3d at 328 (quoting *Islamic Ctr. of Miss., Inc. v. City of Starkville*, 876 F.2d 465, 469 (5th Cir. 1989), *abrogated on other grounds by City of Burlington v. Dague*, 505 U.S. 557 (1992)).  Finally, "trial courts are considered experts as to the reasonableness of attorney's fees," *Primrose Op. Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004), although "[t]he hourly fee awarded must be supported by the record" and cannot be based solely on the court's "own experience in the relevant legal market," *LULAC*, 119 F.3d at 1234.

Here, the parties disagree as to what constitutes the relevant community.  The defendants assert that the Court should consider the prevailing rates in Lubbock or San Angelo—the city in which the Court sits and the division in which this case was brought, respectively.  Dkt. No. 162 at 20.  The plaintiffs present evidence of rates in the Northern District of Texas, specifically the Dallas/Plano/Fort Worth market, in part through the declaration of Jonathan Mitchell.  *See* Dkt. Nos. 156 at 25; 157 at 8–9.  Further, the plaintiffs argue that they should receive the rates charged in their home districts because out-of-district counsel was necessary.  Dkt. No. 156 at 25.

Although the Court agrees that Lubbock or San Angelo is often the appropriate community, due to the unique circumstances of this case, it finds that the Northern District of Texas is the relevant community.  "Courts differ in defining the relevant community."

– 43 –

*Segovia v. Fuelco Energy LLC*, No. SA-17-CV-1246-JKP, 2024 WL 1161730, at *3 (W.D. Tex. Mar. 18, 2024) (collecting cases); *see, e.g.*, *Ramirez*, 197 F. Supp. 3d at 956 (considering the judicial district in which the court sits); *Veasey*, 2020 WL 9888360, at *8–9 (same); *Schlieper v. City of Wichita Falls*, No. 7:00-CV-045-R, 2003 WL 21355982, at *3 (N.D. Tex. June 6, 2003) (same); *Gill v. Bullzeye Oilfield Servs., LLC*, No. 5:15-CV-1166-DAE, 2018 WL 4770853, at *3 (W.D. Tex. Sept. 25, 2018) (considering the city in which the court sits). And "[i]n some circumstances, courts may agree that a local community rate is too restrictive and thus may exercise their discretion to expand the relevant community." *Segovia*, 2024 WL 1161730, at *4. For example, in *Bowman v. Prida Construction, Inc.*, the district court sitting in Galveston determined that out-of-district counsel was not necessary because the plaintiff had "overlook[ed] the rest of the Southern District." 568 F. Supp. 3d at 784. The court noted that many Houston lawyers handled the same kind of case at issue and that Houston lawyers also regularly practiced in the Galveston division. *Id.* Accordingly, it found that Houston was the relevant local market and adjusted the attorney's hourly rate upwards to match those rates. *Id.* A similar view of the relevant community is appropriate here.

The plaintiffs have presented evidence that there are no attorneys in Lubbock or San Angelo with the unique skillset, experience, or capacity to handle a matter of this size and scope. *See* Dkt. No. 157 at 7. Based on its experience in these legal communities, the Court concurs. The plaintiffs present the declaration of Jonathan Mitchell, who has practiced law in Texas for 13 years, previously served as the Solicitor General of Texas, regularly practices in this district, and is familiar with complex civil litigation in this district. *Id.* at 6. Mitchell testified that, based on his "knowledge of practitioners in those markets, and the complexity

of this litigation," he does not know of any practitioners in Lubbock or San Angelo who would be able to handle and succeed in this litigation. *Id.* at 7. This is confirmed by the declarations of Sergeant Robert Schelske, who was stationed in San Angelo, *see* Dkt. No. 1 ¶ 20, and Chrisman. Dkt. No. 157 at 141, 144. Both Schelske and Chrisman were unable to locate an attorney in San Angelo or Lubbock who was willing to take their case. Dkt. No. 157 at 141, 144. And although the defendants argue generally that other attorneys in Texas have brought similar cases against the vaccine mandate, they do not point to one such attorney based in Lubbock or San Angelo. *See* Dkt. No. 162 at 26.

However, there are lawyers in other divisions of the Northern District who have the skill and experience to litigate this matter. Mitchell also testified that "[t]here are firms in the Northern District of Texas who had the capacity to handle this matter," specifically larger firms or organizations located in Dallas, Fort Worth, or Plano. *Id.* at 7. And, of course, Sullivan practices in the Northern District. *See* Dkt. No. 26. The Court therefore considers the Northern District of Texas as the relevant legal market when determining a reasonable hourly rate for this case.

Next, the Court finds that the rates requested by the plaintiffs are in line with the prevailing Northern District rates for lawyers of similar skill, experience, and reputation. *See Blum*, 486 U.S. at 895 n.11. As an initial matter, the Court rejects out of hand the defendants' assertion that this case did not "require[] any specialized knowledge or experience" and was not "particularly novel or complicated compared to other run-of-the-mill civil rights matters." Dkt. No. 162 at 27. As discussed above, this case involved both complex facts and complex law—the details of the Army's vaccine exemption process, standing and mootness, class-action motions, deference to military affairs, and RFRA and

First Amendment issues. This was not a run-of-the-mill civil rights case, and plaintiffs'

counsel's rates should not be limited those of a run-of-the-mill case.

Both Mitchell and Sullivan testify that the requested rates are reasonable for

experienced litigators in the Dallas market. Dkt. No. 157 at 8, 129. For example, both

declarations state that attorneys with less experience charge higher fees. *Id.* Further,

Mitchell states that the vigorous litigation by the Department of Justice required

"substantial experience, expertise, and sophistication, as well as a large team—resources

that normally can be brought to bear only by a national firm." *Id.* at 7. As a result, the

Court concludes that hourly rates in line with large national firms in Dallas are reasonable.

The cases discussed by the defendants are also distinguishable. *See* Dkt. No. 162 at

21–22. *Kostic v. Texas A&M University-Commerce* involved a Title VII claim, First

Amendment and Due Process claims, and a defamation claim against a university and

officials. 2015 WL 9997211, at *5–6. Although that litigation undoubtedly involved many

claims and constitutional issues, those claims are much more common than RFRA and Free

Exercise Clause challenges to a military vaccine mandate. The discovery dispute in

*Architectural Granite & Marble, LLC v. Pental*, even in a complex civil matter, is still quite

different from the civil-rights litigation here—which also involved a fair share of discovery

disputes. *See* No. 3:20-CV-295-L-BK, 2023 WL 2825699, at *1, *3 (N.D. Tex. Jan. 29,

2023); Dkt. Nos. 66; 158. Wiest's prior COVID-19 cases were brought in different legal

markets and did not involve going head-to-head with the military and the DOJ. *See, e.g.*,

*Roberts v. Beshear*, No. 2:20-CV-054, 2022 WL 4592538, at *1 (E.D. Ky. Sept. 29, 2022).

And with regard to the rates sought by counsel in *Doster v. Kendall*, rates in the Southern

District of Ohio are standardized using a certain matrix. *See* Dkt. No. 176 at 4.

Finally, the Court concludes that each proposed billing rate is reasonable in light of the attorneys' expertise and experience, much of which is practically tailored to this case. Siri, Brehm, and Sullivan seek a rate of $975. Dkt. No. 166 at 26. Siri was admitted to the bar in 2005 and has litigated multiple civil-rights matters and class actions, and his practice has been "heavily focused on vaccine policy work" for the past seven years or more. Dkt. No. 157 at 25. Similarly, Brehm was admitted to the bar in 2009 and has over 13 years of litigation experience, including work on class-action litigation, and she "has worked almost exclusively on vaccine-related policy and litigation work" for about four years. *Id.* at 28. Sullivan was admitted to the bar in 2012, clerked on the Fifth Circuit, served as an Assistant Solicitor General for Texas, regularly works on religious liberty cases, and has brought similar class-action cases related to COVID-19 vaccine exemptions. *Id.* at 127–28. In light of these attorneys' skill and experience, the Court finds that their requested rate of $975 is reasonable for the Dallas legal market.

Next, Cox, Bruns, and Wiest seek rates of $875, $850, and $825, respectively. Dkt. No. 166 at 26. Cox has over 16 years of experience as an attorney for the Army, including as Chief Attorney of Federal Litigation, and has worked on vaccine policy and exemption cases while with Siri & Glimstad. Dkt. No. 157 at 29. Bruns has practiced law for over 33 years and has litigated multiple constitutional law cases in that time. *See id.* at 94, 104–05. Wiest was admitted to the bar in 2004, served as an Assistant Attorney General, practiced in a large international law firm, and has litigated in federal courts across the country. *Id.* at 72–73. Bruns and Wiest were also counsel in *Doster v. Kendall*, a class-action suit challenging the COVID-19 vaccine mandate and religious exemption policies in the Air

Force. *See id.* at 81, 104.  The Court determines that their requested rates are reasonable in the Dallas market for attorneys of their experience.

Smith and Cline seek rates of $775.  Dkt. No. 166 at 26.  Smith has been practicing law since 2016, has a wide variety of experience in general litigation and the interactions between employment law and constitutional issues, and now exclusively works on vaccine-policy cases.  Dkt. No. 157 at 30.  Cline has also been practicing law since about 2016, has served in three judicial clerkships, and has experience in constitutional, administrative, and employment law.  Dkt. No. 167 at 7.  Their requested rate is reasonable.

Mannella and Tenney seek paralegal rates of $240.  Dkt. No. 166 at 26.  Mannella has over 29 years of experience as a paralegal and has assisted in class-action, religious-exemption, and employment law matters.  Dkt. No. 157 at 30.  Tenney has over 11 years of experience in a variety of legal fields.  Dkt. No. 167 at 7–8.  The Court finds that the requested rate is appropriate for comparable paralegals in the Dallas legal market.

### iii.    Lodestar Calculation

As shown below, multiplying the reasonable number of hours expended by each attorney by his or her reasonable hourly rate results in a lodestar of $921,106.25.

| Attorney | Reasonable Hours | Reasonable Rate | Total Fee |
|---|---|---|---|
| Aaron Siri | 48.21 | $975 | $47,004.75 |
| Elizabeth Brehm | 48.16 | $975 | $46,956.00 |
| Wendy Cox | 269.97 | $875 | $236,223.75 |
| Dana Smith | 190.32 | $775 | $147,498.00 |
| Catherine Cline | 16.08 | $775 | $12,462.00 |
| Gina Mannella | 32.14 | $240 | $7,713.60 |
| Nicky Tenney | 10.16 | $240 | $2,438.40 |
| Christopher Wiest | 223.74 | $825 | $184,585.50 |
| Thomas Bruns | 131.81 | $850 | $112,038.50 |
| John Sullivan | 127.37 | $975 | $124,185.75 |
| **Total** | **1,097.96** | - | **$921,106.25** |

## C.    *Johnson* Factors

Although the lodestar amount is presumptively reasonable, the Court must consider the twelve *Johnson* factors and determine if an adjustment is necessary. *Jimenez*, 621 F.3d at 380. Here, the Court finds that no adjustment is necessary.

Many of the *Johnson* factors, including "the novelty and complexity of the issues, the special skill and experience of counsel, the quality of representation, and the results obtained from the litigation," are generally "subsumed within the initial calculation of the lodestar" and accordingly "cannot serve as independent bases for increasing the fee award." *Del. Valley Citizens' Council for Clean Air*, 478 U.S. at 565 (cleaned up). It is possible to upwardly adjust the lodestar based on those factors, but "such modifications are proper only in certain rare and exceptional cases." *Shipes v. Trinity Indus.*, 987 F.2d 311, 320 (5th Cir. 1993). The time limitations imposed and the preclusion of other employment are also often subsumed within the lodestar. *Id.* at 321–22. Further, the time and labor required and the customary fee are expressly contemplated in the lodestar analysis. *Jimenez*, 621 F.3d at 379. And the

Supreme Court has barred consideration of whether the fee is fixed or contingent.  *Dague*, 505 U.S. at 565.  After eliminating the superfluous *Johnson* factors, just three remain: the undesirability of the case, the nature and length of the professional relationship with the client, and awards in similar cases.  "[T]he party seeking modification of the lodestar under the *Johnson* factors bears the burden" of showing that the adjustment is appropriate.  *Fessler*, 23 F.4th at 416.

Here, the plaintiffs argue that the novelty and difficulty of the issues, the skill required to perform the legal services, the preclusion of other employment, the contingent fee, the limitations imposed by the circumstances, the amount involved and the results obtained, and the undesirability of the case warrant an upward adjustment.  *See* Dkt. No. 156 at 28–42.  On the other hand, the defendants claim that none of the factors support an upward adjustment and that, instead, the plaintiffs' limited success in this case may warrant an additional reduction to the lodestar.  Dkt. No. 162 at 42–44.

The Court finds that most of the factors cited by the plaintiffs are already accounted for by the lodestar.  For example, the difficulty of the issues and the skill required were part of the Court's considerations when determining a reasonable hourly rate.  *See supra* Section 3.B.ii.  The limitations imposed by the circumstances and the preclusion of other employment were largely reflected in the hours billed.  And the Court cannot consider the contingent nature of the fee.  *Dague*, 505 U.S. at 565.

As to the undesirability of the case, the plaintiffs note that the vaccine mandates were "a controversial, polarizing, and highly politicized issue," the unpopularity of religious objections to vaccination, especially in the military, and the high-risk nature of the litigation. Dkt. No. 156 at 38–39.  However, the defendants note that plaintiffs' counsel have not

shown that they, for example, "have faced hardship in their community that has had an economic impact on their practice."  Dkt. No. 162 at 43 (cleaned up) (quoting *Johnson*, 488 F.2d at 719).  The Court concludes that the plaintiffs have not borne their burden to show that the unpopularity of their position warrants further adjustment to the lodestar.

Both parties argue that the eighth factor, the results obtained, justify an adjustment. *See id.* at 44; Dkt. No. 156 at 32–33.  The plaintiffs point out that the original plaintiffs won a preliminary injunction that protected service members from further adverse actions and that the agreed order resolved the case in their favor.  Dkt. No. 156 at 32–33.  In contrast, the defendants note that the plaintiffs' success was limited when compared to the relief they sought, such as declaratory relief, policy-related relief, or class relief.  Dkt. No. 162; *cf.* Dkt. No. 92 at 33–35.  The Court finds that these considerations cancel each other out.  While the preliminary injunctive relief was meaningful, the original plaintiffs were all dismissed, and while Chrisman did achieve relief, it was limited to him.  Under these circumstances, the Court determines that an adjustment of the lodestar is unwarranted.  In addition, the Court has already reduced the lodestar when it was calculated by effectively eliminating many hours claimed by the plaintiffs before Chrisman was added, to account for the fact that Chrisman was the only prevailing party.  The Court declines to further reduce the award under the *Johnson* factors.

### D.    Costs

Finally, the Court considers the plaintiffs' claims for expenses and costs.  A prevailing party may recover his reasonable out-of-pocket expenses under Section 1988 "because they are part of the costs normally charged to a fee-paying client."  *Associated Builders & Contractors of La., Inc. v. Orleans Par. Sch. Bd.*, 919 F.2d 374, 380 (5th Cir. 1990).

The defendants object to compensation for travel costs for non-witness plaintiffs and to costs for tasks related to non-prevailing plaintiffs. Dkt. No. 162 at 42. However, the Court finds that all of the costs were reasonable and may be recovered. The Court grants the plaintiffs the requested costs of $21,240.94. *See* Dkt. Nos. 157 at 34, 79, 101, 138–39; 167 at 6–7.

4.    **Conclusion**

For the foregoing reasons, the Court grants in part the plaintiffs' motion for attorneys' fees and costs (Dkt. No. 155). It is ordered that the defendants must pay Chrisman $921,106.25 in reasonable and necessary attorneys' fees and $21,240.94 in costs, for a total of $942,347.19. The fees shall be disbursed as follows:

| Firm | Attorneys' Fees | Costs | Total |
|------|-----------------|-------|-------|
| Siri & Glimstad LLP | $500,296.50 | $13,079.04 | $513,375.54 |
| Christopher Wiest | $184,585.50 | $5,947.39 | $190,532.89 |
| Thomas Bruns | $112,038.50 | $854.76 | $112,893.26 |
| John Sullivan | $124,185.75 | $1,359.75 | $125,545.50 |
| **Total** | $921,106.25 | $21,240.94 | **$942,347.19** |

So ordered on August 16, 2024.

JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE